**ROBINSON BROG LEINWAND GREENE**                HEARING DATE:
  **GENOVESE & GLUCK P.C.**                                     HEARING TIME:
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
Fred B. Ringel
*Proposed Attorneys for the Debtors and Debtors*
*in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
                                                                          Chapter 11
In re:
**EAST VILLAGE PROPERTIES LLC,**               Case No. 17-22453 (RDD)
*et al.*,[1]
                                                                          (Jointly Administered)
                                       Debtors.
----------------------------------------------------------X

## MOTION TO SCHEDULE AN EMERGENCY HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER APPROVING THE INTERIM STIPULATION AND ORDER (A) AUTHORIZING AND DIRECTING USE OF CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION, AND (C) GRANTING RELATED RELIEF

TO THE HONORABLE ROBERT D. DRAIN
UNITED STATES BANRUPTCY JUDGE:

    **East Village Properties, LLC** and its affiliates (together, the "Debtors"), by their

proposed attorneys, **Robinson Brog Leinwand Greene Genovese & Gluck P.C.**, hereby

submit this motion (the "Motion") for an order scheduling an emergency hearing to approve

the interim Stipulation and Order (i) authorizing the use of cash collateral (as defined herein)

pursuant to 11 U.S.C. §§ 361 and 363 of Chapter 11 of Title 11 of the United States Code

(the "Bankruptcy Code"); (b) approving the form of adequate protection provided EVF1 LLC

---

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: East Village Properties LLC (1437); 223 East 5th Street LLC (8999); 229 East 5th Street LLC (8348); 231 East 5th Street LLC (4013); 233 East 5th Street LLC (8999); 235 East 5th Street LLC (1702); 228 East 6th Street LLC (2965); 66 East 7th Street LLC (1812); 27 St Marks Place LLC (1789); 334 East 9th Street LLC (7903); 253 East 10th Street LLC (4317); 325 East 12th Street LLC (0625); 327 East 12th Street LLC (7195); 329 East 12th Street LLC (0475); 510 East 12th Street LLC (1469); and 514 East 12th Street LLC (7232).

(the "Secured Creditor") pursuant to 11 U.S.C. §§ 361 and 363, and (c) granting related relief substantially in the form annexed hereto as Exhibit "A" (the "Stipulation")[2]. In support of the Motion, the Debtors set forth and allege as follows:

**JURISDICTION AND VENUE**

1.      Jurisdiction over this application is vested in the United States District Court for this District pursuant to Sections 1334 of Title 28 of the United States Code (the "Judicial Code").

2.      This application has been referred to this Court for consideration pursuant to Section 157 of the Judicial Code and the *Standing Order of Reference Regarding Title 11* (S.D.N.Y. Feb 1, 2012) (Preska, C.J.).

3.      This is a core proceeding arising under title 11 of the United States Code. *See* 28 U.S.C. §§157(b)(2). The statutory predicate for the relief sought herein is Bankruptcy Code Sections 361 and 363 and Rule 4001 of the Bankruptcy Rules.

4.      Venue of this motion in this district is proper pursuant to Section 1409 of the Judicial Code.

5.      On March 28, 2017, (the "Petition Date") the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. The Debtors have submitted an application to extend their deadline to file their schedules and statements of financial affairs.

6.      On April 6, 2017, this Court signed an order directing the joint administration of the Debtors' cases.

7.      No trustee, examiner or creditors committee has been appointed in the Debtors cases.

---

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms in the Stipulation. The terms of the Stipulation described herein are qualified in their entirety by the language of the Stipulation itself.

8.      The Debtors are in possession of their assets and are continuing to manage their property in accordance with sections 1107 and 1108 of the Bankruptcy Code.

9.      The Debtors own fifteen residential apartment building located in the East Village area of New York City located at 27 St. Marks Place, 514 East 12th Street, 223 East 5th Street, 229 East 5th Street, 231 East 5th Street, 233 East 5th Street, 235 East 5th Street, 66 East 7th Street, 253 East 10th Street, 510 East 12th Street, 228 East 6th Street, 325 East 12th Street, 327 East 12th Street, 329 East 12th Street and 334 East 9th Street (collectively, the "Properties").

## **BACKGROUND**

10.     The Debtors' Properties are encumbered by five mortgages granted to the Secured Creditor. As of the Petition Date, the Debtors are in default under each of the five notes and mortgages and owe the Secured Creditor the sum of $145,347,732.32. The following paragraphs set forth the capital structure of the Debtors in more detail.

The First Loan:

11.     On or about September 10, 2015, the Debtors duly executed and delivered to the Secured Creditor that certain Mortgage Note (the "First Note") dated September 10, 2015, evidencing a loan (the "First Loan") in the principal amount of $89,667,660.00. As security for the First Note, the Debtors duly executed and delivered that certain Mortgage and Security Agreement (the "First Mortgage", and together with the First Note, the "First Loan Documents") in favor of the Secured Creditor encumbering the Properties.

12.     The Debtors failed to comply with the terms and provisions of the First Loan Documents by failing to pay the monthly interest payments which came due on July 1, 2016 and August 1, 2016 (the "First Loan Default"), the Secured Creditor accelerated the First Loan.

The Second Loan:

13.     On or about September 10, 2015, the Debtors duly executed and delivered to the Secured Creditor, a second Mortgage Note (the "Second Note") dated September 10, 2015, evidencing a loan (the "Second Loan") in the principal amount of $20,000,000.00. As security for the Second Note, the Debtors executed a second Mortgage and Security Agreement (the "Second Mortgage", and together with the Second Note, the "Second Loan Documents") in favor of the Secured Creditor encumbering the Properties.

15.     The Debtors failed to comply with the cross-default terms and provisions of the Second Loan Documents by failing to pay the monthly interest payments for July 1, 2016 and August 1, 2016 on the other loans set forth herein (the "Second Loan Default").

16.     As a result of the Second Loan Default, the Secured Creditor accelerated the Second Loan.

The Third Loan:

17.     On or about September 10, 2015, the Debtors duly executed and delivered to the Secured Creditor, that certain Building Loan Note (the "Third Note") dated September 10, 2015, evidencing a loan (the "Third Loan") in the principal amount of $10,068,000.00. As security for the Third Note, the Debtors further duly executed and delivered that certain Building Mortgage and Security Agreement (the "Third Mortgage", and together with the Third Note, the "Third Loan Documents") in favor of the Secured Creditor, further encumbering the Properties.

19.     The Debtors failed to comply with the terms and provisions of the Third Loan Documents, by failing to pay the monthly interest payments for July 1, 2016, and August 1, 2016 (the "Third Loan Default").

20.     As a result of the Third Loan Default, the Secured Creditor accelerated the Third Loan.

The Fourth Loan

21.     On or about September 10, 2015, the Debtors duly executed and delivered to the Secured Creditor that certain Project Loan Note (the "Fourth Note") dated September 10, 2015, evidencing a loan (the "Fourth Loan") in the principal amount of $4,249,340.00. As security for the Fourth Note, the Debtors further executed and delivered to the Secured Creditor that certain Project Mortgage and Security Agreement (the "Fourth Mortgage", and together with the Fourth Note, the '"Fourth Loan Documents") in favor of the Secured Creditor, further encumbering the Properties.

23.     The Debtors failed to comply with the terms and provisions of the Fourth Loan Documents by failing to pay the monthly interest payments for July 1, 2016 and August 1, 2016 (the "Fourth Loan Default").

24.     As a result of the Fourth Loan Default, the Secured Creditor accelerated the Fourth Loan by letter.

The Fifth Loan

25.     On or about June 24, 2016, the Debtors duly executed and delivered to the Secured Creditor that certain Mortgage Note (the "Fifth Note" and together with the First Note, the Second Note, the Third Note and the Fourth Note, collectively, the "Notes") dated June 24, 2016, evidencing a loan (the "Fifth Loan" and together with the First Loan, the Second Loan, the Third Loan and the Fourth Loan, collectively, the "Loans") in the principal amount of $1,100,000.00. As security for the Fifth Note, the Debtors further executed and delivered to the Secured Creditor that certain Mortgage and Security Agreement (the "Fifth Mortgage", and together with the First Mortgage, the Second Mortgage, the Third Mortgage and the Fourth Mortgage, collectively. the "Mortgages") in favor of the Secured Creditor, with the Fifth

Mortgage (the Fifth Mortgage together with the Fifth Note, the "Fifth Loan Documents"), further encumbering the Properties.

27.     The Debtors failed to comply with the cross-default terms and provisions of the Fifth Loan Documents by failing to pay the monthly interest payments for July 1, 2016 and August 1, 2016 on the other loans set forth herein (the "Fifth Loan Default" and together with all aforementioned defaults, the "Defaults").

28.     As a result of the Fifth Loan Default, the Secured Creditor accelerated the Fifth Loan by letter.

29.     As a result of the aforementioned defaults, the Secured Creditor commenced an action to foreclose the Mortgages in the Supreme Court, State of New York, County of New York under Index No. 850052/2107 (the "Foreclosure Action").   In connection with the Foreclosure Action, an Ex-Parte Order Appointing a Temporary Receiver in a Foreclosure Action was entered on or about March 2, 2017, appointing Hon. Melvin L. Schweitzer as receiver (the "Receiver") over the Properties in the Foreclosure Action.

30.     Prior to the Receiver's motion to appoint a property manager and in anticipation of filing for chapter 11 protection, the Debtors' prior management – Brookhill Management and Raphael Toledano –were removed from all managerial authority of the Debtors and over the Properties by their Board including their Independent Director.

31.     Since the Petition Date, the Debtors and the Secured Creditor have been in constant and constructive negotiations regarding both a proposed term sheet for a global resolution with respect to the Secured Creditor's claims and the terms and conditions under a plan of reorganization to be proposed by the Debtors and for the consensual use of cash collateral.   The Debtors have since come to terms for a global resolution that will lead to a

consensual reorganization starting with the terms and conditions for the use of cash collateral in accordance with the attached proposed Stipulation.

32.     Some of the key terms of the Stipulation include, among other things:

a.     The Debtors and the Secured Creditor agree that as of Petition Date, the amount of the Secured Creditor's claims against the estates of the Debtors on account of the Loans (before applicable legal fees and costs, unless already included in the payoff statements attached hereto) is a sum not less than $145,428,538.38 (the "Secured Claim"), which sum shall continue to accrue pursuant to and in accordance with the terms of the Loan Documents.

b.     The Debtors have agreed, and have executed a new management agreement with Silverstone Property Group, LLC ("SPG"), which is annexed to the Stipulation, whereby SPG will immediately manage the Properties and collect all Cash Collateral and start making disbursements with the approval of GC Realty Advisors LLC ("GCRE"), the Debtors' manager;

c.     all Cash Collateral collected by SPG from Properties shall be deposited into bank accounts established by SPG which will be deemed debtor-in-possession bank accounts;

d.     upon approval of the Stipulation, the Secured Creditor is entitled, in its sole discretion, to make protective advances and pay outstanding pre and postpeptition real estate taxes due with respect to the Properties; and

e.     granting adequate protection to the Secured Creditor as set forth in the proposed Stipulation.

33.     Additionally, the Stipulation contains certain milestones, which the Debtors must

use their best efforts to comply with, including, among other things, filing a plan of reorganization and disclosure statement that will be agreed to between the Debtors and the Secured Creditor by May 4, 2017 and to be confirmed by September 15, 2017.

**THE DEBTORS' NEED TO USE CASH COLLATERAL**

34.    The Debtors have not used Cash Collateral through the date hereof without the written consent of the Secured Creditor.  Currently, the Debtors have insufficient cash, absent use of the Cash Collateral to meet their ongoing obligations to maintain and operate the Properties.  Specifically, the use of Cash Collateral is necessary in order for the Debtors to pay for ordinary operating expenses and maintenance and repairs to the Properties and provide services to its tenants.   It is imperative that the Debtors have access to Cash Collateral and that SPG immediately take control of the Properties in order to provide necessary services to tenants, including but not limited to oil deliveries for heat and hot water, which services Debtors' counsel has been advised are not currently being provided at certain of the Properties.

35.    The consequences of leaving the Debtors without access to the Cash Collateral and its anticipated rental revenue income will have a materially adverse effect on the Debtors' ability to operate and provide services to its tenants and to reorganize its financial affairs and will adversely affect the Debtors, their estates and their creditors.

