UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| EAST VILLAGE PROPERTIES LLC, *et al.* | Case No. 17-22453 (RDD) |
| Debtors | (Jointly Administered) |

**OBJECTION OF THE NEW YORK ATTORNEY GENERAL
AS A PARTY IN INTEREST TO THE FINAL CONSENT ORDER
(I) AUTHORIZING AND DIRECTING USE OF CASH COLLATERAL PURSUANT TO
11 U.S.C. § 363(c) (II) GRANTING ADEQUATE PROTECTION PURSUANT TO
11 U.S.C. § 361, AND (III) GRANTING RELATED RELIEF**

**ERIC T. SCHNEIDERMAN**
Attorney General of the State of New York
120 Broadway, 3rd Floor
New York, New York 10271
(212) 416-8622

Of Counsel:
JANE M. AZIA, Bureau Chief
LAURA J. LEVINE, Deputy Bureau Chief
MARK LADOV, Assistant Attorney General
ELENA GONZÁLEZ, Assistant Attorney General

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................... 1

JURISDICTION .......................................................................................................................... 6

THE NYAG'S INTEREST IN THIS PROCEEDING ................................................................. 6

PROCEDURAL BACKGROUND............................................................................................... 7

FACTUAL BACKGROUND ...................................................................................................... 9

I.    Madison Realty Capital's Mortgage Loan to Toledano is Consistent with a Predatory "Loan to Own" Business Model ...................................................................................................... 9

II.   Madison was Aware of Toledano's Record of Tenant Harassment and Unlawful Conduct  11

III.  The Loan Terms for the East Village Portfolio Were Unaffordable and Impossible to Meet ..................................................................................................................................................... 14

IV.   Toledano and Madison's Impossible "Plan" for Increasing Property Values Relied on Unlawful Conduct and Tenant Harassment .............................................................................. 19

      A.    Fraudulent Inducement and Unpaid Buyouts........................................................... 20

      B.    Unlawful Renovations.............................................................................................. 22

      C.    Unsafe Construction Practices ................................................................................. 23

      D.    Lack of Adequate Operating Funds ......................................................................... 23

OBJECTIONS TO THE PROPOSED CONSENT ORDER ....................................................... 26

I.    The Consent Order as Submitted is Not Fair, Reasonable or Adequate................................ 26

II.   The Court Should Reject the Proposed Timeframes and Events of Default That Give Madison an Unfair Advantage to the Detriment of Other Parties ................................................. 28

III.  The Court Should Limit the Debtors' Expenditures Only to the Remediation of Violations and Operation of the Properties for the Benefit of Current Tenants............................................ 32

      A.    The Proposed Section 506(c) Waiver is Inappropriate ............................................ 34

      B.    Fees Should Be Limited ........................................................................................... 36

IV.   The NYAG Should Receive Notice and Must Have an Opportunity to Challenge the Findings in the Consent Order ..................................................................................................... 36

CONCLUSION........................................................................................................................... 38

i

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE(S)**

*Balaber-Strauss v. Murphy (In re Murphy)*,
  331 B.R. 107 (Bankr. S.D.N.Y. 2005) ............................................................27

*Bello, et al., v. Toledano, et al.*,
  Index No. HP 1158/2015 (New York City Civil Court, Housing Part B, filed
  June 30, 2015) ..................................................................................................14

*Cohane v. NCAA*,
  612 F. App'x. 41 (2d Cir. 2015) .......................................................................28

*Cornwall Press, Inc. v. Ray Long & Richard R. Smith. Inc.*,
  75 F.2d 277 (2d Cir. 1935) ...............................................................................26

*Dunlop-McCullen v. Local 1-S*,
  149 F.3d 85 (2d Cir. 1998) ...............................................................................27

*Estate of Lennon v. Screen Creations, Ltd.*,
  939 F. Supp. 287 (S.D.N.Y. 1996) ...................................................................27

*In re Ames Dep't Stores, Inc.*,
  115 B.R. 34 (Bankr. S.D.N.Y. 1990) ................................................................27

*In re Aqua Assoc.*,
  123 B.R. 192 (Bankr. E.D. Pa. 1991) ...............................................................27

*In re FCX, Inc.*,
  54 B.R. 833 (Bankr. E.D.N.C. 1985) ...............................................................31

*In re Lockwood Corp.*,
  223 B.R. 170 (B.A.P. 8th Cir. 1998) ................................................................35

*In re Mid-State Raceway*,
  323 B.R. 40 (Bankr. N.D.N.Y. 2005) ...............................................................27

*In re Ridgeline Structures, Inc.*,
  154 B.R. 831 (Bankr. D. N.H. 1993) ................................................................35

*In re Tenney Vill. Co.*,
  104 B.R. 562 (Bankr. D.N.H. 1989) .................................................................27

*Kivitz v. CIT Group/Sales Fin., Inc.*,
  272 B.R. 332 (D. Md. 2000) .............................................................................35

*McAlpine v. Comerica Bank-Detroit (In re Brown Bros, Inc.),*
   136 B.R. 470 (W.D. Mich. 1991) ........................................................................35

*Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.),*
   57 F.3d 321 (3d Cir. 1995)...............................................................................35

*Resolution Trust Co. v. Official Unsecured Creditors Comm. (In re Defender*
   *Drug Stores, Inc.),*
   145 B.R. 312 (9th Cir. BAP 1992).......................................................................30

**FEDERAL STATUTES**

11 U.S.C.
   § 361.....................................................................................................................1
   § 363(c) (II).........................................................................................................1

28 U.S.C.
   § 157 and 1334.....................................................................................................7
   § 157(b)(2)............................................................................................................7
   § 1408...................................................................................................................7
   § 1409...................................................................................................................7

Bankruptcy Code
   § 506(c) ....................................................................................................34-36, 1
   § 1107(a) and 1108 ..............................................................................................7
   § 1108...................................................................................................................7

**STATE STATUTES**

New York Executive Law 63(12) ............................................................................7

**STATE REGULATIONS**

9 N.Y.C.R.R.
   § 2520.3................................................................................................................2
   § 2522.1................................................................................................................3
   § 2524.1................................................................................................................2

**RULES**

Fed. R. Bankr. P. 2018(b) ......................................................................................7

**MISCELLANEOUS AUTHORITIES**

N.Y.C. Admin. Code § 27-2004(48)(f-2) .............................................................22

N.Y.C. Admin. Code § 27-2004(48)(f-3) .............................................................22

The People of the State of New York, by their attorney, ERIC T. SCHNEIDERMAN,

Attorney General of the State of New York ("NYAG"), submit this objection (the "Objection")

and the Declaration of Mark Ladov ("Ladov Declaration") and exhibits thereto, in opposition to

the *Final Consent Order (I) Authorizing and Directing Use of Cash Collateral Pursuant to 11*

*U.S.C. § 363(c), (II) Granting Adequate Protection Pursuant to 11 U.S.C. § 361 and (III)*

*Granting Related Relief* (the "Consent Order").[1]  In support of this Objection, the NYAG

respectfully represents and alleges the following:

## PRELIMINARY STATEMENT

1.      This bankruptcy proceeding is part of an ongoing property flipping scheme, which

started in September 2015 when an inexperienced and unscrupulous landlord named Raphael

Toledano ("Toledano") purchased fifteen rent-stabilized apartment buildings in Manhattan's East

Village (the "East Village Portfolio" or the "Portfolio")[2], using financing provided by Madison

Realty Capital ("Madison").[3]

---

[1] All capitalized terms not otherwise defined herein have the meanings ascribed to them in the Motion.

[2] *See* First Hearing Transcript at 8.  At the time the Debtors purchased the Portfolio, Toledano was the principal in all of these LLCs.  According to documents filed by the Debtors, Toledano currently controls 2% of the shares of East Village Properties LLC, which owns and manages all of the other single-asset LLCs in these proceedings.  The other current shareholders are GC Realty Advisors LLC ("GCRE") and Yonah Halton.  The Debtors have also represented that GCRE, through its manager David Goldwasser, took control of the Debtors from Toledano shortly before filing the current Chapter 11 bankruptcy petitions on March 28, 2017. Accordingly, for the purposes of this filing, the NYAG refers to the Debtors interchangeably as either "Toledano" or "Debtors" when discussing matters that occurred prior to March 28, 2017, when the Debtors were under Toledano's management and control.

[3] Madison's loans were made through an LLC whose name was later changed to EVF 1 LLC, the Secured Creditor in these proceedings.