**CASH COLLATERAL**

36.    All Cash Collateral will be collected by SPG from the Properties, which shall then be deposited in to bank accounts to be established by SPG (the "SPG Accounts") in the name of each respective Debtor.  The Debtors have not submitted a budget, because pursuant to the Stipulation, Cash Collateral will be used solely to pay post-petition operating expenses at the Properties at the direction of SPG with GCRE's approval.  Any and all disbursements on account

of the Debtors shall be made from the SPG Accounts and must be approved by GCRE, as follows: emergency repairs and ordinary course expenses, shall not require GCRE approval. All other disbursements shall require retroactive approval within 48 hours of notice of such disbursement, which notice will be provided once every calendar week. If the Secured Creditor or SPG does not provide such notice of disbursements once every calendar week, the Debtors may send a seven (7) day notice to cure. No response from GCRE shall be deemed approval of such disbursement. If GCRE objects to any such disbursement, such disbursement shall be deemed a permitted protective advance which will be added to the Secured Creditor's Secured Claim. Regardless of their classification, SPG shall provide notice to GCRE of all disbursements and advances. While the Cash Collateral will be used to pay post-petition operating expenses, the Secured Creditor may use its funds to make protective advances which include the payment of pre-petition debts of the Debtors, including pre-petition real estate taxes which are accruing interest at the effective rate of 24 percent.

## ADEQUATE PROTECTION

37    Parties with an interest in Cash Collateral are entitled to adequate protection. 11 U.S.C. § 363(e). Adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims. Thus, what constitutes adequate protection is decided on a case-by-case basis. *See, e.g.*, *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("the determination of adequate protection is a fact specific inquiry . . . left to the vagaries of each case"); *In re Realty Sw. Assocs.*, 140 B.R. 360 (Bankr. S.D.N.Y. 1992); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its

collateral during the reorganization process") (citation omitted).  The critical purpose of adequate protection is to guard against the diminution of a secured creditor's collateral during the period when such collateral is being used by the debtor in possession. *See 495 Cent. Park*, 136 B.R. at 631 ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Hubbard Power & Light*, 202 B.R. 680, 685 (Bankr. E.D.N.Y. 1996).

38.    To adequately protect the Secured Creditor with respect to the Cash Collateral utilized during these cases, to the extent that a reduction in the value of the Secured Creditor's prepetition liens without a corresponding reduction in prepetition obligations owed to the Secured Creditor by the Debtors under the Debtors prepetition loan documents (a "Diminution") exists, as adequate protection for any Diminution in the Secured Creditors collateral as security for the Loans (the "Collateral") the Secured Creditor shall receive:

a.    A superpriority administrative expense claim (the "Superpriority Claim") under Bankruptcy Code § 364(c)(l) and valid and perfected replacement security interests in and liens on, all of the Debtors' right, title and interest in and to all assets and properties of the Debtors, subject to certain carve outs for fees due to the United States Trustee, fees and expenses of Professional Persons as defined in the proposed Stipulation, certain limited fees payable to GCRE and no more than $25,000 for the commissions and expenses of any chapter 7 trustee appointed in these cases (exclusive of fees the trustee may incur to challenge the Secured Creditors claims and liens); and

b. valid perfected and enforceable security interests (the "Adequate Protection Liens") on all of the Debtors' pre and postpetition assets presently owned or hereinafter acquired, wherever located, of any kind and nature, including but not limited to the Collateral described in the Loan Documents together with the proceeds and products thereof, including but not limited to accounts receivable and rental income, wherever located whether in the Debtors' possession or that of third parties, under Bankruptcy Code §§ 364(c)(2) and (3); provided, however, that such replacement liens and security interests shall not attach to any claims or causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549 or the proceeds thereof.

39. Based on the foregoing, the adequate protection granted to the Secured Creditor is both fair and reasonable, and sufficient to satisfy the requirements of the Bankruptcy Code.

**RELIEF REQUESTED**

40. The Debtor seeks entry of the Stipulation substantially in the form annexed hereto as Exhibit "A" authorizing the Debtors' use of Cash Collateral and under the terms and conditions set forth herein and in the Stipulation, granting the Secured Creditor the adequate protection described in the Stipulation, and setting a final hearing pursuant to Bankruptcy Rule 4001.

41. For the reasons set forth herein, the Debtors require use of Cash Collateral to provide funds for the operation of the Debtors' Properties, including paying operating expenses and providing maintenance and repairs to the Properties for the benefit of the Debtors' estates and creditors as well as the Debtors' tenants. Section 363(c) of the Bankruptcy Code governs a

debtor's use of a secured creditor's cash collateral. Specifically, that provision provides, in

pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease
> in accordance with the provisions of this section [363].

11 U.S.C. §363(c)(2).  Further, section 363(e) provides that "on request of an entity that has

an interest in property . . . proposed to be used, sold or leased, by the trustee, the court, with

or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to

provide adequate protection of such interest." 11 U.S.C. §363(e).

42.    The Debtors have satisfied the requirements of sections 363(c)(2) and (e), and

should be authorized to use the Cash Collateral.  Also, as described above, the Debtors are

providing the Secured Creditor with Adequate Protection Liens on the prepetition collateral and

Superpriority Claims for and equal in amount to any aggregate Diminution in the value of the

Secured Creditors' security interests and liens in the prepetition collateral.  Accordingly, the

Court should grant the Debtors the authority to use their Cash Collateral under section 363(c)(2)

of the Bankruptcy Code.

## THE SCOPE OF THE CARVE OUT IS APPROPRIATE

43.    The proposed Stipulation subjects the Secured Creditors' security interests and

administrative expense claims to a carve out of up to $1,000,000 for professional fees, fees due

to GCRE, and up to $25,000 for any chapter 7 trustee (the "Carve Out").  The Carve Out is

similar to other terms created for professional fees that have been found to be reasonable and

necessary to ensure that a debtor's estate and any statutory committee can retain assistance from

counsel. *See Ames*, 115 B.R. at 40.

44.    In addition, the Secured Creditor is holding $675,000 of funds of the Debtors in an escrow account obtained prior to the commencement of these cases. From those funds, the Secured Creditor will, upon entry of the Stipulation, transfer the sum of $100,000 to Debtors' bankruptcy counsel and $50,000 to Debtors' special counsel as post-petition retainers that shall not be drawn upon except upon prior application to the Court and $32,000 to Debtors' counsel representing the chapter 11 filing fees for the Debtors' cases. Upon the filing of a plan, an additional $100,000 will be paid from the escrow account to Debtors' counsel as an additional post-petition retainer to be held by Debtors' counsel pending proper application to the Court. The remaining balance of the escrowed funds can be applied by the Secured Creditor to pay post-petition real property taxes for the Debtors' Properties.

45.    Without the Carve Out and post-petition retainers, the Debtors' estates or other parties-in-interest may be deprived of possible rights and powers because the services for which Professional Persons may be paid in these Chapter 11 Cases would be restricted or unavailable. *Id.* at 38 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve Out protects against administrative insolvency during the course of the case by ensuring that assets remain for the payment of U.S. Trustee fees and professional fees of the Debtors.

## THE DEBTOR REQUIRES IMMEDIATE ACCESS TO THE CASH COLLATERAL

46.    The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." FED. R. BANKR. P.4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts in this

jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

47.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors' ability to use cash collateral on an interim basis pending a final hearing is not granted promptly after the filing of this motion. The Debtors have insufficient cash to fund operations without immediate access to their Cash Collateral. Further, the Debtors anticipate that the commencement of these Chapter 11 Cases will significantly increase the demands on their cash as a result of, among other things, the costs of administering these Chapter 11 Cases, funding security deposits for utilities under section 366, and addressing tenant concerns with respect to the condition of the Debtors' Properties. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of its business, maintain their relationships with tenants, meet payroll, pay for maintenance and repairs, procure goods and services from vendors and suppliers and otherwise satisfy their operational needs, all of which are required to preserve and maintain the Debtors' value for the benefit of all parties in interest.

48.    In addition, the Secured Creditor is prepared to make significant protective advances to pay for expenses at the Properties to the extent that there may be shortfalls in operating funds. However, the Secured Creditor will not make such protective advances without the protections of the Stipulation including having the Properties managed by SPG.

## REQUEST FOR THE EMERGENCY AND FINAL HEARING

49.    As noted above, the Debtors need immediate access to cash collateral. Since the filing on March 28, 2017, the Debtors have not had access to their cash collateral and conditions at the Properties need to be normalized as soon as possible. Accordingly, the Debtors request that

an emergency hearing on the approval of the interim relief requested in the annexed Stipulation be scheduled for a hearing no later than **Friday April 14, 2017**, contemporaneously with other hearings scheduled in these cases.

50.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no later than 14 days after entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

51.    The Office of the United States Trustee was previously provided with a copy of the form of stipulation.  The Office of the United States Trustee provided counsel to the Debtors and Secured Creditor with their comments to the form of stipulation which comments have been incorporated into the Stipulation for which the Parties seek this Court's approval.  The Office of the United States Trustee supports entry of the Stipulation.

52.    The Debtors request that they be authorized to serve a copy of the signed Stipulation, which fixes the time and date for the final hearing on Cash Collateral by first class mail upon the Notice Parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rule 4001(c)(2).

**<u>NOTICE</u>**

53.    Notice of this Motion shall be provided pursuant to the Order to Show Cause entered by the Court.

54.    The Debtors propose giving notice of the Emergency Hearing to the Office of the United States Trustee, the Secured Creditor by its counsel, all parties who have filed notices of appearance in these cases, and the Debtors' thirty (30) largest unsecured creditors on a consolidated basis by overnight delivery and by facsimile or email to the extent such contact information is available to the Debtors.

55.    No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

**WHEREFORE**, the Debtors seek the entry of the Order authorizing the Debtors to use Cash Collateral; granting the Secured Creditor adequate protection, scheduling a final hearing in accordance with rule 4001 and such other and further relief as may be just and proper.

**Dated:**  New York, New York
        April 12, 2017

> **ROBINSON BROG LEINWAND GREENE**
>   **GENOVESE & GLUCK P.C.**
> **Proposed Attorneys for the Debtors**
> 875 Third Avenue
> New York, New York 10022
> 212-603-6300
>
> By:  /s/ A. Mitchell Greene
>         A Mitchell Greene
>         Fred B. Ringel

# **EXHIBIT A**

**KRISS & FEUERSTEIN LLP**
360 Lexington Avenue, Suite 1200
New York, New York 10017
Jerold C. Feuerstein, Esq**.**
Jason S. Leibowitz. Esq.
(212) 661-2900
(212) 661-9397 – facsimile

*Attorneys for EVFI LLC*

**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
Fred B. Ringel, Esq.
Lori A. Schwartz, Esq.
(212) 603-6300

*Proposed Attorneys for the Debtors and Debtors in Possession*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

_____

In re:

**EAST VILLAGE PROPERTIES LLC,
*et al.*[1]**,                          Case No. 17-22453-rdd

                                        (Jointly Administered)

                    Debtors.

_____


## INTERIM STIPULATION AND ORDER BETWEEN EVF1 LLC[2] AND THE DEBTORS, (I) AUTHORIZING AND DIRECTING USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION AND (III) GRANTING RELATED RELIEF

_____

[1] The Debtors in these chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows:  East Village Properties LLC (1437); 223 East 5th Street LLC (8999); 229 East 5th Street LLC (8348); 231 East 5th Street LLC (4013); 233 East 5th Street LLC (8999); 235 East 5th Street LLC (1702); 228 East 6th Street (2965); 66 East 7th Street LLC (1812); 27 St Marks Place LLC (1789); 334 East 9th Street LLC (7903); 253 East 10th Street LLC (4317); 325 East 12th Street LLC (0625); 327 East 12th Street LLC (7195); 329 East 12th Street LLC (0475); 510 East 12th Street LLC (1469); and 514 East 12th Street LLC (7232).
[2] EVF1 LLC was previously known as EVP1 LLC, however, on or about January 31, 2017, EVP1 LLC, filed a State of Delaware Certificate of Amendment with the State of Delaware Secretary of State Division of Corporations, whereby EVP1 LLC changed its name to EVF1 LLC.