2.      New York State has enacted the Rent Stabilization Code, which covers many of New York City's large apartment buildings such as those in the Portfolio, in order "to prevent the exaction of unjust, unreasonable and oppressive rents and rental agreements, and to forestall profiteering, speculation and other disruptive practices tending to produce threats to the public health, safety and general welfare." 9 N.Y.C.R.R. § 2520.3. In order to achieve these goals, the Code includes a number of protections for covered tenants, including a guaranteed right to a renewal lease, *see* 9 N.Y.C.R.R. § 2524.1, and limitations on a landlord's ability to increase rents, *see* 9 N.Y.C.R.R. § 2522.1, *et seq*. Toledano and Madison sought to profit from the elimination of these protections in the Portfolio.

3.      At the time Toledano struck this deal with Madison, he was a 25-year-old real estate broker who had just started using his relationships in the real estate industry, and a willingness to engage in misrepresentations and fraud, to build up a small portfolio of individual multi-family properties. Despite his limited holdings, Toledano had already developed an outsized reputation for harassing tenants. Toledano's tactics quickly led to complaints from tenants and local elected officials, as well as multiple lawsuits (including a tenant harassment case that later settled for over $1 million).

4.      In response to such complaints, the NYAG and the Tenant Protection Unit (TPU) of the New York State Division of Housing and Community Renewal (DHCR) opened a joint investigation into Toledano's misconduct, including violations of New York's rent stabilization code and other tenant protection laws. That investigation has since expanded to review Toledano's financial misconduct, and to examine the role of Toledano's lenders and financial partners, including Madison, in facilitating his schemes to harass tenants and avoid rent regulation laws.

2

5.      The prior landlord, the Tabak family, had owned these buildings for decades under a traditional model: the landlord collects rents from tenants, uses that money to operate the building, and keeps whatever is left as profit.  Madison's loan terms instead required Toledano to embark on a hyper-aggressive plan to drive up the rents in these buildings.  Within only two years of closing on the Portfolio, pursuant to his plan with Madison, Toledano intended to evict or buy out half of the tenants in these buildings, including those protected by New York's affordable rent regulation laws; renovate their apartments, often without regard to applicable housing and safety laws; pass his construction costs on to new tenants via increased rents; and increase rents as quickly as possible above the threshold (currently $2700 per month under New York law) that allows a landlord to apply to remove an apartment from rent stabilization or rent control.  Madison's loan terms, which required repayment of the Debtors' mortgage loan in full after 24 months, mandated Toledano's accelerated and unrealistic timetable.

6.      Madison knew or should have known this plan could not be executed without disregarding tenants' rights and Toledano's obligations as their landlord.  As a consequence, during Toledano's brief tenure as manager, these properties accumulated dozens of regulatory violations, as well as over $1 million in unpaid bills for taxes, insurance, utilities and other costs that are standard for a New York City landlord.

7.      Toledano's plan, however, was doomed from the start, because it was impossible to satisfy the terms of the loans he used to buy these properties.  Toledano purchased the East Village Portfolio for $97 million, and acquired over $124 million in cash and lines of credit from Madison to finance the purchase and planned buyout and construction costs.  Madison's loan terms ensured that the Debtors' property income could *never* cover the required monthly interest

3

payments on these loans.  As a result, Toledano was destined to default (as he did less than 10 months after purchase) when a reserve fund covering initial interest payments ran out.

8.      After Toledano defaulted by missing the interest payment due on July 1, 2016, his interest rate on all these loans jumped to Madison's default interest rate of 24%.  Madison now claims a secured debt of over $145 million, far more debt than the Portfolio can cover based on the current rent rolls.

9.      Although post-petition financing is necessary to ensure that the Debtors can continue business operations, preserve the value of estate assets, and maintain the properties for current tenants, the Consent Order as proposed is overreaching, and grants the Debtors and Secured Creditor too much discretion to continue their plans for these properties without regard to tenants' rights or the public interest.

10.     Madison provided financing to Toledano that was known from the outset the Debtors would be unable to repay, and that resulted in Toledano's mismanagement of the Debtors' properties.  The proposed Consent Order and Property Management Agreement ("PMA") in turn will maximize Madison's own profits and secure for itself all of the Debtors' valuable assets at the expense of the general unsecured creditors, including tenants.  GCRE will similarly benefit from the Consent Order by securing its profits from the Debtors' affairs, without regard to the proper administration of this bankruptcy proceeding or the other claims on these properties.

11.     Madison's position as the secured creditor is preventing the Debtors from pursuing an alternative restructuring, such as a sale to a new owner who would correct the unlawful conduct that has characterized the Debtors' management of these properties to date. The proposed Consent Order will curtail the ability of other creditors and parties in interest to

4

participate in an honest and fair bankruptcy process and chills any serious competitive offers for the Debtors' assets.

12.    In fact, although Madison is seeking to obtain adequate protection through cross-collateralized liens and super priority claims, and to control the outcome of this case by a Plan and Agreements that have not been filed with this Court, there do not appear to have been prepetition efforts to obtain financing on more favorable terms.  The Debtors have not addressed whether they vigorously sought post-petition financing during the pre-petition period.  There also do not appear to have been sufficient pre-petition efforts to market the Debtors for sale.  The Debtors have only spoken generally about two sale offers that they rejected.  One was rejected at least in part because it "would have eaten into an agreement with [Madison]."[4]  It is not surprising that the Debtors, having no other options and no negotiating leverage, were ultimately forced to seek refuge in the bankruptcy court and strike a deal with Madison.  However, Madison's outsized position in this case stems from its own misconduct in making a predatory "loan to own" deal with the Debtors.  The Court should require this case to proceed in a manner that will allow other potential buyers to come forward and in a manner dictated by the lawful needs of these rent-stabilized apartment buildings, rather than by Madison's position as the secured creditor.

13.    The proposed Consent Order hinges on an extremely aggressive timetable that does not allow sufficient time to scrutinize how the Plan will be implemented and who stands to profit from it.  In fact, the Debtors here have not even filed the Plan that, pursuant to the Interim Stipulation, was due on May 4, 2017.  The NYAG asks the Court not to approve any financial

---

[4] *See* First Hearing Transcript at 12.

arrangements that will limit the State's ability to seek appropriate relief for the unlawful conduct

that has taken place in the financing and management of these properties to date.

14.     For these reasons, the NYAG objects to, among other things, the manner in which

the PMA and the Consent Order have been linked and the aggressive and unreasonable milestone

requirements being imposed in these cases.  The NYAG requests that the Court deny the Consent

Order, or alternatively, direct modification of the proposed Consent Order, including

modifications to de-link the Consent Order and the PMA and to extend the timeframe of the

milestones, so as to address the objections set forth herein.

## JURISDICTION

15.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

16.     Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

## THE NYAG'S INTEREST IN THIS PROCEEDING

17.     The NYAG is an interested party in this proceeding.  Fed. R. Bankr. P. 2018(b)

authorizes the NYAG to appear and be heard on behalf of consumer creditors in a Chapter 11

case when the intervention is in the public interest.  Under New York Executive Law 63(12), the

NYAG is authorized to investigate and take remedial action against any person or business that

engages in repeated or persistent fraudulent business practices.  The NYAG, along with the

Tenant Protection Unit (TPU) of the New York State Division of Housing and Community

Renewal (DHCR) is currently investigating the parties involved in this bankruptcy proceeding.

As such, the NYAG has a clear interest in redressing the harm to affected tenants' health, safety

and legal rights and ensuring that terms by which this bankruptcy proceeding unfolds and are

ultimately resolved are fair and equitable.

## PROCEDURAL BACKGROUND

18.     On the Petition Date, each of the Debtors filed voluntary petitions for

reorganization under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

This Court has entered an order directing the joint administration of these cases.  The Debtors

continue to operate their businesses and manage their properties as debtors-in-possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been

appointed in the Debtors' cases.

19.     The Debtors consist of fifteen single-asset entities that were created to purchase

and own a set of fifteen rent-stabilized multi-family apartment buildings in Manhattan's East

Village, as well as a holding company that is the owner of the fifteen single-asset LLCs.  At the

time of their initial incorporation, Toledano was the principal of each single-asset LLC.

20.     According to documents filed by the Debtors, Toledano currently controls 2% of

the shares of East Village Properties LLC, which owns and manages all of the other single-asset

LLCs in these proceedings.  The other current shareholders are GCRE and Yonah Halton.  The

Debtors have also represented that GCRE, through its manager, David Goldwasser, took control

of the Debtors from Toledano shortly before filing the current Chapter 11 bankruptcy petitions

on March 28, 2017.  The circumstances surrounding Goldwasser's takeover of the Debtors have

not been disclosed.  It is not clear who Goldwasser or Yonah Halton are or what their role was

with respect to the Debtors prepetition.