East Village Properties LLC ("East Village"), 223 East 5th Street LLC ("223 East"), 229 East 5th Street LLC ("229 East"), 231 East 5th Street LLC ("231 East"), 233 East 5th Street LLC ("233 East"), 235 East 5th Street LLC ("235 East"), 228 East 6th Street LLC, ("228 East"). 66 East 7th Street LLC ("66 East"), 27 St. Mark's Place LLC ("27 St. Marks"), 334 East 9th Street LLC ("327 East"), 253 East 10th Street LLC ("253 East"), 325 East 12th Street LLC ("325 East"), 327 East 12th Street LLC ("327 East"), 329 East 12th Street LLC ("329 West"), 510 East 12th Street LLC ("510 East"), and 514 East 12th Street LLC ("514 East" and together with each of the aforementioned debtors, are collectively referred to herein as the "Debtors"), together with the Debtors prepetition secured mortgagee, and interested party, EVF1 LLC (the "Secured Creditor" and together with the Debtors, the "Parties") through their respective attorneys, have entered into this Stipulation and Order (the "Stipulation") for review and consideration by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") for the purposes of (i) authorizing the use of cash collateral (as defined herein) pursuant to 11 U.S.C. §§ 361 and 363 of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"); (b) approving the form of adequate protection provided to the Secured Creditor pursuant to 11 U.S.C. §§ 361 and 363, and (c) granting related relief, and respectfully represent as follows:

## **RECITALS**

The First Loan

**WHEREAS,** on or about September 10, 2015, the Debtors duly executed and delivered to the Secured Creditor that certain *Mortgage Note* (the "First Note") dated September 10, 2015, evidencing a loan (the "First Loan") in the principal amount of $89,667,660.00; and

**WHEREAS**, on or about September 10, 2015, as security for the First Note, the Debtors

duly executed and delivered that certain *Mortgage and Security Agreement* (the "<u>First Mortgage</u>", and together with the First Note, the "<u>First Loan Documents</u>") in favor of the Secured Creditor encumbering certain real properties owned by the Debtors (the "<u>Properties</u>"); and

**WHEREAS,** the Debtors failed to comply with the terms and provisions of the First Loan Documents by failing to pay the monthly interest payments which came due on July 1, 2016 and August 1, 2016 (the "<u>First Loan Default</u>"); and

**WHEREAS,** the Secured Creditor accelerated the First Loan by letter to Borrowers dated August 8, 2016; and

<u>The Second Loan</u>

**WHEREAS,** on or about September 10, 2015, the Debtors duly executed and delivered to the Secured Creditor, a second *Mortgage Note* (the "<u>Second Note</u>") dated September 10, 2015, evidencing a loan (the "<u>Second Loan</u>") in the principal amount of $20,000,000.00; and

**WHEREAS,** as security for the Second Note, the Debtors executed a second *Mortgage and Security Agreement* (the "<u>Second Mortgage</u>", and together with the Second Note, the "<u>Second Loan Documents</u>") in favor of the Secured Creditor encumbering the Properties; and

**WHEREAS,** Debtors failed to comply with the cross-default terms and provisions of the Second Loan Documents by failing to pay the monthly interest payments for July 1, 2016 and August 1, 2016 on the other loans set forth herein (the "<u>Second Loan Default</u>"); and

**WHEREAS,** as a result of the Second Loan Default, the Secured Creditor accelerated the Second Loan by letter to the Debtors dated August 8, 2016; and

<u>The Third Loan</u>

**WHEREAS,** on or about September 10, 2015, the Debtors duly executed and delivered

to the Secured Creditor, that certain *Building Loan Note* (the "Third Note") dated September 10, 2015, evidencing a loan (the "Third Loan") in the principal amount of $10,068,000.00; and

**WHEREAS,** on or about September 10, 2015, as security for the Third Note, the Debtors further duly executed and delivered that certain *Building Mortgage and Security Agreement* (the "Third Mortgage", and together with the Third Note, the "Third Loan Documents") in favor of the Secured Creditor, further encumbering the Properties; and

**WHEREAS,** Debtors further failed to comply with the terms and provisions of the Third Loan Documents, by failing to pay the monthly interest payments for July 1, 2016, and August 1, 2016 (the "Third Loan Default"); and

**WHEREAS,** as a result of the Third Loan Default, the Secured Creditor accelerated the Third Loan by letter to the Debtors dated August 8, 2016; and

The Fourth Loan

**WHEREAS,** on or about September 10, 2015, the Debtors duly executed and delivered to the Secured Creditor that certain *Project Loan Note* (the "Fourth Note") dated September 10, 2015, evidencing a loan (the "Fourth Loan") in the principal amount of $4,249,340.00; and

**WHEREAS,** on or about September 10, 2015, to secure the Fourth Note, the Debtors further executed and delivered to the Secured Creditor that certain *Project Mortgage and Security Agreement* (the "Fourth Mortgage", and together with the Fourth Note, the "Fourth Loan Documents") in favor of the Secured Creditor, further encumbering the Properties; and

**WHEREAS,** Debtors failed to comply with the terms and provisions of the Fourth Loan Documents by failing to pay the monthly interest payments for July 1, 2016 and August 1, 2016 (the "Fourth Loan Default"); and

**WHEREAS,** as a result of the Fourth Loan Default, the Secured Creditor accelerated the

Fourth Loan by letter to the Debtors dated August 8, 2016; and

The Fifth Loan

**WHEREAS,** on or about June 24, 2016, the Debtors duly executed and delivered to the Secured Creditor that certain *Mortgage Note* (the "<u>Fifth Note</u>" and together with the First Note, the Second Note, the Third Note and the Fourth Note, collectively, the "<u>Notes</u>") dated June 24, 2016, evidencing a loan (the "<u>Fifth Loan</u>" and together with the First Loan, the Second Loan, the Third Loan and the Fourth Loan, collectively, the "<u>Loans</u>") in the principal amount of $1,100,000.00; and

**WHEREAS,** on or about September 10, 2015, as security for the Fifth Note, the Debtors further executed and delivered to the Secured Creditor that certain *Mortgage and Security Agreement* (the "<u>Fifth Mortgage</u>", and together with the First Mortgage, the Second Mortgage, the Third Mortgage and the Fourth Mortgage, collectively. the "<u>Mortgages</u>") in favor of the Secured Creditor, with the Fifth Mortgage (the Fifth Mortgage together with the Fifth Note, the "<u>Fifth Loan Documents</u>"), further encumbering the Properties; and

**WHEREAS,** Debtors failed to comply with the cross-default terms and provisions of the Fifth Loan Documents by failing to pay the monthly interest payments for July 1, 2016 and August 1, 2016 on the other loans set forth herein (the "<u>Fifth Loan Default</u>" and together with all aforementioned defaults, the "<u>Defaults</u>"); and

**WIIEREAS,** as a result of the Fifth Loan Default, the Secured Creditor accelerated the Fifth Loan by letter to the Debtors dated August 8, 2016; and

**WHEREAS,** the Properties consist of, *inter alia,* multi-family residential apartment buildings; and

**WHEREAS,** as a result of the Defaults, the Secured Creditor commenced an action to foreclose the Mortgages before the Supreme Court, State of New York, County of New York (the "State Court") under Index No. 850052/2107 (the "Foreclosure Action"); and

**WHEREAS,** in connection with the Foreclosure Action, an *Ex-Parte Order Appointing a Temporary Receiver in a Foreclosure Action* was entered on or about March 2, 2017, appointing Hon. Melvin L. Schweitzer as receiver (the "Receiver") over the Properties in the Foreclosure Action; and

**WHEREAS**, in connection with the Foreclosure Action, the Receiver retained Howard W. Kingsley, Esq., as legal counsel to the Receiver (the "Receiver's Counsel"); and

**WHEREAS,** on March 28, 2017 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 the Bankruptcy Code; and

**WHEREAS**, the Debtors acknowledge and agree that the Notes and the Mortgages (the "Loan Documents") are legal, valid, and binding obligations of the Debtors, and further that the Loan Documents are enforceable against the Debtors in accordance with their respective terms and the Secured Creditor's Secured Claim (defined below) is a valid claim; and

**WHEREAS**, the Debtors acknowledge and agree that the Secured Creditor has duly perfected, valid, non-avoidable, first priority liens on and security interests in any pre-petition collateral (collectively, the "Pre-Petition Liens") to secure the obligations under the Loan Documents (collectively, the "Pre-Petition Obligations"); and

**WHEREAS**, the Pre-Petition Obligations, Pre-Petition Liens, and Loan Documents are not subject to counterclaims, rights of offset, claims, or other defenses of the Debtor of any kind; and

**WHEREAS,** all cash, accounts receivable and other proceeds in the Debtors' custody,

possession or control as of the Petition Date, and all cash, accounts receivable and other proceeds coming into the Debtors' possession or control after the Petition Date, constitute cash collateral within the meaning of § 363(a) of the Bankruptcy Code (the "Cash Collateral"); and

WHEREAS, prior to the commencement of the chapter 11 case, Brookhill Management and Raphael Toledano were removed from all managerial authority of the Debtors and at the Properties; and

WHEREAS, the Debtors and the Secured Creditor have agreed to the Debtors' use of the Secured Creditor's Cash Collateral to operate the Properties and to pay adequate protection to the Secured Creditor in accordance with the term set forth herein below, subject to the Bankruptcy Court's approval and entry of this Stipulation.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and between the Debtors and the Secured Creditor as follows:

1.      The foregoing recitals are incorporated by reference herein.

2.      The Debtors and the Secured Creditor agree that as of Petition Date, the amount of the Secured Creditor's claims against the estates of the Debtors on account of the Loans (before applicable legal fees and costs, unless already included in the payoff statements attached hereto) is a sum not less than $145,428,538.38 (the "Secured Claim") as set forth in the attached payoff statements, which sum shall continue to accrue pursuant to and in accordance with the terms of the Loan Documents.

3.      The Debtors have an immediate need for the use of Cash Collateral for the purpose of funding operations during  the pendency of the Chapter 11 Cases, and the Debtors have requested that the Secured Creditor consent to the Debtors' use of Cash Collateral pursuant to the terms and subject to the conditions set forth herein.

4.      Based on the various acknowledgments, representations, warranties, findings,

waivers, releases, and covenants contained herein, the Secured Creditor is willing to consent to the Debtors' use of Cash Collateral commencing on the date that this Stipulation is approved by the Court for the limited purposes and for the term set forth herein and otherwise in accordance with the terms and subject to the conditions contained herein.

5.       The Debtors hereby agree to the full amount, extent and validity of the Secured Claim, plus any interest accrued thereon, protective advances and fees and costs due or to become due in shall be made in accordance with the applicable loan documents in favor of the Secured Creditor.

6.       In addition to the foregoing, the Debtors shall use their best efforts to adhere to the following agreed upon schedule, under the direction of its manager, GC Realty Advisors LLC ("GCRE"), which will require that they file with the Bankruptcy Court:

  a.   an application to set a bar date, not later than April 21, 2017; and

  b.   a complete set of schedules, statements of financial affairs and other required documents not later than April 19, 2017; and

  c.   A Plan of Reorganization (the "Plan") and Disclosure Statement pursuant to an agreement[3] (the "Agreement") between the Secured Creditor and the Debtors, consistent with the Agreement and satisfactory to the Secured Creditor to be filed by the Debtors by or before May 4, 2017, provided, however, that if the Plan is not confirmed by September 15, 2017 (the "Deadline"), the Secured Creditor may elect not to proceed with the Plan, and in such case, will have no further obligation to perform under the Plan, and (ii) that if (a) the Secured Creditor has elected not to proceed with its obligations

---

3 The terms of which will be set forth more fully in the Debtors' Plan and Disclosure Statement.

under the Plan on account of the Debtors' failure and/or inability to confirm the Plan by the Deadline, or (b) in the event that the Debtor revokes its Plan: then the Secured Creditor may propose its own Plan of Reorganization for the Debtors, which shall be subject to the terms and conditions of the Agreement, and, provided the Secured Creditor's Plan adheres to the Agreement, the Debtors and their affiliates shall have no right to object to such Secured Creditor's Plan.

d.  All deadlines set forth herein <u>shall</u> (i) be subject to the Court's calendar and availability; and (ii) be subject to extension by written agreement between Debtors and Secured Creditor without further order of the Court.