21.     On April 12, 2017 the Debtors filed the Motion for Entry of an Order Approving

the Interim Stipulation and Order (A) Authorizing and Directing the Use of Cash Collateral, (B)

Granting Adequate Protection, and (C) Granting Related Relief [Docket No. 20] (the "Motion")

and the Court entered an Order to Show Cause that same day setting an interim hearing on April

14, 2017 to consider whether to approve the Interim Stipulation (the "First Hearing").

22.     On April 14, 2017, the First Hearing on the approval of the Motion was held

before the Honorable Sean H. Lane, at which time, counsel for the Debtors, Madison, the Office

of the United States Trustee ("UST"), the NYAG, and counsel to certain tenants represented by

the Urban Justice Center ("UJC") appeared.

23.     On April 24, 2017, a second interim hearing on the approval of the Motion was

held before the Honorable Sean H. Lane (the "Second Hearing"), at which hearing counsel for

the Debtor, Madison, the UST, the NYAG, and UJC appeared.

24.     On April 27, the Court so ordered the Interim Stipulation and set a final hearing to

be held on May 16, 2017.

25.     Upon information and belief, the United States Trustee was unable to form a

committee of unsecured creditors.

26.     The Interim Stipulation required that on May 4, 2017, the Debtors file their Plan

of Reorganization (the "Plan") and Disclosure Statement (the "Disclosure Statement") pursuant

to an agreement (the "Agreement") between Madison and the Debtors.  As of the date of this

Objection, they have not filed any of these.

## **FACTUAL BACKGROUND**

I.     ***Madison Realty Capital's Mortgage Loan to Toledano is Consistent with a Predatory "Loan to Own" Business Model***

27.     Madison is a private equity firm that has developed a reputation for high-cost equity-based loans, made based on the value of the collateral but without regard to the ability of the borrower to repay the loan terms.  *See* Mark Maurer, "Friend to Some, Foe to Others," *The Real Deal* (Sept. 1, 2016), available at https://therealdeal.com/issues_articles/friend-to-some-foe-to-others/.  In addition, Madison purchases its own portfolio of distressed property assets, which it manages through its Silverstone Property Group ("Silverstone") property management arm, in order to resell the buildings for significant profit.  *See id.*

28.     Madison has presented itself in these proceedings as the party best positioned to clean up the mess created by Toledano and his company Brookhill Properties.  *See, e.g.,* Decl. of Phillip G. Lavoie, Doc. 56-2, ¶¶ 13-15 (describing steps that Silverstone will take to correct Toledano's failure to staff properties properly; clean up waste and debris from vacant apartments; and address property code violations).  However, Madison shares responsibility for Toledano's misconduct.

29.     As the evidence described below shows, when Madison advanced funds for the purchase of the Portfolio in September 2015, it was evident from the loan and underwriting documents that the loans would soon go into default.  It was clear that the two-year loan term set impossible targets; that increasing the cash flow and value of these properties would never

happen quickly enough to cover the required debt payments; and that these events would trigger the 24% default interest rate as soon as approximately nine months after origination.[5]

30.    Toledano's efforts to meet Madison's loan terms forced him to defer routine maintenance and property costs needed to operate the buildings, thus violating tenants' leases and disturbing their right to quiet enjoyment of their homes.  Madison and Toledano's plan also anticipated that Toledano would rely on unlawful conduct, including construction plans that violated New York City law; aggressive and sometimes allegedly frivolous litigation against tenants; and plans to charge illegal rents.

31.    Madison's willingness to take over properties in default, as it is seeking to do through these bankruptcy proceedings, is consistent with reports that Madison engages in predatory "loan to own" deals with unaffordable terms that it expects to result in a foreclosure and property acquisition.  *See* Mark Maurer, "Friend to Some, Foe to Others," *The Real Deal* (Sept. 1, 2016), available at https://therealdeal.com/issues_articles/friend-to-some-foe-to-others/. According to this real estate industry news report, "limited liability companies affiliated with

_____

[5] Debtors' counsel has conceded that Toledano lacked the financial resources to execute the parties' agreed-upon plan to increase property values; cover ongoing debt payments to Madison; pay other ordinary operating expenses such as property taxes; and meet the Debtors' obligations to tenants. *See* Transcript of April 14, 2017 Hearing at 24:

> Mr. Greene: Your Honor, these buildings were purchased by Mr. Toledano as the principal of the debtor entities. In the course of running these properties, he vacated a lot of apartments through buyouts and so on. So we ended up reducing the rent-rolls to the extent that he needed extra money to continue to do the renovations and the repairs necessary at the property. The rent-rolls were insufficient to satisfy the payments due the secured creditors and to pay the real estate taxes.

> As such, it started to snowball as he -- it's a classic, Your Honor, attempt when you're not capitalized sufficiently[.]

Madison filed at least 50 foreclosure proceedings on more than 70 New York City properties

since 2012." *See id.*

32.     Other lenders recognize that this is Madison's business model. Signature Bank,

for example, has engaged in numerous transactions with Madison, including by purchasing a $70

million share of Madison's debt on the East Village Portfolio. According to internal documents

provided to the NYAG, Signature agreed to accept Madison's loan to Toledano as collateral for

its own $70 million loan to Madison, in part because Signature recognized that Madison "would

have no problem foreclosing and or owning" the Portfolio when the loan to Toledano entered

into default.  *See* Signature Bank Loan Data File, Email from Joseph Fingerman to Brian

Twomey (April 27, 2016, 3:35 PM), attached as Ladov Decl. Exhibit 3.  Signature also observed

that Madison had significant experience with the type of scheme proposed by this deal, and that

with many of the buildings Madison owned it had "purchased the buildings, gut renovated units

and re-leased them at substantially higher rents."  *See* Signature Bank Corporate Credit Offering

Memorandum at 6 (Aug. 18, 2015), attached as Ladov Decl. Exhibit 4.

## II.     *Madison was Aware of Toledano's Record of Tenant Harassment and Unlawful Conduct*

33.     Madison knew when Toledano sought funding for the purchase of this large,

fifteen-building portfolio of multi-family apartment buildings that he was an inexperienced

property manager with a reputation for harassing tenants and engaging in fraud and

misrepresentations.

34.     Madison's background research showed that Toledano was a 25-year-old

convicted felon, who had been sentenced to two years' probation for a felony of aggravated

assault in 2012, as well as arrested in 2009 on felony charges (later dismissed) of "theft by

11

deception" for an alleged scheme to fraudulently withdraw money from a bank.  *See* EGS

Financial Investigative Services, Report on Raphael Toledano (Aug. 17, 2015), attached as

Ladov Decl. Exhibit 5.  Madison's mortgage contracts with the Debtors nonetheless represented

that "no Guarantor or member of Mortgagor have ever been convicted of a felony criminal

offense."  *See* East Village Portfolio, Mortgage and Security Agreement § 57 (Sept. 10, 2015),

attached as Ladov Decl. Exhibit 6.

    35.    Madison also likely knew that Toledano had engaged in misrepresentations in the

course of his real estate business.  Among other practices, Toledano repeatedly misrepresented

himself as an attorney, and as an agent for established real estate developers, in his efforts to

drum up possible real estate deals.  For example, in correspondence dated from March 2014,

Toledano falsely represented to the owner of property located at 444 East 13th Street in

Manhattan that he was a lawyer with the Weissman Law Firm; that he represented Josh Zegen

(one of Madison's founders and principals); and that he was seeking a 1031 exchange deal on

Zegen's behalf.  *See* Correspondence from Raphael Toledano (March 2014), attached as Ladov

Decl. Exhibit 7.  News reports later quoted Zegen as denying that Toledano had ever represented

him in such a capacity.  *See* Hiten Samtani, "Raphael Toledano, Esq.?: Investor may be tied to

fake law firm," *The Real Deal* (published Dec. 14, 2015, 10:10 a.m.), available at

https://therealdeal.com/2015/12/14/raphael-toledano-esq-investor-may-be-tied-to-fake-law-firm/.

    36.    Madison also knew the size of Toledano's existing holdings, which showed he

had no experience managing a portfolio this size.  At the time this deal closed, Toledano only

owned and managed three other multi-family apartment buildings in Manhattan.  All three of

those properties (at 444 East 13th Street, 97 Second Avenue and 125 West 16th Street) have also

been subject to financial strain and mismanagement. Madison is currently foreclosing on 125

12

West 16th Street. *See 125 West 16th Street LLC v. West 16th Street Owner LLC,* et al., Index No.

850048/2017 (Sup. Ct. N.Y. Cnty, Filed Jan. 30, 2017).  Upon information and belief, the other

two properties have been the subject of disputes between Toledano's mezzanine creditors, but

are now under the control of Big Greene RE LLC, a Delaware limited liability company with a

mailing address at "c/o Robinson, Brog, Leinwand, Greene, Genovese & Gluck P.C.," the same

law firm that is counsel for the Debtor in these proceedings.