7.  The Debtors have agreed to enter into a management agreement with Silverstone Property Group, LLC ("<u>SPG</u>" and/or "<u>Managing Agent</u>") in accordance with the form of agreement attached hereto, for the purposes of permitting SPG to operate the Properties on a day to day basis, which obligations shall include, but not be limited to collection of any and all Cash Collateral generated at the Properties from the date hereof through and including the date of confirmation of any consensual Plan to be filed by the Debtors, and to pay, subject-to approval by SPG and GCRE, operating expenses and payroll.  Any surplus shall be retained by the Secured Creditor consistent with the Agreement as additional Adequate Protection (as defined below) and any deficiency shall constitute a protective advance as defined below.

8.  All Cash Collateral collected by SPG from the Properties, shall be deposited in to bank accounts to be established by SPG (the "<u>SPG Accounts</u>") in the name of each respective Debtor.  The SPG Accounts shall be considered debtor-in-possession accounts and the only authorized signatories of such accounts shall be authorized signatories of SPG, provided,

however, that any and all disbursements made from the SPG property accounts must be approved by GCRE. as follows:  emergency repairs and ordinary course expenses shall not require GCRE approval. All other disbursements shall require retroactive approval within 48 hours of notice of such disbursement, which notice will be provided once every calendar week.  If the Secured Creditor or SPG does not provide such notice of disbursements once every calendar week, the Debtor may send a seven (7) day notice to cure.  No response from GCRE shall be deemed approval of such disbursement.  If GCRE objects to any such disbursement, such disbursement shall be deemed a permitted protective advance which will be added to the Secured Creditor's Secured Claim.   Regardless of their classification, SPG shall provide notice to GCRE of all disbursements and Advances, as defined below.  GCRE approvals of the Secured Creditor and/or SPG's advances from Cash Collateral may be obtained retroactively.

9.      If the Secured Creditor believes that GCRE has acted in a manner inconsistent with its fiduciary responsibilities to the Debtors, then the Secured Creditor may serve a  notice on GCRE with a copy to Debtors' counsel by email and overnight delivery specifying the manner in which GCRE has allegedly so acted and the specific acts that the Secured Creditor alleges must be taken to cure such alleged breach of duty. If such alleged breach of duty is not cured within ten (10) business days from the receipt of such notice, then the Secured Creditor may settle an order seeking the appointment of a Chapter 11 Trustee in the Debtors' cases by appropriate service of a notice of settlement  in accordance with the Federal Rules of Bankruptcy Procedure and applicable local bankruptcy rule.

10.     The Debtors shall immediately provide SPG with access to, and if requested, copies of, any and all non-privileged files in their possession related to management of the Properties, including, but not limited to maintenance records, environmental reports or tests, copies of all licenses and permits, personnel files, building plans, equipment manuals, records with respect to construction and/or capital improvements or expenditures at the Properties, utility

bills and records, insurance claim reports and other insurance records, multiple dwelling registrations, financial reports, tenant contact information, litigation records, leases, service contracts, filings or correspondence with the New York State Division of Housing and Community Renewal, the New York City Department of Housing Preservation and Development or any other city, state or other governmental agency or department, rent rolls and/or other documents relating to income at the Properties and/or the Debtors (the "Information").   The Debtors' obligation to provide SPG with access to the Information shall continue through and including the date that the Plan is confirmed.

11.     Secured Creditor shall, in its sole discretion, be entitled to make protective advances (the "Advances") in accordance with the Loan Documents to pay outstanding pre and post-petition real estate taxes due at the Properties or any other pre and post petition expenses, including, without limitation, maintenance and other capital expenditures, related to the Properties.  To the extent not otherwise repaid prior to the effective date of the Debtors' Plan, the amount of any such Advances will be added to the Secured Creditor's Secured Claim against the Debtors' estates as a superpriority administrative expense claim under Bankruptcy Code § 364(c)(l). Any Advances made by the Secured Creditor may be reimbursed to the Secured Creditor from Cash Collateral collected by SPG at the Properties.

12.     Secured Creditor shall, in its sole discretion, be entitled to utilize its Cash Collateral to pay outstanding post-petition real estate taxes due at the Properties or any other post-petition expenses, including, without limitation, maintenance and other capital expenditures, related to the Properties.

13.     Any remaining sums may be utilized by the Secured Creditor to pay other post-petition obligations[4] due at the Properties or to be applied to the Secured Creditor's Secured

---

[4] The Secured Creditor may, make protective advances to pay certain obligations due in connection with the

Claim in the following order: Advances, interest, and thereafter principal.

14.    Notwithstanding the foregoing, and for the avoidance of doubt, any Advances made by the Secured Creditor shall not dilute the payment of $9,500,000 to be paid to the Debtors' Estates to fund the Debtors' Plan (inclusive of the $1,000,000 Carve-out (as hereinafter defined)).

15.    On the date that this Stipulation is entered by the Bankruptcy Court, the Secured Creditor shall transfer from the Debtors' funds currently being held in escrow by the Secured Creditor the following amounts (a) $100,000.00 to Robinson Brog Leinwand Greene Genovese & Gluck P.C. ("Robinson Brog") as Debtors' bankruptcy counsel and $32,000.00 to cover the Debtors' chapter 11 filing fees, and (b) $50,000.00 to Goldberg Weprin Finkel Goldstein LLP ("Goldberg Weprin"), as special counsel and conflicts counsel to the Debtors, which post-retainer retainers shall not be drawn down without prior application in accordance with sections 330 and 331 of the Bankruptcy Code.    In addition, upon the filing of the Plan, the Secured Creditor shall advance the additional sum of $100,000.00 to the Debtors' counsel which post-retainer retainers shall not be drawn down without prior application in accordance with sections 330 and 331 of the Bankruptcy Code.    The foregoing $282,000.00, (the "Initial Professional Fees") shall be advanced from, and in reduction of a sum of $675,000.00 ("Escrow Funds") currently held in escrow by the Secured Creditor. Any remaining sums from the Escrow Funds

---

Properties, which include, without limitation, tenant buy out agreements, amounts due contractors in connection with the Properties, amounts due in connection with HPD liens, rent overages, prepaid rents, and security deposits (the "Property Related Obligations"), and any such advances, if made, become protective advances which amounts, to the extent not otherwise repaid prior to the effective date of the Debtors' plan of reorganization, will be added to the Secured Creditor's Secured Claims against the Debtors' estates, and such advances may diminish sums to be paid by the Secured Creditor, pursuant to, and in accordance with the Agreement, provided, however, that such advances shall not dilute the $9,500,000.00 payment to be made by Secured Creditor to the Debtors' Estates pursuant to the Agreement, inclusive of the $1,000,000.00 Carve-Out, unless provided by separate agreement between the Parties pursuant to, and in accordance with the Agreement.

not discussed herein, shall be applied by the Secured Creditor to pay or post-petition real estate taxes at the Properties.  For the avoidance of doubt, the post-petition disposition of the Escrow Funds utilized for the Initial Professional Fees shall be applied in reduction of any post-petition claims, agreed to be paid by the Secured Creditor in accordance with the Agreement.

16.    In addition, pending confirmation of the Debtors' plan, GC Realty Advisors shall continue to be the manager of all of the Debtors, responsible for all legal and financial matters, for which it will receive $10,000.00 per month for a maximum of six (6) months (or a total of $60,000.00).[5]

17.    To the extent that a reduction in the value of the Pre-Petition Liens without a corresponding reduction in the Pre-Petition Obligations owed to the Secured Creditor by the Debtors under the Pre-Petition Loan Documents (a "Diminution") exists, as adequate protection for any Diminution in the Secured Creditors collateral as security for the Loans (the "Collateral") the Secured Creditor shall receive:

    a.    A superpriority administrative expense claim (the "Superpriority Claim") under Bankruptcy Code § 364(c)(l) and valid and perfected replacement security interests in and liens on, all of the Debtors' right, title and interest in and to all assets and properties of the Debtors, subject only to (i) fees due the United States Trustee, pursuant to 28 U.S.C. § 1930 and 31 U.S.C. § 3717 ; (ii) all accrued and unpaid claims for unpaid fees, costs, and expenses, payable to estate professionals, retained by the Debtors whose retention is approved by the Bankruptcy Court pursuant to sections 327 or 328 of the

---

[5] Furthermore, the Parties agree that the Secured Creditor, shall pay the first $40,000.00 out of rents generated at the Properties and the remaining $20,000.00, if needed, shall come from those sums allocated by the Parties to pay professional fees pursuant to the Agreement.

Bankruptcy Code (the "Professional Persons," and the fees, costs and expenses of Professional Persons, the "Professional Fees") to the extent such Professional Fees are allowed by the Bankruptcy Court at any time on an interim or final basis, not to exceed $1,000,000; (iii) the fees due GC Realty Advisors (collectively, the "Carve-Out"), provided the Professionals are not in default under the terms of the Agreement and (iv) no more than $25,000.00 for the commissions, fees and expenses of any chapter 7 trustee appointed in these cases, provided, however, that none of those funds may be used to challenge or object to the Secured Creditor's claims and liens, and provided further, that the Secured Creditor has no liability for, or obligation to advance such funds.   From and after the declaration of any Event of Default, the Secured Creditor shall still be responsible for payment of the Carve Out up to the amount of $1,000,000.00,.   For the avoidance of doubt, provided the Professionals and the Debtor comply with the Agreement, the Carve Out shall be senior to any claims arising under or relating to any liens securing the Secured Creditor's Collateral including, without limitation, any administrative or superpriority claims and all forms of adequate protection liens or security interests and shall not be diminished due to any protective advances made by the Secured Creditor due to alleged cash shortfalls at the Properties funded by the Secured Creditor through protective advances or otherwise;

b. valid perfected and enforceable security interests (the "Adequate Protection Liens") on all of the Debtors' pre- and post-petition assets presently owned or

hereinafter acquired, wherever located, of any kind and nature, including but not limited to the Collateral described in the Loan Documents together with the proceeds and products thereof, including but not limited to accounts receivable and rental income, wherever located whether in the Debtors' possession or that of third parties, under Bankruptcy Code §§ 364(c)(2) and (3); provided, however, that such replacement liens and security interests shall not attach to any claims or causes of action arising under 11 U.S.C. §§ 544, 545, 547, 548, or 549 or the proceeds thereof.

18.    Within three (3) business days of this Stipulation being entered, the Debtors shall turnover any income and/or Cash Collateral in their possession as of the Petition Date to SPG for deposit into the appropriate accounts for the respective Debtors from which each of the Debtors' operations are being funded.  In the event that the Debtors receive any Cash Collateral after this Stipulation is entered, the Debtors shall similarly turn same over to SPG for deposit into the Debtors respective operating accounts within three (3) business days of receiving same.

19.    The Debtors are authorized, deemed to ratify, and adopt the Loan Documents as modified and supplemented herein. Except as specifically and expressly modified herein, the Secured Creditor's rights and remedies and the Debtors' obligations, consents, and requirements shall be governed in all respects by the terms and conditions of the Loan Documents, which are deemed incorporated herein, and which shall continue and be in full force and effect with respect to the Debtors' use of Cash Collateral. The Debtors assert that the Loan Documents, (as modified and supplemented herein), shall constitute valid, binding, and enforceable obligations of the Debtors in accordance with their terms. The Debtors are authorized to do and perform all acts, to make, execute, and deliver any and all agreements, assignments, instruments and documents and to pay all filing fees and recording fees to give effect to any of the terms and conditions of the

Loan Documents as modified and supplemented herein. To the extent necessary, each officer of

the Debtors, and such other individuals as may be so authorized by the Debtors, are hereby

authorized to execute and deliver each document necessary with respect to the Debtors' use of

Cash Collateral - such execution and delivery to be conclusive of their respective authority to act

in the names, and on the Debtors' behalf.

20.    The acknowledgments, representations, warranties, agreements, and findings

made above shall be binding on Debtors and their estates, creditors and any official committee of

unsecured creditors appointed in these Chapter 11 Cases (a "Committee"), and any trustee

subsequently appointed in these Chapter 11 Cases, provided, however, that if a Committee is

appointed, the Committee (or if a Committee is not appointed, any party in interest) shall have

ninety (90) days from the date of entry of the final order on this Stipulation to investigate and

challenge the Pre-Petition Obligations, Pre-Petition Liens, and Loan Documents and any of the

other acknowledgements, representations, warranties, agreements, waivers and findings made

above and bring any appropriate proceeding or thereafter be bound by the acknowledgments,

representations, warranties, agreements, waivers and findings made in this stipulation and order

(the "Challenge Period").