37.    Madison, which was the secured mortgage lender for 444 East 13th Street, was

aware that Toledano had been accused of harassing tenants, many of whom were immigrant

families, at that property in an effort to pressure tenants into surrendering their rent-regulated

apartments.  On or about May 29, 2015, just a little more than three months before closing on the

financing for the East Village Properties, a group of 444 East 13th Street tenants, represented by

the UJC, sued Toledano and other responsible parties for tenant harassment and other claims.

*See Bello, et al., v. Toledano, et al.,* Index No. HP 1158/2015 (New York City Civil Court,

Housing Part B, filed June 30, 2015), Verified Petition attached as Ladov Decl. Exhibit 8.  As

alleged in the Verified Petition, Toledano engaged in the following tactics:  he employed private

investigators and others to harass tenants and dig up information that he could use to try to evict

them; threatened to file baseless eviction cases against tenants; locked tenants out of their homes;

increased their rents without regard to the protections of New York's rent stabilization laws;

withheld essential services, including gas, hot water, and heat; rendered the building

uninhabitable by performing dangerous construction and demolishing the building; and falsely

reported tenants to the police for illegal activities.  Tenants ultimately signed a confidential

settlement agreement reportedly worth over $1 million with Toledano in or about May 2016.  *See*

Mark Maurer, "Toledano's Fast and Rocky Ride," *The Real Deal* (June 1, 2016), available at

https://therealdeal.com/issues_articles/toledanos-fast-and-rocky-ride/.  Madison has since

represented to the NYAG that it loaned $1.1 million to Toledano to pay this harassment

settlement pursuant to a fifth mortgage loan placed against the East Village Portfolio that is the

subject of this bankruptcy proceeding.  That fifth mortgage loan on the Portfolio was dated June

24, 2016, a mere week before Toledano defaulted on all of his loans on these properties.  *See*

East Village Portfolio Payoff Letters, Doc. 56-1, Exhibit A to Interim Stipulation ("Payoff

Letters"), at 5.

### III.    *The Loan Terms for the East Village Portfolio Were Unaffordable and Impossible to Meet*

38.    Toledano purchased the East Village Portfolio pursuant to a Purchase and Sale

agreement executed on or about May 27, 2015 between Toledano (as managing member of East

Village Owners Group LLC) and the property owners (which were three separate LLCs

controlled by members of the Tabak family).  *See* East Village Portfolio, Purchase and Sale

Agreement (May 27, 2015) ("EVP Purchase Agreement"), attached as Ladov Decl. Exhibit 9.

39.    When Madison made its mortgage loan for the Portfolio in September 2015,

Raphael Toledano was the principal in all of the LLCs that purchased and held the East Village

Portfolio properties, and that appear as Debtors in the current bankruptcy proceedings.  Although

Toledano purchased the portfolio from its prior owners for $97 million (less the cost for 95 East

7th Street, a sixteenth property originally included in the Portfolio but ultimately bought by

Toledano's family member and former business partner Aaron Jungreis),[6] his initial mortgage

---

[6] According to legal papers, Toledano was sued by his uncle Aaron Jungreis, who alleged that he
was supposed to be Toledano's partner in this Portfolio but that Toledano cut him out of the
promised deal following the execution of the May 2015 contract of sale.  Under a settlement

loans from Madison included cash and lines of credit totaling nearly $124 million, significantly

more debt than was needed to purchase the properties.  *See* EVP Purchase Agreement.  These

funds and credit lines were divided up among four separate notes and mortgages, all of which

were due to be fully repaid to Madison at the end of only 24 months:

a.  A First Loan of $89,667,660.00, which initially accrued interest at a rate of 9.00%, with interest payments of 6% due on an ongoing basis and 3% due on maturity, *see* First Loan Note, attached as Ladov Decl. Exhibit 10;

b.  A Second Loan of $20,000,000 which initially accrued interest at a rate of 20.00%, *see* Second Loan Note, attached as Ladov Decl. Exhibit 11;

c.  A Building Loan of up to $10,068,000, which could be drawn down for construction and other "hard costs," and which initially accrued interest at a rate of 9.00%, with interest payments of 6% due on an ongoing basis and 3% due on maturity, *see* Building Loan Note, attached as Ladov Decl. Exhibit 12; and

d.  A Project Loan of up to $4,249,340, which could be drawn down for tenant buyout payments and other "soft costs," and which initially accrued interest at a rate of 9.00%, with interest payments of 6% due on an ongoing basis and 3% due on maturity, *see* Project Loan Note, attached as Ladov Decl. Exhibit 13.

40.  Presumedly because Toledano could not afford to make monthly mortgage

payments from the outset, the loan documents set aside a Prepaid Interest fund of slightly more

than $4 million. *See* East Village Portfolio, Prepaid Interest Agreement (Sept. 10, 2015), attached

as Ladov Decl. Exhibit 15. These funds were taken from the interest-bearing proceeds provided

by Madison to the Debtors under the First Loan and the Project Loan. *See id.* These interest-

bearing loan proceeds were retained by Madison and used to pay for the Debtors' initial monthly

interest payments. *See id.*

---

agreement included in Madison's loan files, Toledano and Jungreis agreed that Jungreis would purchase one of the properties (95 East 7th Street) that was originally part of the Portfolio for $6,015,000.  *See* Settlement Agreement between Raphael Toledano and Aaron Jungreis (September 2015), attached as Exhibit 14.

41.    Madison's loan terms ensured that Toledano would default after this interest

reserve ran out, because the Net Operating Income (NOI)[7] generated by these properties would

be insufficient to cover Toledano's monthly interest payments within the two-year term of the

loan. *See* Expert Report of Prof. David Reiss ("Reiss Report"), attached as Ladov Decl. Exhibit

1.

42.    Madison's $89.7 million first mortgage required monthly interest payments at a

minimum of 6% annual interest rate (while accruing additional interest at a 3% annual rate which

would be due at the end of loan term).  *See* First Loan Note. These loan terms required monthly

interest payments of at least $448,000.  Monthly interest payments could increase to as much as

approximately $520,000 per month if Toledano also drew down funds set aside in the Building

Loan and Project Loan for "hard costs" (such as construction) and "soft costs" (such as tenant

buyouts).  *See* Building Loan Note; Project Loan Note.  However, according to Signature Bank's

analysis of Madison's loan, the rent rolls for these properties only produced an NOI of around

$260,000 per month at the outset, far less than was needed to cover these monthly payments.  *See*

Signature Bank Loan Data File, attached as Ladov Decl. Exhibit 3 (identifying Net Operating

Income based on "In place Rent Roll" as $3,116,000 per year).  Madison's estimates of NOI

based on the in-place rent rolls were not much higher, coming in at less than $285,000 per

month.

---

[7] Net Operating Income (NOI) is a term used in the real estate industry to represent the income
that is left after gross income (i.e., the total income generated by property rents) is reduced by the
Net Operating Expenses (i.e., operating costs such as property management, taxes, insurance,
repairs, utilities, etc.) required to run a building properly and according to applicable laws and
regulations.  In other words, NOI represents that cash flow that would be left for the landlord at
the end of the month to cover the property's debt payments and any other costs (or profits) not
associated with the day-to-day management of the buildings.

43.     The actual shortfall was likely even greater, given that the lenders' analyses over-estimated the rental income coming into these buildings and under-stated the true costs of running the Portfolio.

44.     As the New York City Department of Housing Preservation & Development (HPD) explains in its attached analysis, the projected income used for the NOI during underwriting ignored the simple fact that "where there is projected renovation of vacant units there should be a corresponding deduction for lost rent during the period these units are undergoing renovation." *See* NYC Department of Housing Preservation and Development, Evaluation of East Village Portfolio Investment Memorandum (May 11, 2017) ("HPD Evaluation"), attached as Ladov Decl. Exhibit 2.  Instead, the underwriting relied upon a 2% vacancy rate that is unrealistically low even for a property that is not undergoing high turnover and significant construction.  *See* Reiss Report at 12-14.  In reality, the vacancy rate generated by this scheme was far higher than that.  According to documents provided by Toledano's counsel to the NYAG, 82 out of 291 units (28%) of the Portfolio's apartments are currently vacant. These documents indicate that 39 of those vacant units were rendered uninhabitable because Toledano demolished the interiors but has not completed renovations.