21.    Subject to expiration of the Challenge Period, this Stipulation shall be sufficient

evidence of the Secured Creditor's perfected post-petition liens and security interests, in and to

the Collateral, and shall be binding, enforceable, and perfected upon the entry of this Stipulation.

The Debtors are authorized and directed to execute such documents including, without

limitation, Uniform Commercial Code financing statements and to pay such costs and expenses

as may be reasonably required to perfect the Secured Creditor's security interest in the Collateral

as provided herein. The Secured Creditor is further authorized (but not required) to file and

record financing statements with respect to such security interests and liens, all such financing statements being deemed to have been filed or recorded on the Petition Date.

22.    The provisions of this Stipulation shall inure to the Secured Creditor's benefit and, subject to expiration of the Challenge Period, is binding upon the Debtors and their respective successors and assigns (including any trustee or other fiduciary herein appointed as the Debtors' legal representative in these Chapter 11 cases or in any succeeding cases under Chapter 7 or otherwise with respect to the properties of the estates of the Debtors).

23.    Any equity in the Collateral which the Secured Creditor holds as security for pre-Chapter 11 obligations due and owing to it from the Debtors, after payment in full of such pre Chapter 11 obligations, shall constitute further security for any and all obligations or indebtedness due and owing to the Secured Creditor from the Debtors following the Petition Date and as adequate protection to the Secured Creditor for the use by the Debtors of any Collateral which is also subject to the Secured Creditor's pre-Chapter 11 security interests, and, to the extent of the equity that the Secured Creditor may have had in the Collateral securing the pre-Chapter 11 obligations as of the Petition Date, in accordance with Bankruptcy Code § 361, any equity in the Collateral which the Secured Creditor holds as security for obligations due and owing to it from the Debtors, after payment in full of such Chapter 11 obligations, shall constitute additional security for the pre-Chapter 11 obligations of the Debtors owing to the Secured Creditor.

24.    The Secured Creditor is also hereby granted an allowed super-priority administrative claim as provided in Bankruptcy Code § 507(b) against the Debtors' respective estates which shall have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtors and over all administrative expenses or charges

against property arising in the Debtors' Chapter 11 cases or any superseding Chapter 7 cases, including without limitation those specified in Bankruptcy Code **§§** 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 1113 or 1114, subject to the Carve Out (as defined herein).

25.    Each of the following shall constitute an "Event of Default" for purposes of this Order:

a.    The Bankruptcy Court enters an order authorizing the sale of all, or substantially all of the Debtors' assets that does not provide for the payment in full to the Secured Creditor of its claims in cash upon the closing of the sale, unless otherwise agreed by the Secured Creditor in its sole and absolute discretion or is in accordance with the Agreement;

b.    The Bankruptcy Court enters an order granting relief from the automatic stay to a third party with respect to a material portion of the assets of the Debtors' estates;

c.    The Debtors' bankruptcy cases are either dismissed or converted to a Chapter 7 cases, pursuant to an order of the Bankruptcy Court, the effect of which has not been stayed;

d.    A Chapter 11 trustee, an examiner, or any other responsible person or officer of the Court with similar powers is appointed by order of the Bankruptcy Court, the effect of which has not been stayed;

e.    This Stipulation is reversed, vacated, stayed, amended, supplemented or otherwise modified in a manner which shall, in the sole opinion of the Secured Creditor; (i) materially and adversely affect the rights of the Secured Creditor hereunder, or (ii) materially and adversely affect the priority of any or all of

the Secured Creditor's claims and/or the liens granted herein;

    f.   The occurrence, subsequent to the Petition Date, of an event of default under the Loan Documents, as modified and supplemented herein. For the avoidance of doubt, any event of default under the Loan Documents occurring and/or existing as of the Petition Date or solely because of the commencement of the Debtors' bankruptcy cases on the Petition Date shall not constitute an Event of Default under this Order;

    g.   Non-compliance or default by the Debtors with any of the terms and provisions of this Order or the Loan Documents; provided, however. that said non-compliance or default shall not be deemed an Event of Default if curable and cured by the Debtors within five (5) business days after notice of such non-compliance or default is given to the Debtors through GCRE, Debtors' counsel, counsel to any Committee appointed in these cases and the United States Trustee by counsel to the Secured Creditor by electronic mail and overnight delivery

26.    With respect to an Event of Default which would result in the termination of the Debtor's ability to use cash collateral under this Stipulation and Order the Debtors shall have five (5) business days from the receipt of a default notice to cure such default. Such Notice shall be given to the Debtors by serving GCRE and the Debtors' counsel, counsel to any Committee appointed in these cases and the United States Trustee by email delivery and overnight mail.

27.    As consideration for the Secured Creditors performance under the Plan as set forth hereinabove, except as otherwise provided in the Agreement and under the terms of the Carve-Out, no expenses of administration of the Debtors' Chapter 11 cases or any future

proceeding which may result from such cases including liquidation in these Chapter 11 case or other proceedings under the Code, shall be charged against the Collateral pursuant to Bankruptcy Code § 506(c), upon entry of a final order, without the Secured Creditor's prior written consent and no such consent shall ever be implied from any other action, inaction or acquiescence by the Secured Creditor.

28.    The automatic stay, imposed by Bankruptcy Code § 362 shall be, and is hereby modified to the extent necessary, as to the Secured Creditor, with respect to the creation, perfection, and implementation of the Secured Creditor's post-petition liens and security interests in the Collateral, including, but not limited to its right to receive, collect and apply payment and proceeds in respect of the Secured Creditor's post-petition Collateral.

29.    There shall not at any time be entered in the Debtors' Chapter 11 cases or any succeeding Chapter 7 cases, any further order which authorizes (a) the use of cash collateral of the Debtors or the sale, lease or other disposition, out of the ordinary course of business, of property of the estates of the Debtors in which the Secured Creditor has an interest or (b) under Bankruptcy Code § 364, the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to the liens or security interests held by the Secured Creditor, or which is entitled to priority administrative status which is equal to or superior to that granted to the Secured Creditor herein, unless in either case:

a.    the Secured Creditor shall have given its prior written consent thereto; or

b.    such order requires that there shall first be indefeasibly paid in full to the Secured Creditor all of the Debtors' debts and obligations which arise or result from the Loan Documents and the obligations, security interests, and liens authorized herein.

30.     Commencing immediately, SPG shall remit to the Debtors and the Secured Creditor, on or before the twenty-first (21st) day of each month, copies of any and all financial information, including but not limited to any information concerning protective advances, for the previous month, as such information relates to the Properties, to permit the Debtors to file monthly operating reports and provide disbursement information on a debtor-by-debtor basis.

31.     On or before the twenty-eighth (28th) day of each month, the Debtors shall file, or cause to be filed, monthly operating reports for the prior month with the Bankruptcy Court, and will further provide copies of such operating reports to counsel for the Secured Creditor, and the UST. The Debtors may file a single monthly operating report as required by the Operating Guidelines and Reporting Requirement for Debtors in Possession and Trustees, issued by the Executive Office of United States Trustees (rev. 11/27/13) for the jointly administered debtors. However, the monthly operating report shall be filed on a consolidating (not consolidated) basis. The report shall contain on a consolidating basis the information required for each debtor that tracks and breaks out all of the specific information, e.g. receipts, disbursements, profit and loss statements, balance sheets and other required information on a debtor-by-debtor basis.

32.     SPG, with GCRE's approval, shall remit applicable fees to the UST as they come due, for the duration of these cases unless or until SPG is directed otherwise by further order of this Court, and such fees shall be paid by SPG either from Cash Collateral, or as part an Advance, which shall be added to the Secured Creditor's Secured Claims against the Debtors' estates.

33.     Nothing contained herein shall limit the Debtors' obligations to remain in compliance with the operational guidelines promulgated by the Office of the United States Trustee with respect to Chapter 11 Debtors or their fiduciary duties as debtors-in-possession.

34.    -Upon the Bankruptcy Court *So Ordering* this Stipulation, and in furtherance of the attached agreement, the Receiver, the Receiver's Counsel, and any other secondary appointees of the Receiver shall respectfully be discharged of their duties in connection with the Receiver, and the Properties, and the Receiver shall have no further duties and/or responsibilities with respect to the management and/or preservation of the Properties.

    a.    The Receiver and/or the Secured Creditor may present this Stipulation and Order to the Court in the Foreclosure Action to authorize the discharge of the Receiver's duties in the Foreclosure Action.

    b.    Within three (3) three business days of entry of this Stipulation, the Receiver shall provide to SPG, in writing, a list of all unpaid bills related to the operation of the Properties, and copies of any open invoices in the Receiver's possession.  In the event the Receiver receives invoices not otherwise known by him at the time this Stipulation and Order is entered, the Receiver shall promptly provide copies to the Debtor by emailing same to its counsel, c/o A. Mitchell Greene, Esq., at amg@robinsonbrog.com with a copy to counsel to the secured creditor, Jerold C. Feuerstein, Esq., at jfeuerstein@kandfllp.com.

35.    The provisions of this Stipulation and any action pursuant thereto shall be and remain in effect unimpaired and shall survive entry of any order which may be entered confirming a plan of reorganization of the Debtors or converting these cases from Chapter 11 to Chapter 7 and the terms and provisions of this Order, as well as the priorities, liens, and security interests created hereunder, shall continue in this or any other superseding case under the Code, and such liens and security interests shall maintain that priority as provided for in this Order until satisfied and discharged in full.

36.     Unless the Secured Creditor expressly consents in writing, no Plan confirmed in these cases shall impair, effect, amend or otherwise modify the Secured Creditor's rights under this Order or the Loan Documents.   Notwithstanding, this Order and the provisions contained herein shall terminate upon confirmation of the Debtor's Plan (as contemplated by the Agreement).

37.     This Stipulation has been negotiated in good faith and at arm's length between the Debtors and the Secured Creditor.

38.     No rights are created under this Stipulation for the benefit of any creditor of the Debtors, any other party-in-interest in the Debtors' bankruptcy cases, or any other persons or entities. or any direct. indirect or incidental beneficiaries thereof.

39.     The terms and conditions of this Stipulation shall: (a) be immediately enforceable pursuant to Bankruptcy Rule 8005, and (b) not be stayed absent (1) an application by a party in interest for such stay in conformance with such Bankruptcy Rule 8005, and (2) a hearing upon notice to the Debtors, the Secured Creditor, and the Office of the United States Trustee ("UST").

40.     The provisions of this Stipulation shall survive entry of any orders which may be entered confirming any Plan or which may be entered converting these bankruptcy cases from Chapter 11 to Chapter 7 of Bankruptcy Code.

41.     The terms and provisions of this Stipulation, as well as the claims and debtor-in-possession liens granted by this Stipulation, shall continue in these or any superseding case under the Bankruptcy Code, and shall continue notwithstanding any dismissal of the Debtors' bankruptcy cases, and such claims and debtor-in-possession liens shall maintain their priority as provided by this Stipulation until the obligations due the Secured Creditor are satisfied in full.

42.     To the extent that any of the provisions of this Stipulation shall conflict with any

of the provisions of the Loan Documents, this Stipulation is deemed to control and shall supersede the conflicting provision(s). To the extent that any of the provisions of this Stipulation shall conflict with any order of the Bankruptcy Court authorizing the Debtors to continue the use of pre-petition bank accounts, cash management systems and/or business forms, or any similar orders, then this Stipulation is deemed to control and supersede the conflicting provision(s) in said orders.

43.    The Secured Creditor and the Debtors may amend, modify or supplement any of the provisions of the Loan Documents (collectively, a "Modification") without further order of the Court, provided that (a) such Modification is not material, and (b) notice of such Modification is filed with the Court and given to the Committee - and if no Committee - to the 20 largest unsecured creditors, and the UST's counsel reasonably prior to the proposed effective date thereof, except that filing with the Bankruptcy Court shall not be required with respect to any Modification that in addition to being non-material is also technical and/or ministerial.

44.    The foregoing paragraph shall not apply to any forbearance or waiver by the Secured Creditor with respect to any Events of Default which may have occurred (and the foregoing provisions shall not limit or impair the Secured Creditor's absolute discretion to agree to such forbearance or waiver), provided that such forbearance or waiver is not itself conditioned upon the Debtors' agreeing to any Modification that is material.

45.    This Stipulation may be executed in any number of counterparts and by the different parties on separate counterparts.  Each such counterpart shall be deemed an original, but all such counterparts together shall constitute one and the same Stipulation.