45.     The underwriting also drastically underestimated the true costs of operating these properties for existing tenants.  *See* HPD Evaluation at 2.  For example, the deal terms imagined that Toledano would only spend $75,000 per year to hire maintenance staff for all 15 buildings, whereas HPD estimates that the true cost would be nearly four times that.  *See id.* This shortfall helps explain the absence of legally-mandated supers in these buildings during Toledano's management.

17

46.    The Prepaid Interest reserve of approximately $4 million initially masked the

unaffordability of the monthly payments due to Madison.  *See* Reiss Report at 12.  However,

Madison's loan terms required Toledano to increase the NOI generated by these properties to

somewhere between $448,000 to $520,000 per month during this brief grace period of

approximately nine months.  After that, Toledano would be expected to pay interest on these

loans out of the Debtors' own proceeds.

47.    Increasing the Portfolio's rent rolls by over 50% in approximately nine months

was an impossible goal, especially considering that the parties' scheme required Toledano to

*decrease* rent rolls while apartments were being vacated and renovated.  *See* HPD Evaluation at

2; Reiss Report at 12-14. This is precisely what happened.  Toledano defaulted on his loan by

missing the interest payment due July 1, 2016.  *See* Payoff Letters.

48.    In addition, Toledano's unaffordable monthly interest payments were only the tip

of the iceberg.  Besides the 6% interest due monthly, the First Mortgage, Building Loan and

Project Loan each also accrued an additional 3% each month to be paid upon maturity.  *See* First

Loan Note; Building Loan Note; Project Loan Note.  The $20,000,000 second mortgage accrued

interest at an incredible 20% interest rate, all of which was due upon maturity.  *See* Second Loan

Note.  Even if Toledano did not default on his loan terms, by the time the loan term expired after

24 months, he would owe approximately $150 million in principal and interest, most of which

was due when the loan term concluded.

49.    In reality, the impossibility of making the 6% monthly payments increased arrears

even further, by triggering a 24% default interest rate that is applicable to *all* of the Debtors' debt

with Madison. *See* Payoff Letters.  As a result, the total debt on this property at the time this

Chapter 11 was filed, a mere year and a half after loan origination, had ballooned to over $145

18

million on a principal balance of $117 million.  *See id.*  Pursuant to the terms of the Proposed

Final Order, these loans continue to accrue default interest at a rate of 24%; according to the per

diem rate in the Payoff Letters, this results in a daily addition of $77,935.57 to the existing debt.

50.     These figures stand in stark contrast to HPD's valuation of the Portfolio based on

its rent rolls when purchased in September 2015, which concluded that Madison and Toledano

had overstated the value of the Portfolio by approximately 40 percent.  *See* HPD Evaluation at 3.

According to HPD:

> HPD has "As-Is" Appraisal Guidelines that appraisers must follow for projects financed
> by HPD. By applying the guidelines to the "In-Place" Net Operating Income shown [in
> Madison's Investment Memorandum], and using the 3.25% capitalization rate that was
> referenced [in that memo], HPD estimates the as-is value of the property at
> $104,736,861, significantly less than the as-is value of $147,433,000 indicated [by
> Madison].

## IV.     *Toledano and Madison's Impossible "Plan" for Increasing Property Values Relied on Unlawful Conduct and Tenant Harassment*

51.     In order to attempt to meet the debt obligations, Madison and Toledano agreed

upon a hyper-aggressive plan to buy out tenants; renovate units; and increase rents in a manner

that would remove apartments from rent stabilization and rent control.  *See* Reiss Report at 7-8.

This plan was doomed to fail financially, as explained above.  In addition, Madison and

Toledano's plan required unlawful conduct that would, and did, harm the tenants living in these

properties.  As explained below, this unlawful conduct and harassment included improperly

inducing tenants to accept buyout agreements; illegally adding bedrooms to existing apartments;

unsafe construction practices; and failing to comply with the Debtors' legal obligations to

tenants.

19

A. _Fraudulent Inducement and Unpaid Buyouts_

52.     Madison and Toledano's plan required an unrealistic increase in the turnover rate in these rent-stabilized buildings.  Madison's investment memo assumed that Toledano would vacate, renovate and reconfigure nearly half of the units in the Portfolio within the first two years.  In some buildings the required turnover rate was as high as 80-100%.  _See_ Reiss report at 9.

53.     Madison and Toledano's agreed-upon business plan initially targeted tenants who were listed in the prior landlord's rent rolls as not protected by rent stabilization or rent control, and therefore not statutorily entitled to a renewal lease.  Toledano began negotiating buyouts with these tenants even before he had closed on the properties. _See_ May 12, 2017 Affidavit of Zoe Lake ("Lake Aff.") ¶ 4, attached as Ladov Decl. Exhibit 22.[8] Although Toledano was responsible for negotiating these buyouts, Madison funded, supervised and approved these buyouts and surrender agreements.  _See_ Tenant Buy Out Agreement (Sept. 10, 2015) ("Buy Out Agreement"), attached as Ladov Decl. Exhibit 16.

54.     In addition to requiring every one of the "fair market" tenants to vacate their apartments, the hyper-aggressive targets set by Madison's loan also required that Toledano buy

---

[8] The prior landlord represented that approximately 76 of the 281 residential units in the Portfolio were not subject to rent stabilization or rent control at the time of the sale to Toledano. _See_ Reiss report.  The in-place rents for these "market rate" units at the time Toledano bought the portfolio averaged $2,019, according to Madison's underwriting documents. This figure, which was below the threshold for high rent vacancy allowances under rent-stabilization rules, on its face raises questions about whether these units had been removed from rent-stabilization improperly by the prior landlord. In fact, some of the tenants in such units have successfully challenged the Debtors' representations that their apartments were not protected by rent-stabilization.  _See_ Lake Aff. ¶ 9 n.2.

20

out approximately one-third of the Portfolio's rent regulated tenants within two years of purchase.  *See* Reiss Report at 8.

55.      The parties, however, did not budget nearly enough money to meet these targets. Madison's loans to Toledano only budgeted $50,000 (or up to $100,000 for the properties on East 5th Street) for tenant buyouts.  *See* Buy Out Agreement.  This amount turned out to be far less than was needed to buy out the Portfolio's tenants, especially those rent-stabilized tenants who knew their rights and were not unduly pressured or harassed.

56.      As a result of Toledano's lack of funds, and his need to turn over units at an unrealistic pace, Toledano embarked on a strategy of fraudulently inducing tenants into signing surrender agreements that he had no intention of satisfying, a scheme that was recently the subject of a report in the New York Times.  *See* Ronda Kaysen, "Tenants Offered Buyouts Are Left in the Lurch," *N.Y. Times* (Apr. 28, 2017), available at https://www.nytimes.com/2017/04/28/realestate/tenants-offered-buyouts-are-left-in-the-lurch.html.

57.      At the time of the Bankruptcy Petition filing, over a dozen tenants were owed funds by the Debtors.  Toledano produced a list of unpaid buyouts to a possible buyer of this portfolio representing that thirteen tenants were owed over $1.9 million.  The average unpaid buyout, according to this list, was nearly $150,000, substantially more than Madison and Toledano had budgeted for such payments.

58.      Tenants have complained to NYAG that Toledano fraudulently induced them to sign buyout and surrender agreements with the Debtors LLCs, and caused these tenants to rely on the expected payment of these buyout funds, even though the Debtors lacked the funds to satisfy these contracts.  *See* May 12, 2017 Affidavit of Jessica Lee ("Lee Aff.") ¶¶ 19-21,

attached as Ladov Decl. Exhibit 23. This misconduct violates New York City's tenant harassment law, which forbids landlords from seeking buyouts while threatening or intimidating tenants, or while "knowingly falsifying or misrepresenting any information provided" to the tenant. *See* N.Y.C. Admin. Code § 27-2004(48)(f-3).

59.    Toledano also resorted to harassment and frivolous litigation tactics in order to increase his turnover rate, much as he had done at 444 East 13th Street.  For example, multiple tenants have complained to NYAG that Toledano and his agents wrongly accused them of not living in these apartments as primary residences.  In such cases, Toledano and his agents threatened, or actually filed, holdover cases seeking to evict such tenants.

60.    Toledano also repeatedly failed to provide written notices to tenants when he offered buyouts. *See* Lee Aff. ¶ 8 ¶ 11; May 13, 2017 Affidavit of Joanna Sanchez ("Sanchez Aff.") ¶¶ 10-12, attached as Ladov Decl. Exhibit 24; Lake Aff. ¶ 14.   Since December 2015, New York City law has forbidden landlords from offering buyouts to tenants unless the property owner discloses *in writing* the tenant's rights, including the right to reject the offer and seek legal advice. *See* N.Y.C. Admin. Code § 27-2004(48)(f-2).