**46.**    A final hearing to consider the Debtors' use of Cash Collateral shall be held on

**_____, 2017 at 10:00 a.m. before the Honorable Robert D. Drain, United**

States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of

New York, 300 Quarropas Street, White Plains, New York 10601.

47.    The Court shall retain exclusive jurisdiction to enforce and interpret the terms of

this Stipulation.

Dated:  New York, New York
          April __, 2017

**KRISS & FEUERSTEIN LLP**
*Attorneys for EVF1 LLP*


By: /s/ Jerold C. Feuerstein
      Jerold C. Feuerstein, Esq.
      Jason S. Leibowitz. Esq.
      360 Lexington Avenue, Suite 1200
      New York, New York 10017
      (212) 661-2900
      jfeuerstein@kandfllp.com
      jleibowitz@kandfllp.com

**ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.**
*Proposed Attorneys for the Debtors and
Debtors in Possession*


By: /s/ A. Mitchell Greene
      A. Mitchell Greene, Esq.
      Fred B. Ringe1, Esq.
      Lori A. Schwartz, Esq.
      875 Third Avenue
      New York, New York 10022
      (212) 603-6300
      amg@robinsonbrog.com
      fbr@robinsonbrog.com
      ls@robinsonbrog.com

Dated:  White Plains, New York
          April __, 2017

SO ORDERED:

_____
      U.S.B.J

**MRFS LLC**
**825 Third Avenue, 37th Floor**
**New York, NY 10022**
**Telephone: 646-472-1900**

RE:  Loan to:                          27 St Marks Place LLC, 514 East 12th Street LLC, 223,229,231,233,235 East
5th St LLC, 66 East 7th Street LLC, 253 East 10th Street LLC, 510, 325, 327,
329 East 12th Street LLC, 228 East 6th Street LLC, 334 East 9th Street LLC

Date of Loan:                          9/10/2015
Gross Loan Amount:               $   89,667,660.00

To Whom It May Concern:

In accordance with the recent request, please be advised that the outstanding indebtedness of the Borrower under the above-referenced loan as of the date
set forth below will be as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unpaid Principal Balance | | | | | : | $ | 89,667,660.00 |
| Nominal Interest  at | 9.00% | from | 9/10/2015 | to | 6/30/2016 | : | $ | 6,612,989.93 |
| Default Interest at | 24.00% | from | 7/1/2016 | to | 3/28/2017 | : | $ | 16,199,957.24 |
| Payments Received at Pay Rate | | | | | | : | $ | (4,265,122.50) |
| Late Fee | | | | | | : | $ | 14,353.75 |
| Exit Fee | | | | | | : | $ | 896,676.60 |
| Servicing Fee | | | | | | : | $ | 2,500.00 |
| Entity Fees | | | | | | : | $ | 794.08 |
| Legal Fees | | | | | | : | $ | 95,806.06 |
| Protective Advance Payments for ConEdison | | | | | | : | $ | 33,002.01 |

**Total Amount Due on:**        3/28/2017                          $      **109,258,617.16**

Please note that the per diem rate thereafter is:      $59,778.44
This payoff letter shall expire on:                        3/28/2017

Please be aware that we reserve the right to make adjustments to the above amounts in the  event that a mathematical, typographical, or clerical error has
occurred. This payoff letter shall not be binding until verified with Lender.

**MRTS LLC**
**825 Third Avenue, 37th Floor**
**New York, NY 10022**
**Telephone: 646-472-1900**

RE: Loan to:                                  27 St Marks Place LLC, 514 East 12th Street LLC, 223,229,231,233,235 East 5th St
                                              LLC, 66 East 7th Street LLC, 253 East 10th Street LLC, 510, 325, 327, 329 East
                                              12th Street LLC, 228 East 6th Street LLC, 334 East 9th Street LLC

Date of Loan:                                 9/10/2015
Gross Building Loan Amount:              $    10,068,000.00

To Whom It May Concern:

In accordance with the recent request, please be advised that the outstanding indebtedness of the Borrower under the above-referenced loan as of the date set
forth below will be as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Unpaid Principal Balance | | | | | | : | $ | 2,397,453.50 |
| Nominal Interest on $65,000.00 at | 9.00% | from | 9/10/2015 | to | 9/30/2015 | : | $ | 341.25 |
| Nominal Interest on $65,000.00 at | 9.00% | from | 10/1/2015 | to | 11/23/2015 | : | $ | 877.50 |
| Nominal Interest on $362,500.00 at | 9.00% | from | 11/24/2015 | to | 2/24/2016 | : | $ | 8,428.13 |
| Nominal Interest on $799,585.00 at | 9.00% | from | 2/25/2016 | to | 4/13/2016 | : | $ | 9,794.92 |
| Nominal Interest on $1,469,092.50 at | 9.00% | from | 4/14/2016 | to | 6/22/2016 | : | $ | 25,709.12 |
| Nominal Interest on $2,397,453.50 at | 9.00% | from | 6/23/2016 | to | 6/30/2016 | : | $ | 4,794.91 |
| Default Interest at | 24.00% | from | 7/1/2016 | to | 3/28/2017 | : | $ | 433,139.93 |
| Prepayment Premium | | | | | | : | $ | 423,375.50 |
| Exit Fee | | | | | | : | $ | 100,680.00 |
| Payments Received at Pay Rate | | | | | | : | $ | (33,297.21) |

**Total Amount Due on:**          3/28/2017                                              $          **3,371,297.54**

Please note that the per diem rate thereafter is:          $1,598.30
This payoff letter shall expire on:                        3/28/2017

Please be aware that we reserve the right to make adjustments to the above amounts in the  event that a mathematical, typographical, or clerical error has
occurred. This payoff letter shall not be binding until verified with Lender.

**MKPS LLC**
**825 Third Avenue, 37th Floor**
**New York, NY 10022**
**Telephone: 646-472-1900**

RE: Loan to:           27 St Marks Place LLC, 514 East 12th Street LLC, 223,229,231,233,235 East
5th St LLC, 66 East 7th Street LLC, 253 East 10th Street LLC, 510, 325, 327,
329 East 12th Street LLC, 228 East 6th Street LLC, 334 East 9th Street LLC

Date of Loan:         9/10/2015
Gross Project Loan Amount:   $  4,249,340.00

To Whom It May Concern:

In accordance with the recent request, please be advised that the outstanding indebtedness of the Borrower under the above-referenced loan as of the date set forth below will be as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Unpaid Principal Balance | | | | | | : | $ | 3,738,261.67 |
| Nominal Interest on $369,000.00 at | 9.00% | from | 9/10/2015 | to | 9/15/2015 | : | $ | 553.50 |
| Nominal Interest on $469,000.00 at | 9.00% | from | 9/16/2015 | to | 9/24/2015 | : | $ | 1,055.25 |
| Nominal Interest on $519,000.00 at | 9.00% | from | 9/25/2015 | to | 9/30/2015 | : | $ | 778.50 |
| Nominal Interest on $519,000.00 at | 9.00% | from | 10/1/2015 | to | 10/21/2015 | : | $ | 2,724.75 |
| Nominal Interest on $551,000.00 at | 9.00% | from | 10/22/2015 | to | 10/29/2015 | : | $ | 1,102.00 |
| Nominal Interest on $646,000.00 at | 9.00% | from | 10/30/2015 | to | 11/5/2015 | : | $ | 1,130.50 |
| Nominal Interest on $669,000.00 at | 9.00% | from | 11/6/2015 | to | 11/12/2015 | : | $ | 1,170.75 |
| Nominal Interest on $826,000.00 at | 9.00% | from | 11/13/2015 | to | 11/24/2015 | : | $ | 2,478.00 |
| Nominal Interest on $1,184,347.00 at | 9.00% | from | 11/25/2015 | to | 12/6/2015 | : | $ | 3,553.04 |
| Nominal Interest on $1,366,167.00 at | 9.00% | from | 12/7/2015 | to | 12/22/2015 | : | $ | 5,464.67 |
| Nominal Interest on $1,456,167.00 at | 9.00% | from | 12/23/2015 | to | 1/7/2016 | : | $ | 5,824.67 |
| Nominal Interest on $1,858,167.00 at | 9.00% | from | 1/8/2016 | to | 2/9/2016 | : | $ | 15,329.88 |
| Nominal Interest on $2,700,167.00 at | 9.00% | from | 2/10/2016 | to | 2/24/2016 | : | $ | 10,125.63 |
| Nominal Interest on $2,993,681.53 at | 9.00% | from | 2/25/2016 | to | 2/25/2016 | : | $ | 748.42 |
| Nominal Interest on $3,376,681.53 at | 9.00% | from | 2/26/2016 | to | 3/3/2016 | : | $ | 5,909.19 |
| Nominal Interest on $3,462,014.41 at | 9.00% | from | 3/4/2016 | to | 4/13/2016 | : | $ | 35,485.65 |
| Nominal Interest on $3,718,261.67 at | 9.00% | from | 4/14/2016 | to | 6/22/2016 | : | $ | 65,069.58 |
| Nominal Interest on $3,738,261.67 at | 9.00% | from | 6/23/2016 | to | 6/30/2016 | : | $ | 7,476.52 |
| Default Interest at | 24.00% | from | 7/1/2016 | to | 3/28/2017 | : | $ | 675,379.28 |
| Exit Fee | | | | | | : | $ | 42,493.40 |
| Bank Monthly Administration Fees | | | | | | : | $ | 55,000.00 |
| Payments Received at Pay Rate | | | | | | : | $ | (110,653.66) |

**Total Amount Due on:**    3/28/2017        **$  4,566,461.18**

Please note that the per diem rate thereafter is:  $2,492.17
This payoff letter shall expire on:     3/28/2017

Please be aware that we reserve the right to make adjustments to the above amounts in the event that a mathematical, typographical, or clerical error has occurred. This payoff letter shall not be binding until verified with Lender.

**MRPS LLC**
**825 Third Avenue, 37th Floor**
**New York, NY 10022**
**Telephone: 646-472-1900**

RE: Loan to:                    27 St Marks Place LLC, 514 East 12th Street LLC, 223,229,231,233,235 East
                                5th St LLC, 66 East 7th Street LLC, 253 East 10th Street LLC, 510, 325, 327,
                                329 East 12th Street LLC, 228 East 6th Street LLC, 334 East 9th Street LLC

Date of Loan:                   9/10/2015
Gross Loan Amount:          $      20,000,000.00

To Whom It May Concern:

In accordance with the recent request, please be advised that the outstanding indebtedness of the Borrower under the above-referenced loan as of the
date set forth below will be as follows:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Unpaid Principal Balance | | | | | | : | $ | 20,000,000.00 |
| Nominal Interest at | 20.00% | from | 9/10/2015 | to | 12/16/2015 | : | $ | 1,088,888.89 |
| Nominal Interest at | 20.25% | from | 12/17/2015 | to | 6/30/2016 | : | $ | 2,216,250.00 |
| Default Interest at | 24.00% | from | 7/1/2016 | to | 3/28/2017 | : | $ | 3,613,333.33 |

**Total Amount Due on:**          3/28/2017                                            **$      26,918,472.22**

Please note that the per diem rate thereafter is:        $13,333.33
This payoff letter shall expire on:                     3/28/2017

Please be aware that we reserve the right to make adjustments to the above amounts in the event that a mathematical, typographical, or clerical error
has occurred. This payoff letter shall not be binding until verified with Lender.

**MRFS LLC**
**825 Third Avenue, 37th Floor**
**New York, NY 10022**
**Telephone: 646-472-1900**

RE: Loan to:                                27 St Marks Place LLC, 514 East 12th Street LLC, 223,229,231,233,235 East
5th St LLC, 66 East 7th Street LLC, 253 East 10th Street LLC, 510, 325, 327,
329 East 12th Street LLC, 228 East 6th Street LLC, 334 East 9th Street LLC

Date of Loan:                               6/24/2016
Gross Loan Amount:                    $        1,100,000.00

To Whom It May Concern:

In accordance with the recent request, please be advised that the outstanding indebtedness of the Borrower under the above-referenced loan as of the date
set forth below will be as follows:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Unpaid Principal Balance | | | | | : | $ | 1,100,000.00 |
| Nominal Interest at | 18.50% | from | 6/24/2016 | to | 6/30/2016 | : | $ | 3,956.94 |
| Default Interest at | 24.00% | from | 7/1/2016 | to | 3/28/2017 | : | $ | 198,733.33 |
| Exit Fee | | | | | : | $ | 11,000.00 |

**Total Amount Due on:**          3/28/2017                                                        **$        1,313,690.28**

Please note that the per diem rate thereafter is:          $733.33
This payoff letter shall expire on:                              3/28/2017

Please be aware that we reserve the right to make adjustments to the above amounts in the  event that a mathematical, typographical, or clerical error has
occurred. This payoff letter shall not be binding until verified with Lender.