B. *Unlawful Renovations*

61.    After vacating apartments, in the manner described above, Toledano planned to renovate and reconfigure these units in order to increase rents. Madison and Toledano agreed on an aggressive construction plan that would carve up apartments by adding 1, 2 or even 3 new bedrooms, essentially turning long-standing and desirable housing for families and long-time East Village residents into dormitories for students or transient white collar workers.  *See* Reiss Report at 10-11.

22

62.     In fact, many of the proposed renovation plans violated New York City law, as

both Toledano and Madison knew or should have known, because they created rooms without

windows or less than the minimum size for a bedroom under New York City law.  *See* Reiss

Report at 10-11.  As the architectural renderings for these renovations acknowledged, the units

often described as "bedrooms" were actually windowless rooms that may not be legally

advertised and rented as bedrooms in New York City.  *See* Proposed Architectural Layouts for

East Village Portfolio, attached as Ladov Decl. Exhibit 17.

63.     Madison went so far as affirming in its Investment Memo for this deal that

"MRC's in-house design director has reviewed all layouts to confirm that the renovated layouts

conform to all codes and will allow the unit to command current market pricing." The assertion

that the planned layouts "conform to all codes" is simply false.

64.     Toledano intended to rent out these apartments as 2BR, 3BR and 4BR dwellings,

and Madison and Toledano based rental projections on those assumptions.  *See* Reiss Report at

10-11.  However, Madison and Toledano's underwriting analysis failed to acknowledge that

these planned multi-bedroom apartments were cramped, illegal units, and that their comparisons

to legal multi-bedroom apartments in the East Village thereby substantially inflated the projected

rental income.  *See* Reiss Report *id*.

### C. *Unsafe Construction Practices*

65.     Toledano repeatedly used the threat and reality of constant and unsafe

construction work in his efforts to harass and coerce tenants into vacating these properties.  *See*

Lake Aff. ¶¶ 4, 6, 8; Lee Aff. ¶¶ 4-5, 12; Sanchez Aff. ¶ 12. Tenants have complained that they

were told by Toledano and his agents that construction would make these properties

23

uninhabitable, and that they should accept offers to vacate in response. *See* Lake Aff. ¶¶ 4, 6, 8;

Lee Aff. ¶¶ 5, 12; Sanchez Aff. ¶ 12.

66.     Toledano and his agents repeatedly engaged in unsafe construction practices, and

failed to comply with the protections required by city, state and federal law when construction

work is undertaken in an occupied building. In particular, tenants have complained about

exposure to lead-contaminated dust generated by demolition and construction work in their

homes.

67.     For example, tenant complaints prompted the New York City Department of

Health and Mental Hygiene (DOHMH) to send inspectors to review construction at 233 East 5th

Street, 235 East 5th Street and 514 East 12th Street in March 2016. *See* Letter from East Village

Elected Officials to DOHMH (May 4, 2016), attached as Ladov Decl. Exhibit 18; Lead Testing

Results (March 2016), attached as Ladov Decl. Exhibit 19.  Lead testing at all three building

found that tenants were being exposed to construction dust contaminated with lead; dust

collected at all three building displayed lead levels above the threshold (40 micrograms per

square foot) that State and Federal environmental agencies consider an unacceptably hazardous

level. *See id.*

68.     Lead-contaminated dust continues to be a problem at the properties.  On April 14,

2017, DOHMH collected a series of dust samples at 514 East 12th Street, where tenants reported

to the NYAG that Silverstone had removed plastic sheeting from apartment doors during its

inspection of "dumpster apartments" filled with construction debris.  DOHMH's environmental

test found dust in one hallway with lead contamination of 82 micrograms/square foot, which is

twice the threshold (40 micrograms/square foot) defined by the EPA as hazardous.  *See* Lead

Testing Results for 514 East 12th Street (collected April 14, 2017), attached as Ladov Decl.

Exhibit 20.

69.     In addition, on April 21, 2017, DOHMH took samples at 233 East 5th Street,

where dust from cleaning out these apartments was reportedly left in a hallway by cleanup crews.

One of the two dust samples taken showed lead concentrations of 58 micrograms per square foot,

again above the legally-defined threshold for hazardous contamination.  *See* Lead Testing

Results for 233 East 5th Street (collected April 21, 2017), attached as Ladov Decl. Exhibit 21.

D.  *Lack of Adequate Operating Funds*

70.     Madison and Toledano's plan also ignored the ordinary costs required to operate

these properties in compliance with a landlord's legal obligations and the needs of existing

tenants.  *See* HPD Evaluation at 2; Reiss Report at 14-15.  Madison and Toledano were primarily

focused on spending money to increase the rent rolls of these properties, so they never properly

budgeted for the operating costs of these buildings.  *See id.*

71.     HPD concluded that this plan's operating expenses were only slightly more than

half of what HPD would require, when underwriting a deal to ensure that projected cash flow

would be sufficient to support debt service. HPD Evaluation at 2. The underwriting shortfalls

included a failure to budget for adequate maintenance staff, repairs and utility payments.  *See id.*

72.     Similarly, the proposed operating funds failed to provide a realistic assessment of

real estate taxes. As Professor Reiss observes, Madison and Toledano only budgeted for a 3%

increase in real estate taxes for the Portfolio, while the actual year-to-year increases were much

higher.  *See* Reiss Report at 14-15.  The failure to budget for real estate taxes is reflected in the

fact that these bills were all past due when this bankruptcy commenced.

25

73.    The failure to create a proper operating budget is consistent with the Debtors'

mismanagement of these buildings.  As the accounting documents so far submitted to the

Bankruptcy Court by the Debtors and Madison illustrate, by the time the Petition was filed, the

Debtors had accrued well over $ 1 million in unpaid bills for such basic operating expenses as

taxes, insurance, and utilities payments.

74.    The Debtors' unpaid bills prompted numerous complaints from tenants, who

contacted NYAG around the time of the filing of these Petitions to complain repeatedly about

lack of heat and hot water, utility shutoff notices, lack of supers, and inadequate repairs and

services at the buildings.  *See, e.g.*, Lee Aff. ¶ 15. These shortcomings are also documented by

the numerous property violations that have accumulated on these buildings.

## OBJECTIONS TO THE PROPOSED CONSENT ORDER

### I.    *The Consent Order as Submitted is Not Fair, Reasonable or Adequate*

75.    A bankruptcy court is a court of equity.  *Cornwall Press, Inc. v. Ray Long &*

*Richard R. Smith. Inc.*, 75 F.2d 277 (2d Cir. 1935) ("as a court of equity [the bankruptcy court]

may protect itself from being used as an instrument of fraud").  As such, the Court should take into

account both Madison's bad faith in making the loans to Toledano, its role in creating and

perpetuating the illegal and hazardous conditions for tenants, as well as the lack of transparency

to date as to how David Goldwasser, the manager of GCRE, came to control the Debtors.

76.    The Court must review the terms of a debtor-in-possession facility to determine

whether those terms are fair, reasonable and adequate given the circumstances of the debtor and

the proposed lender.  *In re Tenney Vill. Co.*, 104 B.R. 562, 568 (Bankr. D.N.H. 1989) (DIP

financing terms must not "pervert the reorganizational process from one designed to accommodate

26

all classes of creditors and equity interests to one specially crafted for the benefit of" the secured creditor); *In re Aqua Assoc.*, 123 B.R. 192, 195-96 (Bankr. E.D. Pa. 1991) (citing *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (holding that proposed financing should be fair and reasonable); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) (the court should focus on terms of proposed financing to determine whether they are reasonable); *In re Mid-State Raceway*, 323 B.R. 40, 60 (Bankr. N.D.N.Y. 2005).  The Consent Order as proposed is neither fair, reasonable nor adequate.

77.    The Court has the power to deny or modify the relief requested where, as here, the parties come to the Court with unclean hands.  *See, e.g, Balaber-Strauss v. Murphy (In re Murphy)*, 331 B.R. 107, 135 (Bankr. S.D.N.Y. 2005) ("A party seeking equitable relief from the bankruptcy court "must come with clean hands if relief is to be granted.") (internal citations omitted); *Dunlop-McCullen v. Local 1-S*, 149 F.3d 85, 90 (2d Cir. 1998) (a party applying for relief must have "acted fairly and without fraud or deceit as to the controversy in issue") (internal citation omitted); *Estate of Lennon v. Screen Creations, Ltd.*, 939 F. Supp. 287, 293-94 (S.D.N.Y. 1996).