# PROPERTY MANAGEMENT AGREEMENT

This Property Management Agreement (this "Agreement") is made between **Silverstone Property Group, LLC** (hereinafter called "Agent") and the "Owners" and/or "Debtors" [1] and each a "Debtor") identified on that certain property management terms exhibit attached hereto as **Exhibit A** and made a part hereof (the "PMA Terms Exhibit"). Owner hereby appoints Agent as the exclusive managing agent for the "Property" identified on the PMA Terms Exhibit beginning on the "Effective Date" identified on the PMA Terms Exhibit.

## Section 1: Scope of the Agreement

A. Subject to and in accordance with the terms of this Agreement, Owner hereby authorizes Agent to undertake all of the following, in accordance with that certain Stipulation and Order between EVF1 LLC and Owner (I) Authorizing and Directing use of Cash Collateral, (II) Granting Adequate Protection and (III) Related Relief dated as of April ___, 2017 (the "Cash Collateral Agreement") in connection with the jointly administered bankruptcy matters of the Owner under the lead case In re East Village Properties LLC, Case No 17-22453-rdd (the "Bankruptcy"). In the event of any inconsistency between the terms of the Cash Collateral Agreement and the terms of this Agreement, the terms of the Cash Collateral Agreement shall govern.

    i. Act as the exclusive agent to lease, manage, operate and maintain the Property to the extent expressly set forth in this Agreement.

    ii. Collect and deposit all Property Funds (defined below). As used herein, "Property Funds" means all rentals, utility charges, common area charges, deposits, maintenance and insurance charges, vending machine income, license agreement income, concessionaire income, real estate and personal property tax and assessment charges, and any and all other charges and income derived from the Property.

    In accordance with the terms of the Cash Collateral Agreement, all Property Funds collected by the Agent from the Property, shall be deposited into bank accounts to be established by Agent (the "SPG Accounts") in the name of each Debtor, and each Debtor's respective real property. The SPG Accounts shall be considered debtor-in-possession accounts and the only authorized signatories of such accounts shall be authorized signatories of SPG, provided, however, that any and all disbursements made from the SPG

---

[1] The Debtors in the chapter 11 cases to which this Agreement pertains, and the last four digits of each Debtor's taxpayer identification number are as follows: East Village Properties LLC (1437); 223 East 5th Street LLC (8999); 229 East 5th Street LLC (8348); 231 East 5th Street LLC (4013); 233 East 5th Street LLC (8999); 235 East 5th Street LLC (1702); 228 East 6th Street (2965); 66 East 7th Street LLC (1812); 27 St Marks Place LLC (1789); 334 East 9th Street LLC (7903); 253 East 10th Street LLC (4317); 325 East 12th Street LLC (0625); 327 East 12th Street LLC (7195); 329 East 12th Street LLC (0475); 510 East 12th Street LLC (1469); and 514 East 12th Street LLC (7232).

Accounts must be approved by GCRE as the managing member for the Debtors as follows: emergency repairs and ordinary course expenses shall not require GCRE approval. All other disbursements shall require retroactive approval within 48 hours of notice of such disbursement, which notice will be provided once every calendar week. If SPG does not provide such notice of disbursements once every calendar week, the Debtor may send a seven (7) day notice to cure. No response from GCRE shall be deemed an approval of such disbursement by the Debtors. IF GCRE objects to any disbursement, such disbursement shall be deemed a permitted protective advance. Any inconsistencies between this Agreement the Cash Collateral Agreement, the Cash Collateral Agreement shall control. GCRE approvals of advances from Cash Collateral may be obtained retroactively.

iii. Make and/or supervise the making of maintenance, repairs, renovations, alterations and improvements including, but not limited to, electrical, plumbing, steam fitting, carpentry, masonry and any other routine repairs and incidental alterations as may be required in the course of ordinary maintenance and care of the Property.

iv. Enter into service contracts in the ordinary course, for utility readings, roofing, plumbing, electricity, gas, mechanical maintenance, elevator maintenance, insurance, tax reduction proceedings, inspections, fire protection services, telephone, window cleaning, rubbish removal, fuel oil, vermin extermination and other services or such of them as shall be advisable as determined by Agent; provided that such contracts are for a term of one (1) year or less. In addition, Agent shall use commercially reasonable efforts to ensure that such contracts are terminable without cause on no more than thirty (30) days' notice without payment of material penalty or premium.

B. Subject to and in accordance with this Agreement, Agent shall:

i. List, offer for lease and renew existing leases for space in the Property, as agent for Owner and cooperate with any brokers with whom the Agent, acting as agent for Owner, in its discretion, may list space in the Property for rent.

ii. Prepare or cause to be prepared lease documents for all space in the Property which may be rented.

iii. Supervise the moving in and out of tenants and arrange the dates thereof so that there shall be a minimum of disturbance to the operation of the Property and of inconvenience to other tenants.

iv. Acting as agent for Owner, bill, or cause to be billed tenants for rent and other charges.

2

v.      Hire and retain attorneys selected by Agent on behalf of the Debtor, at
        Owner's cost and expense, to handle collections from tenants for rent
        and other charges, as well as to handle other issues with tenants, subject
        to Bankruptcy Court approval

vi.     Acting as agent for Owner, use commercially reasonable efforts to
        collect or cause to be collected rent and other charges.

vii.    Check all bills received for services, work, and supplies ordered in
        connection with maintaining and operating the Property and disburse
        and pay or cause to be paid all such bills as well as all other Operating
        Expenses, as and when the same shall become due and payable, but only
        to the extent of funds available from receipts derived from the Property
        or funds supplied by Owner.  As used herein, "Operating Expenses"
        means the following:   all costs and expenses of maintaining and
        operating the Property, including without limitation, (i) each and every
        installment payable under or pursuant to each mortgage or ground lease
        affecting the Property, (ii) water charges, (iii) steam charges, (iv)
        insurance premiums, (v) sewer rents, (vi) assessments, (vii) real estate
        taxes and assessments levied against the Property (provided that Agent
        shall take such actions with respect to protesting such taxes or the
        assessments upon which they are based as may be directed by Owner),
        (viii) advertising expenses, (ix) expenses for repairs and maintenance,
        (x) all payments due under contracts entered into by Agent on behalf of
        Owner as contemplated by this Agreement, (xi) rental sales tax with
        respect to Property leases (if applicable), and (xii) all operating
        expenses incurred in the proper management, operation or protection of
        the Property.

viii.   Consider and, when reasonable and consistent with the leases of the
        tenants occupying the Property, as the agent for Owner, attend to
        complaints of tenants; any costs and expenses incurred by the Agent in
        this regard shall be at the Owner's expense.

ix.     Maintain records to properly account for income and expenses relating
        to the Property.

x.      Cause the Property to be maintained in good condition.

xi.     Agent shall maintain complete, accurate and separate books and records
        of account for the Property covering the renting, maintenance and
        operation of the Property. The accounting entries in these books and
        records shall be supported by documentation sufficient to ascertain that
        the entries are properly and accurately recorded for the Property. Agent
        shall keep copies of all the Property records on a current basis.

xii. Agent shall Provide to Owner within a reasonable time after request therefor, such monthly, quarterly and/or annual operating statements with respect to the Property as Owner shall reasonably request.

## Section 2: Compensation

The compensation set forth in this Section 2 shall be paid in accordance with the terms of the Cash Collateral Agreement.

A. <u>Management Fee</u>:

    i. During the term of this Agreement, the Owner shall pay to the Agent the "Management Fee" identified on the PMA Terms Exhibit.

    ii. Agent may at any time after the first day of any month deduct and pay from the SPG Accounts, monthly in arrears, an amount equal to the Management Fee for the preceding month.

B. <u>Leasing Fee</u>: Upon the execution of any new Rent/Lease Agreement ("RLA"), Owner shall pay Agent the applicable fee as set forth in the "Leasing Fee" Section of the PMA Terms Exhibit for each new residential unit and/or commercial lease for costs associated with the application, credit checks, marketing, showings and broker interactions required to secure qualified tenants. Owner shall pay Agent the applicable fee as set forth in the "Leasing Fee" Section of the PMA Terms Exhibit for renewals of Residential Units and Commercial Units. All such amounts may be deducted by Agent from the SPG Accounts as and when incurred.

C. Owner shall reimburse Agent for reasonable office overhead.

## Section 3: Term of Agreement

A. Subject to subsection B below, the term of this Agreement shall commence on the Effective Date and shall continue for the number of months set forth on the PMA Terms Exhibit, and will thereafter automatically renew for one (1) year periods, unless terminated (after the applicable term or renewal period only) by either party no less than thirty (30) days prior to any expiration.

B. <u>Termination</u>: This Agreement may not be terminated, except with the approval of the bankruptcy court overseeing the bankruptcy of the Owner or upon the earlier of (i) confirmation of the Plan or (ii) sale of the property, in accordance with the Bankruptcy (the "Bankruptcy Court"),

C. Upon any termination of this Agreement, the parties shall account to each other with respect to all uncompleted business (including, but not limited to, payment by the Owner of all amounts payable to the Agent or any other party under this Agreement), and the Agent shall deliver to the Owner all leases, permits,

4

subleases, corporate files, plans, licenses, contracts, correspondence, books and records and other instruments relating to the Property and the Owner that may be in the possession of the Agent, as well as all equipment, supplies, keys, locks, safety-combinations, and advertising and promotional materials developed, maintained, kept or possessed by Agent with respect to the Property. The Agent shall deliver to the Owner:

    i. a final accounting, reflecting the income and expenses of the Property up to the effective date of termination, which accounting shall be delivered to the Owner within thirty (30) days after such effective date;

    ii. any balance of monies of the Owner held by the Agent with respect to the Property (less monies owed), which monies shall be delivered to the Owner promptly upon such termination;  and

    iii. any lists or information prepared by Agent with respect to prospective tenants of the Property.

**Section 4: General Provisions**

A. **Representations:** Each person signing this Agreement on behalf of Owner or Agent hereby warrants and represents to the other party hereto that he or she has the lawful and proper responsibility and authority to execute this Agreement as provided herein. In addition, if either party has executed this Agreement as a corporation, partnership, or limited liability company, such party further represents and warrants that (i) it is duly authorized and existing under the laws of the applicable state of its organization, (ii) it is in good standing under the laws of such applicable state, (iii) if required by applicable law, it is qualified to do business in the state in which the Property is situated, (iv) it has full right and authority to execute this Agreement, and (v) this Agreement constitutes a valid and binding obligation, enforceable in accordance with its terms.

B. **Access and Records:** Owner shall provide to Agent 24/7 access to the Property and Owner shall provide access and copies of all records for the Property in Owner's possession to Agent within a reasonable time after the Effective Date.

C. **Attorney's Fees**: If either party shall institute any action or proceeding against the other relating to the provisions of this Agreement, the unsuccessful party in the action or proceeding shall reimburse the prevailing party for all reasonable expenses and attorneys' fees and disbursements.

D. **Assignment; Successors and Assigns:**  Neither party shall have the right to assign this Agreement without the prior written consent of (a) the other party and (b) the Bankruptcy Court.

E. **Governing Law:** This Agreement shall be governed by the laws of the State of New York.

F. **Independent Contractor Status:** This Agreement shall not in any manner be construed to be a partnership agreement and both parties expressly agree that this Agreement establishes an independent contractor relationship.

G. **Indemnity; Insurance:**

(i)     The Owner will indemnify, defend and hold harmless the Agent and its directors, officers, managers, members and employees from cost, loss, damage or expense (including, but not limited to, reasonable attorney's fees and disbursements) resulting from (i) fraud, willful misconduct or gross negligence of the Owner, or (ii) any action or claim against the Agent arising out of the performance of the Agent's obligations hereunder; provided that such performance was within the scope of the Agent's authority under this Agreement or based upon the direction of the Owner or the Bankruptcy Court, and such action or claim does not arise, in whole or in part, due to fraud, willful misconduct or gross negligence on the part of the Agent, or any of Agent's employees or agents. The provisions of this Section shall survive the expiration or sooner termination of this Agreement.