78.    As the above facts demonstrate Madison is coming to the Court with unclean hands.  Madison created a deal with Toledano that – even when taking Madison and Toledano's assumptions about income, operating expenses and the cost and pace of renovations at face value – ensured that the Debtors would default on these loans at the earliest possible date, because there was not enough income coming into these properties to cover the monthly debt servicing obligations of the loan.  In reality, the unaffordability of these loans was even greater than the underwriting suggested, because Madison and Toledano exaggerated the income that these

27

buildings could possibly generate during the loan term, while dramatically understating the true costs of operating these properties for tenants.

79.    Madison's plan from the outset assumed that the Debtors would engage in unlawful conduct in an effort to meet Madison's loan terms.  The Debtors' unlawful conduct – including, but not limited to, illegal and unsafe construction; tenant harassment; and the failure to operate these properties properly for tenants who chose not to vacate – was a consequence of these unaffordable loan terms.

80.    Madison's conduct also constitutes tortious interference with pre-existing tenant contracts.  When Madison entered into its loan agreement with the Debtors, the plan was for the Debtors to violate numerous provisions of New York law, including letting the Portfolio fall into disrepair – a breach of the warranty of habitability – in order to meet the impossible terms of the loan agreement.  Under New York Law, "[t]ortious interference with contract requires the existence of a valid contract between the plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional procurement of the third-party's breach of the contract without justification, actual breach of the contract, and damages resulting therefrom."  *Cohane v. NCAA*, 612 F. App'x. 41 (2d Cir. 2015) (internal citation omitted).  Madison's financing scheme assured that the Debtors would fail under its loan agreement, the loan agreement was the "but-for" cause of the breach of the tenants' contracts, and tenants suffered considerable harm.

## II.    *The Court Should Reject the Proposed Timeframes and Events of Default That Give Madison an Unfair Advantage to the Detriment of Other Parties*

81.    The proposed Consent Order establishes extremely aggressive deadlines and onerous Events of Default that effectively cede control of the Debtors' estate to Madison to the detriment of unsecured creditors and tenants.  The Court should extend these deadlines and

28

eliminate onerous Events of Default in order to allow other potential buyers to evaluate the

Portfolio, and to ensure that Madison cannot condition its post-petition financing on the absence

of any challenges or oversight from other parties.

82.     The Debtors have already missed the May 4, 2017 deadline for filing the Plan that

was included in the Interim Stipulation, demonstrating from the outset the aggressiveness of the

proposed timeframes.  The Consent Order now provides that the Plan must be filed by June 15,

2017.  However, the deadline for confirmation of the Plan is still September 15, 2017.  Failure to

meet these milestones is treated as an Event of Default.  The NYAG objects to the shortened

timeframe for confirmation of the Plan and requests that the Court extend the September 15,

2017 confirmation deadline.

83.     Moreover, the Plan, Disclosure Statement and the Agreement have not been filed,

making it impossible to determine the full meaning and requirements of the Consent Order.

84.     The Consent Order also provides for other onerous Events of Default, which

allow Madison to cut off its post-petition financing if the Court issues an order which Madison

deems to limit its rights as the Secured Creditor:

> a.    "The Bankruptcy Court enters an order authorizing the sale of all, or
>       substantially all of the Debtors' assets that does not provide for the payment in
>       full to the Secured Creditor of its claims in cash upon the closing of the sale;"
>       and
>
> b.    "A Chapter 11 trustee, an examiner, or any other responsible person or officer
>       of the Court with similar powers is appointed by order of the Bankruptcy
>       Court."

85.     As the only secured creditor and the owner of Silverstone, which is being paid by the Debtors to manage these properties, Madison effectively controls the Debtors and is attempting to use the aggressive deadlines and Events of Default in the Consent Order to maximize its own profits and secure for itself all of the Debtors' valuable assets at the expense of the general unsecured creditors, including tenants.  The cases are on a "breakneck" pace that will preclude any meaningful role for any party in interest and will chill any serious competitive offers for the Debtors' assets.  Such aggressive milestones leave insufficient opportunity to review the prepetition efforts to obtain alternative financing arrangements, evaluate potential restructuring alternatives, perform an appropriate valuation of the Debtors or investigate the Debtors' prepetition affairs and transactions, including those of GCRE and Madison, before moving forward with any proposed plan of reorganization.

86.     Moreover, the Consent Order provides no realistic alternatives for the Debtors.  If the Debtors do not assume the PMA, they will lose access to Madison's protective advances, which are needed to clear up the many property violations and unpaid bills left deferred by Toledano, and to operate these buildings in compliance with tenants' leases and all applicable laws.

87.     The Debtors should not be permitted by virtue of the Consent Order to cede control to Madison to the detriment of unsecured creditors and tenants.  *See Resolution Trust Co. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores, Inc.)*, 145 B.R. 312, 317 (9th Cir. BAP 1992) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to benefit all creditors to one designed for the unwarranted benefit of the postpetition lender.") (citing *In re Tenney Village Co.*, 104 Bankr. at 567-570); *In re FCX, Inc.,* 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not

ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has

compromised the rights of unsecured creditors.") (citing *In re B & W Tractor Co., Inc.*, 38 B.R.

613 (Bankr. E.D. N.C. 1984).

88.     The accelerated timeframe will be a deterrent to any potential buyer because there

is insufficient time for the due diligence required.  Such due diligence should consider the actual

costs and obligations of lawfully operating the Portfolio in a manner that has not been done to

date by Madison and the Debtors.  For the same reasons the Court should be skeptical of the

Debtors and Madison's valuation representations.[9]

89.     As explained above, the speculative valuation of the Portfolio has harmed tenants

and the public interest.  Tenants were harmed because the debt to Madison has always been

above the amount the rent rolls could support, there was insufficient money available for

operating expenses and the Debtors could not even support the monthly interest that was due.

Tenants and the public interest were also harmed because these loan terms anticipated that

Toledano would take a variety of unlawful and harmful actions in order to attempt to increase the

value of the Portfolio.

90.     It is in the tenants' interest and the public interest that the rent rolls be reviewed

for potential improprieties to ensure proper valuation of the properties.  The properties should

then be marketed for sale to an appropriate buyer who will protect tenant health and safety and

properly comply with laws designed to protect affordable housing.

---

[9] As noted above, *see supra* ¶ 50, HPD's appraisal of the Portfolio based on the rent roll at time
of loan origination found that Madison's underwriting overstated the Portfolio's value by over
$40 million.  DHCR is currently auditing those rent rolls, pursuant to a notice sent to Debtors on
April 3, 2017.  The NYAG also continues to investigate whether apartments in the Portfolio were
removed from rent stabilization improperly or unlawfully.

III.    *The Court Should Limit the Debtors' Expenditures Only to the Remediation of Violations and Operation of the Properties for the Benefit of Current Tenants*

91.    The Court should limit the Debtors' expenditures to only those necessary to maintain the health and safety of the current tenants and not permit the Debtors to fund efforts that may harm the estate.

92.    The NYAG previously argued, at the First Hearing and Second Hearing, that the Debtors and Madison should not be permitted to spend money on the Portfolio other than to address current needs of existing tenants.  The NYAG's position has been that funds should only be spent to ensure that all violations on these properties are cleared; all taxes and other arrears are paid up; and that tenants' health, safety and repair needs are fully addressed moving forward.

93.    At the First Hearing, the Court was unwilling to give the Debtors and Madison unfettered discretion over expenditures, such as capital improvements, given the large volume of issues at the Portfolio related to tenants' health and safety.[10]

94.    The NYAG asks the Court to revisit its ruling at the Second Hearing that the Debtors and Madison should be permitted to advance funds for tenant buyouts and renovation of vacant apartments so long as such payments do not impair their ability to simultaneously meet tenants' current needs.

95.    As described above, health and safety issues persist in these buildings, including SPG's failure to protect tenants from lead-contaminated dust during waste removal and failure to hire the legally required number of superintendents.  Since taking over the management of the Portfolio, Madison, SPG and the Debtors have demonstrated that tenants' health and safety take a back seat to capital improvements to the Portfolio.

---

[10] *See* First Hearing Transcript at 57 – 83.

96.     The language of the proposed Consent Order demonstrates that Madison and the

Debtors seek to improve the value of the Portfolio without much regard, if any, to tenant health

and safety.  In fact, the Consent Order is devoid of any mention of "health" or "safety,"[11] and

instead focuses on tenant buyouts (Consent Order, paragraph 12), capital expenditures and

capital improvements (Consent Order, paragraphs 11 and 15).[12]

97.     The Court should take into account the fact that some of the unoccupied units in

these properties may have been vacated improperly.  The Consent Order should not permit the

Debtors and Madison to drive up rents in these properties while the audits of the Portfolio's rent

rolls are pending.  The results of the audit will clarify whether there have been violations of rent

regulations or other laws.