(ii)    Agent will indemnify, defend and hold harmless the Owner and each of its directors, officers, managers, members and employees from cost, loss, damage or expense (including, but not limited to, reasonable attorney's fees and disbursements) resulting from (i) fraud, willful misconduct or gross negligence on the part of the Agent, or any of Agent's employees or agents, (ii) any act or omission adjudged to be a material breach by Agent or its officers, directors, agents, or employees, of the terms of this Agreement. The provisions of this Section shall survive the expiration or sooner termination of this Agreement.

(iii)   Agent shall maintain in effect throughout the term of this Agreement, insurance policies in compliance with the insurance requirements described on Exhibit B attached hereto. Owner shall reimburse Agent for the costs and expenses associated with the insurance required by this Agreement.

(iv)    Owner and Agent (each, a "Waiving Party") each hereby waives and releases all rights of recovery against the other and the other's agents and employees on account of loss and damage to the property of the Waiving Party to the extent that such loss or damage is insured against under any insurance policies carried by the Waiving Party; provided, however, that the foregoing waiver shall not apply to the extent of deductibles under any such policies. By this waiver it is the intent of the parties that neither Owner nor Agent or their respective agents or employees shall be liable to the Waiving Party or any insurance company (by way of subrogation or otherwise) insuring the Waiving Party for any loss or damage actually insured against

6

under any such insurance policies, even though such loss or damage might be occasioned by the negligence of the other party, or its agents or employees.

(v)      Owner shall include in each of its policies of property damage insurance for the Property, including rent insurance, a waiver of the insurer's right of subrogation against Agent, and the officers, directors, managers, members and employees of Agent if such waiver is obtainable without material cost, or, if such waiver at any time is or becomes unobtainable or is obtainable only at a material cost, (i) an express agreement that such policy shall not be invalidated if the insured waives or has waived before the loss the right of recovery against any party responsible for an insured casualty, or (ii) any other form of permission for the release of such responsible party, provided such waiver, agreement or permission is obtainable under normal commercial insurance practice at the time without material cost.

H.    **Authority and Payment of Costs; Expense Reimbursement:** The parties acknowledge and agree that, except as otherwise provided herein, any and all obligations, costs or expenses incurred by the Agent in the performance of its obligations under this Agreement shall be borne by the Owner and not by the Agent. Any payments which are to be at the Owner's expense and which are to be made by the Agent hereunder shall be made out of such funds as the Agent may from time to time hold for the account of the Owner in the SPG Accounts or out of funds provided by the Owner for such purpose. The Agent shall not be obligated to make any advance to, or for the account of, the Owner or to pay any amount which is expressly stated in this Agreement to be at the Owner's expense except out of funds held or provided as aforesaid, nor shall the Agent be obligated to incur any extraordinary liability or obligation on behalf of the Owner unless the Owner shall furnish the Agent with the necessary funds for the discharge thereof. If the Agent shall voluntarily advance for the Owner's account any amount for the payment of any obligation or expense which is expressly stated in this Agreement to be at the Owner's expense, Agent shall properly account for such advance and the Owner shall, upon reasonable prior notice from Agent, reimburse the Agent therefor. Amongst those costs and/or expenses which shall be reimbursable by Owner to Agent shall be, by way of example, but not limitation, printing of checks, bookkeeping expenses, software-related expenses, bank fees, long distance telephone calls, cleaning supplies, stationary, postage and ordinary travel expenses, all of which shall be paid on or about the first (1st) day following the previous month in which such costs and/or expenses were incurred by the deducting by Agent of such amount(s) from the SPG Accounts.

I.    **Limitations on Authority:** Notwithstanding any provision in this Agreement to the contrary, it is hereby agreed that Agent is in any event not authorized and shall not (i) convey or otherwise transfer or pledge or encumber any property or other asset of Owner, (ii) pledge the credit of Owner, (iii) borrow money or execute any

7

promissory note or other obligation or mortgage deed, security agreement or other encumbrance in the name of or on behalf of Owner, or (iv) do any act in contravention of this Agreement or which would make it impossible to carry on the business of Owner.

J. **Risk of Loss:** Owner bears all risk of loss or damage to the Property and bears all the cost of any insurance covering the loss or damage to the Property.

K. **Modification:** This Agreement may not be changed, modified or discharged except by instrument signed by each of the Owner and the Agent, and approved by the Bankruptcy Court.

L. **Invalid Provisions:** If any term or provision of this Agreement or the application thereof to any person or circumstances shall, to any extent, be held, by a court of competent jurisdiction, to be invalid or unenforceable, the remainder of this Agreement, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by law.

M. **Copies of Agreement; Signatures**: The parties agree that (i) an electronic signature shall be considered an original signature, and (ii) a copy of the fully executed Agreement shall be considered an original instrument, and each, together or separately, shall become binding and enforceable as if original and the parties may rely on the same to prove the authenticity of this Agreement.  This Agreement may be executed in one or more counterparts, each of which shall be considered an original instrument, but all of which shall be considered one and the same agreement, and shall become binding when one or more counterparts have been signed by each of the party and delivered to the other party.

N. **Emergencies**:  In the event of emergencies, Agent shall take whatever actions which, in Agent's opinion, using reasonable business judgment, are immediately required to be made for the preservation and safety of the Property, to avoid the suspension of any essential service to or for the Property or to avoid danger to life or property at the Property, and notwithstanding any provision in this Agreement to the contrary, in such event Agent may make expenditures or enter into temporary contracts without Owner's consent to stabilize the emergency situation.

O. **Address of Record:** Any notice required or permitted to be delivered by this Agreement shall be deemed to be delivered when received (or when receipt is refused) when sent by nationally recognized overnight courier or certified mail, return receipt requested, addressed to respective addresses contained on the signature page to this Agreement (the "Address of Record").

P. **Subordination**. This Agreement shall not constitute an interest in real estate. Owner and Agent hereby acknowledge that this Agreement is a personal service

8

contract and is not an instrument that runs with the land. This Agreement shall in all events be subject and subordinate to any mortgage, deed of trust, ground lease or underlying lease now or hereafter encumbering the Property or any portion thereof. In confirmation of such subordination, Agent shall execute and deliver to the holder of such mortgage, deed of trust, ground lease, underlying lease or beneficiary of such deed of trust such subordination instruments as the holder may request within ten (10) days after such request. The parties hereto also agree to make such modifications to this Agreement as may be reasonably requested by the holder or holders of any such mortgages, ground leases, underlying leases or beneficiary or beneficiaries of any such deed of trust.

[SIGNATURE PAGE FOLLOWS]

9

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, as of the date set forth hereinabove.

Owner:                                          Agent:
**27 St Marks Place LLC**                        **Silverstone Property Group, LLC**
**223 East 5th Street LLC**                      825 3rd Ave. FL 37
**229 East 5th Street LLC**                      New York, NY 10022
**231 East 5th Street LLC**                      Phone: (646) 786-8000
**233 East 5th Street LLC**
**235 East 5th Street LLC**
**228 East 6th Street LLC**
**66 East 7th Street LLC**
**334 East 9th Street LLC**
**253 East 10th Street LLC**
**325 East 12th Street LLC**
**327 East 12th Street LLC**
**329 East 12th Street LLC**
**510 East 12th Street LLC**
**514 East 12th Street LLC**
2329 Nostrand Avenue, Suite M300
Brooklyn, NY 11210
Phone: (646) 472-1900


By: _____          By: _____
David Goldwasser, Managing Member          Brian Shatz, Authorized Signatory

**EXHIBIT A**

**PMA Terms Exhibit**

**Section 1: General Information**

a) **Owner:** 27 ST MARKS PLACE LLC, 514 EAST 12TH STREET LLC, 223 EAST 5TH STREET LLC, 229 EAST 5TH STREET LLC, 231 EAST 5TH STREET LLC, 233 EAST 5TH STREET LLC, 235 EAST 5TH STREET LLC, 66 EAST 7TH STREET LLC, 253 EAST 10TH STREET LLC, 510 EAST 12TH STREET LLC, 228 EAST 6TH STREET LLC, 325 EAST 12TH STREET LLC, 327 EAST 12TH STREET LLC, 329 EAST 12TH STREET LLC, and 334 EAST 9TH STREET LLC (collectively, the "Owner")

b) **Property Address:** 27 St. Marks Place, 514 East 12th Street, 223 East 5th Street, 229 East 5th Street, 231 East 5th Street, 233 East 5th Street, 235 East 5th Street, 66 East 7th Street, 253 East 10th Street, 510 East 12th Street, 228 East 6th Street, 325 East 12th Street, 327 East 12th Street, 329 East 12th Street, and 334 East 9th Street (collectively, the "Property")

c) **Effective Date:** April ___, 2017 (the "Effective Date")

**Section 2: Compensation**

a) **Management Fee:** A monthly amount (the "Management Fee") equal to the greater of $2,500 (two thousand five hundred dollars) and 3% (three percent) of the Gross Receipts (as hereinafter defined), which shall be determined on a cash basis. For purposes of this Agreement, "Gross Receipts" shall mean all Property Funds actually collected by Agent during the period in question less (i) security, cleaning or damage deposits until such funds are applied to a rental obligation, (ii) any sums paid by tenants of the Property representing (A) proceeds from fire or other casualty losses or (B) amounts separately enumerated in the leases for space in the Property or in tenant work letters paid to reimburse Owner for the cost of capital improvements, remodeling, and tenant changes, including any overhead or interest factor payable by tenants in connection with such reimbursement, (iii) all non-operating income, including, without limitation, interest on accounts, (iv) rents paid more than thirty (30) days in advance of the due date, provided that such payments shall be included as Gross Receipts in the month in which such payments are due, (v) casualty and condemnation loss proceeds, (vi) any proceeds arising out of awards, settlement, or any other disposition of any lawsuit or legal proceedings except to the extent the net amount of such proceeds remaining after accounting for all costs and expense, including attorneys' fees, in obtaining such proceeds represents gross receipts from the Property on which Agent would otherwise be entitled to a Management Fee as set forth herein, then to the extent such proceeds are actually collected, proceeds shall be included in the calculation of gross receipts, (vii) any funds received in nature of real estate tax refunds, (viii) proceeds of any sales or financing (or re-financing) of the Property or any portion of the Property; (ix) any free rent credits; (x) any capital contributions made by any of the

entities comprising the Owner; and (xi) any proceeds from debt or capital financing transactions with respect to the Property.

b) **Section 3: Term of Agreement**

**Term:** 60 months

## EXHIBIT B

### Insurance Requirements

Owner shall obtain and keep in full force and effect, and at its cost, the following insurance or such additional insurance as may be required under the terms of any secured financing:

(a)    "All Risk" property insurance protecting against all risks of physical loss to the Property, in an amount equal to the full replacement cost of the Property.  Such property insurance shall contain appropriate clauses pursuant to which the insurance carrier shall waive all rights of subrogation with respect to losses payable under such policy; any deductible or self-insured retention amounts with respect to such insurance shall be the sole and exclusive responsibility of Owner.

(b)    Commercial General Liability Insurance, including personal injury liability coverage, naming Manager as an additional named insured in an amount not less than One Million Dollars ($1,000,000) per occurrence and Two Million Dollars ($2,000,000) in the aggregate.

(c)    Any vehicles owned by Owner to which Manager or any employees have access, Owner shall carry automobile liability insurance naming Manager as an additional insured with coverage of not less than One Million Dollars ($1,000,000) Combined Single Limit; any deductible with respect to such insurance shall be the sole and exclusive responsibility of Owner.  If the Property includes a parking facility not operated by a third party carrying insurance approved by Owner and Manager, Owner shall carry garage keepers legal liability and garage liability insurance naming Manager as additional insured with limits reasonably acceptable to owner, any deductible with respect to such insurance shall be the sole and exclusive responsibility of Owner.

(d)    Umbrella/Excess Liability Coverage in an amount not less than Twenty Five Million Dollars ($25,000,000).

(e)    Any deductible with respect to such insurance shall be primary and the sole and exclusive responsibility of Owner.  Such liability insurance policies shall be primary and non-contributory with any similar insurance carried by Manager for its account.