98.     As explained above, much of the construction planned for this Portfolio by

Madison and Toledano violated New York City building code requirements.  No construction

should move forward in these properties until proper oversight can determine whether units have

been, or will continue to be, improperly renovated and marketed as multi-bedroom units in

violation of the law.

99.     In addition, Madison should not be allowed to negotiate new tenant buyouts or

perform new construction in these properties because under the current terms of the Consent

---

[11] Paragraph 44 of the Consent Order purports to neither "impair nor diminish the effectiveness of any [of] the provisions of" the Interim Stipulation.  Nonetheless, it goes on to state that the Consent Order controls to the extent that any conflict exists between the Interim Stipulation and the Consent Order.  Paragraph 44 is insufficient as a means of incorporating the Court's prior emphasis on the importance of tenant health and safety.

[12] Footnote 4 of the Consent Order grants Madison and the Debtors unfettered discretion over expenditures "in accordance with [an] Agreement" that has not been made available to anyone.

Order Madison is entitled to a super-priority lien for all of its protective advances.[13]  Madison

should not be allowed to profit post-petition from its pre-petition bad faith and unfair dealing.

100.    Moreover, these activities would potentially drive up the price of the Portfolio,

which would impede the Debtors' ability to receive offers from potential purchasers who wish to

operate the buildings profitably while maintaining the affordability of these rent-stabilized

properties.

101.    The Consent Order currently provides that SPG will make "good faith efforts" to

comply with legal requirements to hire a sufficient number of superintendents at these properties

(Consent Order, paragraph 13).  However, this requirement was discussed at the past hearings

and should have been met by now.  The proposed Consent Order should impose an immediate

deadline for installing and retaining the legally-mandated superintendents and janitorial services,

if it has not yet been met.

A. *The Proposed Section 506(c) Waiver is Inappropriate*

102.    The NYAG objects to the waiver of the Debtors' rights to recover the reasonable,

necessary costs and expenses of preserving or disposing of property securing an allowed secured

---

[13] Pursuant to the Interim Stipulation, the NYAG has been receiving a "five-day notice" from
Madison's counsel when Madison seeks to "consummate buyout agreements and/or surrender
agreements" with tenants who are represented by counsel.  The NYAG has been contacting these
tenants' attorneys to conduct due diligence on these proposed buyouts.  At least one attorney has
represented to the NYAG that he and his client had not reached out to Madison to seek payment
of the buyout; that there was, in fact, no unpaid buyout agreement, because the prior contract had
been rescinded by the parties; and that his client does not currently want to vacate the apartment
or be contacted about buyout agreements.  These facts are contrary to Madison's representation
that it is only seeking to satisfy buyout agreements that were breached by Toledano and where
the tenants are asking for payment. *See, e.g.,* Second Hearing Transcript at 38:13-16 (statement
by Mr. Feuerstein that "Madison would like the ability not to have to engage in litigation now
with respect to some of these tenant buyouts which have existed and actually tenants are actually
calling and saying where's my money.").

34

claim of a pre-petition secured party and to any waiver of section 506(c) rights with respect to

Madison.

103.    Eliminating the ability to surcharge Madison's collateral pursuant to 506(c) of the

Bankruptcy Code will foist all of the costs associated with the Chapter 11 process onto the

estates and unsecured creditors.  Congress' intent in enacting Section 506(c) was to ensure that

the debtor-in-possession would be entitled to recover expenses from its secured lender to the

extent that those expenses are necessarily and reasonably associated with preserving or disposing

of the lender's collateral.  Section 506(c) is "designed to prevent a windfall to the secured

creditor at the expense of the claimant." *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In*

*re Visual Indus., Inc.)*, 57 F.3d 321, 325-26 (3d Cir. 1995).  The rule "shifts to the secured party,

who has benefitted from the claimant's expenditure, the costs of preserving or disposing of the

secured party's collateral, which costs might otherwise be paid from the unencumbered assets of

the bankruptcy estate, providing that such unencumbered assets exist." *Id.*

104.    Moreover, such waivers have been found unenforceable on the basis that they

provide a windfall to the secured creditor at the expense of unsecured claimants.  *See e.g., In re*

*Lockwood Corp.*, 223 B.R. 170, 176 (B.A.P. 8th Cir. 1998); *Kivitz v. CIT Group/Sales Fin., Inc.*,

272 B.R. 332, 334 (D. Md. 2000) (section 506(c) of the Bankruptcy Code exists so that

unsecured creditors do not have to shoulder the cost of protecting collateral that is not theirs "and

to require the secured party to bear the costs of preserving or disposing of its own collateral"); *In*

*re Ridgeline Structures, Inc.*, 154 B.R. 831, 832 (Bankr. D. N.H. 1993) (waiver of rights

pursuant to 506(c) of the Bankruptcy Code without regard to party's action or inaction "is

against public policy and unenforceable *per se*"); *McAlpine v. Comerica Bank-Detroit (In re*

*Brown Bros, Inc.)*, 136 B.R. 470, 474 (W.D. Mich. 1991) (cash collateral order unenforceable to

35

the extent its provisions attempted to immunize postpetition lender from surcharge payment

obligations pursuant to section 506(c) of the Bankruptcy Code).  Given the fact that the Debtors

have not demonstrated any extraordinary circumstance justifying a section 506(c) waiver, this

Court should not permit such waiver.

B. _Fees Should Be Limited_

105.    The Court should not permit the Debtors to pay $10,000 a month to GCRE

(Consent Order, paragraph 19) because it is not clear how or when Toledano's equity partners

entered the picture or whether they should, like Toledano, be held responsible for the Debtors'

unlawful and inequitable conduct.

106.    The Consent Order allots $10,000 per month to GCRE as "manager of the

Debtors, responsible for all legal and financial matters."  The NYAG objects to the fees that will

benefit GCRE, given that there is no explanation as to what "all legal and financial matters"

would entail, there has been no transparency as to how GCRE took control of the Debtors and

GCRE through its manager David Goldwasser had no management experience with respect to

the Debtors or the Portfolio prior to March 28, 2017.

**IV.    _The NYAG Should Receive Notice and Must Have an Opportunity to Challenge the Findings in the Consent Order_**

107.    The Consent Order establishes various obligations of the Debtors, Madison and

Silverstone to provide certain notices and financial reporting to specified parties that do not

always include the NYAG.  The NYAG requests that the Consent Order be amended to include a

requirement that all notices and financial reporting required under the Consent Order also be

provided to the NYAG at the same time as such notice and/or financial reporting is provided to

36

any other party.14  In addition, to the extent that the Debtors and Madison have agreed that other creditors and their counsel may receive such notices from the NYAG, that permission should be expressly stated in the Consent Order.

108.    Due to the NYAG's serious concerns regarding Madison's pre-petition conduct, the NYAG requests that the Consent Order specifically provide that the NYAG may bring an "appropriate proceeding" during the Challenge Period to "investigate and challenge the Pre-Petition Obligations, Pre-Petition Liens, and Loan Documents and any of the other acknowledgements, representations, warranties, agreements, waivers and findings made" in the Consent Order.  (Consent Order, paragraph 25).  The terms of the Consent Order should also specifically state that the Consent Order is not binding on the NYAG.  (Consent Order, paragraph 34).

---

14 In paragraph 8 of the Consent Order the Debtors propose a 48-hour delay in transmitting the weekly disbursements notice to the NYAG.  There is no reason why the NYAG cannot be copied on every notice at the same time as the notice is sent to another party.

37

## CONCLUSION

WHEREFORE, for all of the above-stated reasons, the NYAG respectfully requests that the Court (i) deny the Consent Order, or (ii) alternatively, (a) direct modification of the proposed form of the Consent Order, including modifications to de-link the Consent Order and PMA; extend the timeframe of the milestones; eliminate any Event of Default that would result if the PMA is not approved or is terminated or the Debtors do not pursue a plan acceptable to Madison; limit the Debtors' and Madison's expenditures only to the remediation and operation of the properties for the benefit of current tenants; reject the Debtors' proposed waiver of section 506(c) rights with respect to Madison; eliminate inappropriate proposed fees; and ensure that the NYAG receives adequate notices and may pursue appropriate investigation and other actions during the proposed Challenge Period, so as to address the objections set forth herein, and (b) grant the NYAG such other and further relief as is just and proper.

*       *       *

Dated: May 15, 2017
    New York, New York

ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
120 Broadway, 3rd Floor
New York, New York 10271
(212) 416-8622

By: _____

ELENA GONZÁLEZ
Assistant Attorney General
elena.gonzalez@ag.ny.gov

MARK LADOV
Assistant Attorney General
mark.ladov@ag.ny.gov

JANE M. AZIA
Bureau Chief
LAURA J. LEVINE
  *of Counsel*

38