DAVID REISS, Esq.
107 Saint Marks Ave.
Brooklyn, NY  11217
718-791-0524

May 15, 2017

Elena Gonzalez, Assistant Attorney General
Mark Ladov, Assistant Attorney General
Consumer Frauds Bureau
Office of the Attorney General
120 Broadway, 3d floor
New York, NY  10271

**Re: <u>East Village Portfolio Transaction</u>**

Dear Ms. Gonzalez and Mr. Ladov:

You have requested that I review the facts and law relating to the matter captioned above and provide my opinion regarding certain issues in the context of real estate finance practices.  I am a Professor of Law at Brooklyn Law School, where I teach Real Estate Practice and other real-estate related courses.  I am also a Fellow of the American College of Real Estate Lawyers.  I was a practicing real estate attorney at Paul, Weiss, Rifkind, Wharton & Garrison for a number of years before commencing my academic career. My opinion is shaped by both my scholarly and practice experiences.

My review of the documents made available to me (and described below); the uncontested facts contained therein (which I assume to be true); the law and norms of practice relevant to this matter; and my legal experience lead me to the conclusion that Madison Realty Capital's financing of Raphael Toledano's acquisition of the East Village Portfolio (defined below) was both inadequate to execute their agreed-upon

1

business plan and based on assumptions that were in some cases inconsistent with applicable law.

## MATERIALS CONSIDERED

In preparing this report, I have reviewed the following materials that you have provided to me:

1. Meridian Capital Group, LLC, Confidential Financing Memorandum, East Village Multifamily Portfolio, dated June 2015 ("Meridian Memo");

2. Madison Realty Capital, Note Origination Investment Memorandum, Closed September 10, 2015 ("Madison Memo");

3. Signature Bank, East Village Multifamily Portfolio file (containing Signature Bank Doc pages 954-1024 & 1026-1113) ("Signature File");

4. Letter from Michael Bonneville to Jessica Attie re: Response to Subpoena, dated November 19, 2015;

5. Letter (along with its attachments) from Jeffrey L. Goldman to Mark Ladov and Jessica Attie re: February 14, 2017 Subpoena to Brookhill Properties ("Goldman Letter"), dated April 6, 1017;

6. Conversion Assumptions spreadsheet (July 9, 2015);

7. East Village Portfolio – 12 Month (B) spreadsheet (July 22, 2015);

8. East Village Portfolio Detailed CapEx Budget Breakdown (undated);

9. East Village Portfolio Sources & Uses spreadsheet (undated);

10. East Village Portfolio Buyout Tracking spreadsheet (undated);

11. Spreadsheet tracking apartment renovation of East Village Portfolio (undated);

2

12. "proposed floor plans" by Tersigni Palachek (undated);

13. Building Loan Agreement between 27 ST MARKS PLACE LLC et al. and EVP 1 LLC, dated as of September 10, 2015;

14. Project Loan Agreement between 27 ST MARKS PLACE LLC et al. and EVP 1 LLC, dated as September 10, 2015;

15. Summons and Complaint, EVF1 LLC v. 27 ST MARKS PLACE LLC et al., filed February 03, 2017 (Index No. 850052/2017) ("Complaint");

16. Mortgage Note in the amount of $89,667,660.00, dated as of September 10, 2015, by 27 ST MARKS PLACE LLC et al. for the benefit of EVP 1 LLC ("First Mortgage Note");

17. Mortgage Note in the amount of $20,000,000.00, dated as of September 10, 2015, by 27 ST MARKS PLACE LLC et al. for the benefit of EVP 1 LLC ("Second Mortgage Note");

18. Building Loan Note in the amount up to $10,068,000.00, dated as of September 10, 2015, by 27 ST MARKS PLACE LLC et al. for the benefit of EVP 1 LLC ("Building Loan Note");

19. Project Loan Note in the amount up to $4,249,340.00, dated as of September 10, 2015, by 27 ST MARKS PLACE LLC et al. for the benefit of EVP 1 LLC ("Project Loan Note");

20. Prepaid Interest Agreement, dated as of September 10, 2015, by and between EVP 1 LLC and 27 ST MARKS PLACE LLC et al. ("Prepaid Interest Agreement");

21. Agreement made as of February 2, 2017 by and between 223 EAST 5TH STREET LLC et al. and EV PORTFOLIO NYC LLC ("Sutton-Toledano Contract"); and

22. Letter from the New York City Department of Housing Preservation & Development to Dina Levy, dated May 11, 2017 ("HPD Letter").

## SUMMARY OF QUALIFICATIONS

I am a *magna cum laude* graduate of the New York University School of Law and am admitted to practice in New York and California.  In addition to teaching at Brooklyn Law School, I advise institutional investment managers regarding real estate finance issues through a variety of expert network firms.  I lecture across the country on real estate topics in a variety of fora.

My scholarship has focused on real estate subjects and an article of mine was selected as the best article of 2006 by the American College of Consumer Financial Services Lawyers.  I have given a keynote address at the Annual Meeting of the NYSBA Real Property Law Section and have lectured at the New York State Judicial Institute.  I have also testified before committees of the New York City Council on residential lending issues.

I have been sought out for comment on real estate subjects by, among other media, THE WASHINGTON POST, THE WALL STREET JOURNAL, VOICE OF AMERICA, USA TODAY, THE NEW YORK TIMES, REUTERS, NEW YORK NEWSDAY, NBC, NATIONAL PUBLIC RADIO, FOX, CBS, BLOOMBERG, BANKRATE.COM, the Associated Press, AMERICAN BANKER and ABC.

At Brooklyn Law School, I direct the Community Development Clinic where I train students to become attorneys, with an emphasis on real estate law.  I have also lectured for Kaplan Bar Review on foreclosure, mortgage and lien law and for BARBRI/Law Preview on property topics.

4

I am the editor of REFinBlog.com, which tracks developments in the law and practices of the real estate finance industry.

I have included a copy of my resume with this report which includes a list of all of my publications authored in the last ten years.

I was an expert in Securities and Exchange Commission v. Daniel H. Mudd, 11-CIV-9202 (PAC) (S.D.N.Y.) and was deposed in that case.

The Office of the Attorney General of the State of New York has agreed to compensate me at the rate of $750 per hour.

## OPINION

My opinion proceeds as follows.  First, I set forth the facts upon which my opinion is based.  I then set forth my specific opinions.

### Facts

My opinion is based upon the following facts that are primarily drawn from the Meridian Memo; Madison Memo; and Signature File.  Those facts were not always consistent because documents were prepared at different times based on different facts and assumptions.  I have attempted to identify ambiguities in the facts if they appear material to my opinion.

Raphael Toledano is a real estate professional active in the New York City multifamily building sector.  Madison Memo at 9.  He controls a number of companies including the Truman Realty Group.  Id.  Meridian Capital was the exclusive advisor to the Truman Realty Group as it sought acquisition financing for 15 buildings in Manhattan's East Village

with a total of 173,457 square feet (the "East Village Portfolio" or "Portfolio"). Meridian Memo at 1; Madison Memo at 1-2.

Madison Realty Capital ("Madison Realty") lends in the commercial real estate middle market sector using its capital and that of institutional investors. Signature File at 963. Madison Realty, through affiliated entities, acquires and redevelops properties in the New York region. Id. Madison Realty, on its own behalf, often purchases buildings, renovates the units and releases them at substantially higher rents, a strategy similar to the one at issue here. Id. The founders of Madison Realty are Joshua Zegen and Brian Schatz. Id. Like Toledano, Zegen and Schatz employ buyouts of rent regulated tenants as part of their repositioning strategy for multifamily buildings. Id. at 968. According to Signature Bank's Senior Vice President for Commercial Real Estate Joseph Fingerman, Madison Realty "would have no problem foreclosing and or owning" the Portfolio. Id. at 1049.

Signature Bank frequently works with Zegen and Schatz. Signature File at 963. Signature Bank has funded over 30 credit facilities to entities affiliated with Zegen and Schatz and all of their commitments to Signature Bank had been handled pursuant to the terms of the agreements. Id. Both Madison Realty and Signature Bank believed that Toledano had acquired the Portfolio at a price that was significantly below market. Madison Memo at 10; Signature File at 963. Among Signature Bank's underwriting assumptions was that Toledano would execute dozens of buyout agreements with rent regulated tenants and convert those apartments to free market rents. Signature File at passim.

Signature Bank identified the following risk that it faced in this transaction: the ability of Toledano "to manage the properties, maintain tenancy and cash flow to serve [Signature's] collateral . . ." Signature File at 996. Signature Bank identified the following risk

6

mitigation as well:  Madison Realty "has the requisite wherewithal and experience to satisfy monthly debt service and operate the properties in the event that" Toledano defaults.  Id. One of the main reasons that Signature Bank agreed to originate its loan was that Madison Realty had "an excellent payment history."  Id. at 997.

Toledano acquired the Portfolio on September 10, 2015.  Madison Memo at 1.  These 15 buildings contained 281 residential units and 15 commercial units.  Id. at 1.  At the time of the acquisition, the Portfolio contained approximately 192 rent stabilized units and 13 rent controlled units.  Id.  All of the residential units were either studios or 1 bedrooms prior to the closing of the transaction. Id. at 5.  Madison noted that Toledano planned to "pursue tenant buyouts of rent stabilized units in order to convert them to free market units."  Id. at 6.  Madison also noted that Toledano also planned on converting all of the apartments to one, two, three and four bedroom apartments.  Id. at 5.  The Madison Memo contains a rendering of a proposed conversion of a one bedroom to a three-bedroom unit with one windowless bedroom.  Id. at 6.  Madison assumed that Toledano would renovate 143 of those apartments in the first two years.  Id. at 7.

Toledano acquired the properties in an off-market deal for $99,530,000 from members of the Tabak family.  Id. at 1-2.  Madison provided a fully funded loan amount of $123,990,000 for the transaction which included a $13,880,000 reserve for unit renovations, tenant buyouts and building capital expenditures.  Id. at 1.  Many of the documents relating to this transaction indicate that there was to be a $103,990,000 first mortgage and a $20,000,000 second mortgage.  Id. at 3. Madison Realty ultimately funded the transaction by means of four mortgages.  First Mortgage Note; Second Mortgage Note; Building Loan Note; Project Loan Note.  The Portfolio loans had a two-year term.  Madison Memo at 2.

Signature Bank provided $70,000,000 of the funding for the transaction. Madison Memo at 4. Signature's funding was provided by means of a Senior Participation Loan. Signature File at 957. Signature's loan was secured by a first priority security interest in the first mortgage that Madison originated as part of the transaction with Toledano. Signature File at 962.

Toledano's business plan was to dramatically increase tenant turnover in the building, renovate the apartments and common areas; and lease the apartments at rents that were multiples of the existing rents. Id. at 6. Toledano planned on converting 61 of the 192 rent stabilized units and 2 of the 13 rent controlled units to free market rents within the first two years of his acquisition of the Portfolio. Id. at 7. He budgeted $3,250,000, or a bit more than $50,000 per unit, for these buyout costs. Id. He expected to double the rent roll of the Portfolio within the first two years. Id. at 8. Toledano's actual buyout costs were significantly higher than those projections. Sutton-Toledano Contract, Ex. E (Surrender Charges) (listing just 13 buyouts for which Toledano paid more than $1,900,000; eight of the buyouts were for six figures and the highest one was for $550,000).

Pursuant to the terms of the transaction, Toledano would owe a significant amount of deferred interest and fees at the end of the term of the mortgages. Signature File at 964, 970. Before the loans were paid off, Madison Realty issued default letters to Toledano, dated on or about August 8, 2016. Complaint passim. Toledano failed to make monthly interest payments beginning July 1, 2016. Id. The Prepaid Interest Agreement covered a large portion of the interest payments that were due before Toledano's default. Prepaid Interest Agreement at 2 (noting that $3,767,210.96 had been advanced from the First Mortgage and $326,506.60 from the Project Loan and remitted to the lender for the prepayment of interest

8

due under the two loans). Among other problems, Toledano's renovations of the Portfolio were going slowly. Signature File at 1027.

Sample Property Profiles

*27 Saint Marks Avenue.* The property is a six-story mixed used, residential building with ground floor retail. Signature File at 973. Upon the closing of the transaction, the property contained 20 one-bedroom apartments of which 19 were rent stabilized. Id. The building had a total of 14,644 square feet which includes two ground floor retail spaces. Id. Toledano expected to convert 47% of the rent-regulated apartments in this property to free market within his first two years of ownership. Madison Memo at 62. According to the New York City Department of Finance, property taxes for this property increased 6.6% from June 2014 to June 2015 and 12% from June 2015 to June 2016.

*223 East 5th Street.* The property is a five-story mixed-use residential building with ground floor retail. Id. Upon the closing of the transaction, the property contained 18 one bedroom apartments of which 11 are rent stabilized and one is rent controlled. Id. The building had a total of 9,250 square feet which includes ground floor retail space that appears to be vacant. Id. at 973 & 1006. Toledano expected to convert 83% of the rent-regulated apartments in this property to free market within his first two years of ownership. Madison Memo at 20. According to the New York City Department of Finance, property taxes for this property increased 0% from June 2014 to June 2015 and 21% from June 2015 to June 2016.

*229 East 5th Street.* The property is a five-story residential building with ground floor retail. Id. at 973. Upon the closing of the transaction, the property contained 10 one bedroom apartments of which five are rent controlled. Id. The building had a total of 9,500 square feet which includes ground floor retail space that appears to be vacant. Id. at 973 & 1007. Toledano expected to convert 100% of the rent-regulated apartments in this property to free market within his first two years of ownership. Madison Memo at 23. According to the

New York City Department of Finance, property taxes for this property increased 6% from June 2014 to June 2015 and 59% from June 2015 to June 2016.

### Specific Opinions

Based on the preceding facts, I reach the following specific opinions:

- *Illegal bedrooms.* Bedrooms in New York City must contain a window. NYC Building Code §§ 27-232 (defining habitable room to include bedroom), 27-732 (habitable rooms must have natural light), 27-733 (natural light must be provided by window or other natural light transmitting media). The proposed conversion of a one bedroom to a three-bedroom unit contained in the Madison Memo reveals that Toledano planned to market windowless rooms as bedrooms. Madison Memo at 6. The "proposed floor plans" prepared by Tersigni Palachek reveal much the same. For instance, the "proposed floor plans" prepared for Toledano's Truman Realty Group show 1-bedroom apartments at 233 East 5th Street being renovated to include two code compliant bedrooms and two other windowless offices. These other rooms were to be marketed as bedrooms, according to the Madison Memo at 31 and the Meridian Memo at 19.

  The Property Overview prepared by Meridian also made this clear. Meridian Memo at 11-27. For instance, Toledano conversion plans indicated that 27 St. Marks Place, for instance, would be renovated to house 80 bedrooms while the buildings only had about 40 windows in the residential units. Id. at 12. Similarly, the expansion plan for

323-325 East 12th Street contemplated 152 bedrooms in a building with about half
that number of windows. Id. at 22. As experienced New York City residential real
estate professionals, Toledano, Meridian, Madison and Signature would be well-
aware of the legal requirement for windows in bedrooms.

- *Faulty underwriting.* Lenders typically like to have a debt service coverage ratio of
  at least 1.20 to ensure that the net operating income will cover the debt payments as
  they become due. (The debt service coverage ratio is calculated by dividing net
  operating income by debt service (NOI/DS). ) The debt service coverage ratio for
  this transaction was much lower.

Analyzing Madison Realty's own pro forma, one sees that the In-Place net operating
income was insufficient to cover the minimum debt service required to keep the
Portfolio loans from defaulting. (In-Place refers to the state of affairs at the time of
Toledano's purchase of the Portfolio with certain additional assumptions about
future rents for vacant units. Madison Realty at 7.) And, as discussed below, the
Adjusted In-Place net operating income was based on faulty assumptions. (Adjusted
In-Place assumes that all fair market and some rent-regulated units are renovated and
re-leased at market rents. Id.) In particular, the Adjusted In-Place pro forma
numbers materially overestimated revenues and materially underestimated expenses.

The In-Place numbers clearly show that the estimated net operating income of
$3,403,948 would be insufficient to cover the debt service of even just the First
Mortgage. Madison Memo at 8 (providing net operating income). Toledano was
required to pay 6% interest on that $89,667,660 mortgage. First Mortgage Note.
That comes out to approximately $5,380,000 per year in interest (or $448,333 per

month).  Thus, based on the In-Place numbers, there would be a shortfall of nearly $2,000,000 per year.

The Prepaid Interest Agreement set aside $4,093,718 in prepaid interest.  The Prepaid Interest Agreement allowed Madison Realty to hold onto these funds, and to apply them to the initial monthly payments due under Portfolio loans, so that Toledano would not be responsible for paying out of his own funds until this reserve was exhausted.  Prepaid Interest Agreement at 2.  The prepaid interest would cover fewer than ten months of payments, based on the most conservative assumptions about Toledano's drawing on the Project Loan ($4,093,718/$448,3332).  And, indeed, Toledano failed to make any interest payments within ten months of the September 10, 2015 closing date: he missed his July 1, 2016 payment which led to his default on the Portfolio loans.  Complaint passim.  The In-Place numbers also made certain aggressive assumptions about operating expenses that made the gap between net operating income and debt service even greater, as discussed below.

The Adjusted In-Place numbers assumed that net operating income nearly doubled the In-Place net operating income, amounting to $6,696,587.  While on its face, this amount would be enough to cover the debt service, it is based on a series of inappropriate assumptions about revenues and expenses.

As to overestimated revenues, the rent roll projections did not properly account for the vacancies that the apartment renovations would entail because the pro forma only included a 2% vacancy allowance.  See, e.g., Madison Memo at 8, Signature File at 1052.  A 2% vacancy allowance reflects vacancies that would even be low in a fully-

12

rented building, not buildings going through rapid tenant turnover and renovation like those in the Portfolio.  In general, underwriters might use vacancy rates of 3-8%, depending on the type of property and local market conditions.  For instance, a real estate finance textbook uses a vacancy rate of 5% and an additional credit loss of 1% for unpaid rent for its valuation case study.  William B. Brueggeman & Jeffrey D. Fisher, Real Estate Finance and Investments (12th ed.).  Even in Manhattan's hot rental market in 2015, the vacancy rate was higher than here.  The Douglas Elliman real estate firm found that the overall vacancy rate for the Manhattan rental market was 2.48% in July of 2015.  Douglas Elliman Real Estate, Elliman Report: Manhattan, Brooklyn & Queens Rentals (July 2015), available at https://www.elliman.com/pdf/3b93558cba70c9ea123f73a6579604aa12885a3b.

The vacancies in Portfolio were underwritten to be just 80% (2% v. 2.48%) of the overall Manhattan rate in July of 2015.  But Toledano intended to create numerous vacancies during the term of the loan that would necessarily drive the vacancy rate higher.  These vacancies resulted from the buyouts and resulting renovations that Toledano planned.  In fact, those planned vacancies would drive the vacancy rate well over 2% on their own.  I reach that conclusion based on the following.  There are 281 units in the portfolio.  Madison Memo at 1.  Madison assumed that Toledano would renovate 143 of those apartments in the first two years.  Madison Memo at 7.  The mortgage term is for 24 months and there are 281 units, which means that there are a maximum of 6,744 months of occupancy for all units over the course of those two years.  The underwriting assumed that Toledano would take two months to renovate each unit.  This is, for starters, an aggressive renovation schedule for a project of this scale.  HPD Letter at 2.  Therefore, he was planning on 286 months of unit vacancies for those planned renovations (286/6,744).  This results in a vacancy rate of over 4% during the term of the mortgage.  This 4% figure is just based on

planned vacancies, of course, and it is a figure that is twice as large as the vacancy rate that Madison relied on for its underwriting assumptions.  Unplanned vacancies would only drive the number higher. If we rely on Toledano's very conservative 2% figure for unplanned vacancies, the combined vacancy rate would be a minimum of 6%.  Whatever is theoretically appropriate for a vacancy rate for a project like this, the fact is that the Portfolio had a vacancy rate that reached well into the double digits, according to Toledano's own spreadsheets.  But even if we use the 6% figure, the Adjusted In-Place net operating income would decrease by approximately $337,000/year.

Accounting for the increased vacancies that would result from Toledano's aggressive buyout and renovation plans would significantly decrease the debt service coverage ratios used in Madison Realty and Signature Bank's underwriting of the Portfolio loans.  As Signature Bank acknowledged by early 2016, a couple of months after the closing, the debt service coverage ratio "is an exception to policy."  Signature File at 1048.

Madison Realty's estimates of operating expenses was unrealistic as well.  For instance, the Madison Memo budgets a 3% increase in real property taxes for the portfolio between Toledano's acquisition and the second year of the loan.  Madison Memo at 8.  But the actual increases the year prior to the transaction and the year after the transaction were generally much higher.  This was to be expected, given past increases.  For example, consider the property tax increases for three of the properties for the year before the acquisition and for the year after the acquisition. For 27 Saint Marks Place, Property taxes increased 6.6% from June 2014 to June

14

2015 and 12% from June 2015 to June 2016.  For 223 East 5th Street, property taxes increased 0% from June 2014 to June 2015 and 21% from June 2015 to June 2016. For 229 East 5th Street, property taxes increased 6% from June 2014 to June 2015 and 59% from June 2015 to June 2016.  The 3% that Madison Realty budgeted was clearly out of step with historical property tax increases.

The New York City Department of Housing Preservation and Development has also determined that the "In-Place" operating expenses (exclusive of real property taxes) of $3,920 per apartment are significantly lower than operating expenses used in the Community Preservation Corporation ("CPC") and The New York City Housing Development Corporation ("HDC") underwriting standards.   HPD Letter at 2. CPC's estimated operating expenses for the project are $6,813 per apartment and HDC's are $7,363 per apartment.  Id.  That is, CPC's estimate would be 74% higher than Toledano's and HDC's would be 88% higher.  As one example of the difference between the Toledano numbers on the one hand and the CPC and HDC numbers on the other, Toledano budgeted $75,000 for a super for all 15 buildings while CPC and HDC budgeted closer to $300,000 for maintenance staff salaries for the 15 buildings. Madison Memo at 8, HPD Letter at 2.  Toledano's estimate of operating expenses come in about $1,000,000/year lower than CPC and HDC's.

Taking the effect of the low vacancy rate, low property tax and low operating expense estimates together, I conclude that the project was underwritten with insufficient net operating income to meet its minimum debt service.  I reach this conclusion based on conservative assumptions.  For instance, I have not accounted for the additional interest that was due on the Building Loan Note and the Project Loan Note.

15

And the fact is that the actual vacancy rate and expenses even exceeded my more realistic estimates.  If one also takes into account rent roll projections based on unlawfully marketing one- or two-bedroom apartments as three- or four-bedroom apartments, I am of the opinion that the underwriting was fatally flawed at the time of the closing of the transaction.

- *Win/Win for Madison Realty.*  Signature Bank's underwriting of the transaction was more focused on whether Madison Realty could keep Signature Bank whole than whether Toledano could.  As Signature Bank noted, Madison Realty "has the requisite wherewithal and experience to satisfy monthly debt service and operate the properties in the event that" Toledano defaults.  Signature File at 996.  Given the inadequate debt service coverage ratio, the transaction was not designed to succeed on its own terms.  But Madison Realty designed the transaction so that it would benefit from it whether or not Toledano succeeded because it could take control of the Portfolio and execute the business plan itself.

## **CONCLUSION**

After reviewing Madison Realty and Signature Bank's underwriting materials, it is my opinion that the transaction was not structured in full accordance with applicable law nor to succeed on its own terms.

Sincerely,

David Reiss

Attachment:

Resume of Professor David Reiss

**DAVID REISS**
david.reiss@brooklaw.edu

**Home**                                                                                                **Work**
107 Saint Marks Avenue                                                              Brooklyn Law School
Brooklyn, NY  11217                                                                          1 Boerum Place
c(718) 791-0524                                                                        Brooklyn, NY  11201
                                                                                                   w(718) 780-0636

**EDUCATION**

**NEW YORK UNIVERSITY SCHOOL OF LAW**, New York, NY
J.D., *magna cum laude*, May 1996 (admitted in New York and California)
Honors:          Order of the Coif
                      ANNUAL SURVEY OF AMERICAN LAW, Staff Editor
                      Public Interest Committee Grant Recipient
Activities:      Civil Legal Services Clinic
                      Research, Education and Advocacy to Combat Homelessness, Clinic Coordinator
                      NYU School of Law Alumni Task Force

**WILLIAMS COLLEGE**, Williamstown, MA
B.A., *cum laude*, with honors in Philosophy, June 1989
Honors:          National Merit Scholar
                      National Endowment for the Humanities Younger Scholar
                      Lehman Service Scholar
                      John W. Miller Prize in Philosophy
                      Gargoyle (Honors) Society Member

**EXPERIENCE**

**BROOKLYN LAW SCHOOL**                                                    **August 2003-present**
Brooklyn, NY
*Professor (previously Associate and Assistant Professor)* - Teach Property, Real Estate Practice and
Property Law Colloquium; direct Community Development Clinic.  Academic Program Director, Center
for Business Entrepreneurship (CUBE); served on Entry-Level Appointments Subcommittee (chair);
Publication (chair), Adjustment, Career, Clerkship, Clinics, CUBE, Public Service, and ad hoc Loan
Repayment Program Committees.  Faculty Advisor for urban planning joint degree programs.  Former
Faculty Advisor for JOURNAL OF LAW AND POLICY (2007-2012) and PRACTICUM (2012-2014).

**FURMAN CENTER, NYU**                                                   **August 2016- December 2017**
New York, NY
*Research Affiliate –* Work with faculty and staff at this real estate and urban policy research center
jointly run by law school and public service school.

**FILENE RESEARCH INSTITUTE, INC.**                               **August 2010-January 2011**
Madison, WI
*Principal Investigator –*Prepared report on the future role of Fannie Mae and Freddie Mac in secondary
mortgage market.

**PRATT INSTITUTE GRADUATE CENTER**
**FOR PLANNING & THE ENVIRONMENT**                    **August 2009-December 2013**
Brooklyn, NY
*Visiting Assistant (Adjunct) Professor* - Teach Property Law Colloquium (co-listed with Brooklyn Law School).

**BAR/BRI LAW PREVIEW**                                                    **July 2007-present**
Plymouth, MA
*Lecturer* - Teach fundamentals of property law to incoming students of law schools throughout the country.

**SETON HALL LAW SCHOOL**                                              **May 2002-July 2003**
Newark, NJ
*Visiting Clinical Associate Professor* - Supervised Center for Social Justice's Civil Litigation Clinic and taught related course. Litigated predatory lending, fair housing, consumer fraud, bankruptcy and civil rights cases.  Trained mortgage counselors throughout New Jersey.  Organized predatory lending conference.

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON**         **Dec. 1998-April 2002 and**
New York, NY                                                            **Summers 1995, 1996**
*Associate -* Worked in Real Estate Department.  Represented corporations, not-for-profits, and governments on wide variety of real property transfer, finance, leasing and construction matters.  Volunteered hundreds of hours advising not-for-profits on real estate issues, helping low-income seniors draft estate-planning documents through Volunteer Legal Services and acting as counsel to minority- and women-owned businesses through Upper Manhattan Empowerment Zone.

**MORRISON & FOERSTER**                                          **Sept. 1997-Sept. 1998**
San Francisco, CA
*Associate -* Worked in Land Use and Environmental Law Group on litigation, regulatory and transactional matters.  Drafted brief for case winning reversal in Ninth Circuit and numerous successful briefs for cases before federal District Courts.  Conducted comprehensive review of zoning requirements for billboard placement company.  Conducted environmental due diligence for sale of power plants and related properties.  On pro bono basis, won major victory preventing mass eviction of nursing home residents and advised immigrants regarding immigration law issues.

**JUDGE TIMOTHY K. LEWIS, UNITED STATES COURT OF APPEALS**    **Sept. 1996-Aug. 1997**
**FOR THE THIRD CIRCUIT**
Pittsburgh, PA
*Clerk -* Worked closely with judge, drafting and editing opinions and speeches.

**PARODNECK FOUNDATION**                                             **Summer 1994**
New York, NY
*Legal Research Intern -* Analyzed issues in housing law and policy for this tenant advocacy organization.  Substantially revised housing law handbook for residents and tenant organizers of buildings owned by New York City.  Developed and implemented strategy to change City housing policy and to facilitate tenant organization.

**PROFESSOR MICHAEL SCHILL, NYU SCHOOL OF LAW**          **Summer and Fall 1994**
New York, NY
*Research Assistant -* Researched city-owned housing issues for then Director of the Center for Real Estate and Urban Policy.  Composed comprehensive bibliography of all scholarly, business, governmental and other resources regarding New York City and New York State housing policy.

**DEAN JOHN SEXTON, NYU SCHOOL OF LAW**                    **Summer and Fall 1994**
New York, NY
***Research and Teaching Assistant -*** Researched recent developments in Religion Clause case law.
Assisted in instruction of undergraduate course on same topic taught by this Dean (and later President of
NYU).

**PROFESSOR VICKI BEEN, NYU SCHOOL OF LAW**                    **Summer and Fall 1994**
New York, NY
***Research Assistant*** - Researched correlation between location of public housing projects and
socioeconomic status of surrounding communities.

**COMMUNITY ACCESS, INC.**                    **Sept. 1989-Aug. 1993**
New York, NY
***Administrative Director, Housing Services*** (July 1991-Aug. 1993)
Provided administrative and clinical supervision to seven housing programs and 40 staff members serving
170 mentally ill tenants.  Conducted new housing rent-up, quality assurance and programming.
Supervised Intake Department.  Created training manuals and implemented training procedures for staff
and clients.

***Intake Coordinator*** (April 1990-June 1991)
Coordinated all admissions into one vocational and five residential programs for mentally ill adults.
Compiled statistical reports for government agencies.  Created innovative database system to monitor
referrals and admissions into agency.  Acted as agency spokesperson.

***Case Manager*** (Sept. 1989-March 1990)
Served as sole case manager responsible for locating and placing homeless, mentally ill clients in
housing.


## BOOKS

— PAYING FOR THE AMERICAN DREAM:  HOW TO REFORM THE MARKET FOR MORTGAGES (Oxford
University Press forthcoming)


## SCHOLARLY ARTICLES

— *The Federal Housing Administration and African-American Homeownership*, ABA JOURNAL OF
AFFORDABLE HOUSING & COMMUNITY DEVELOPMENT LAW (forthcoming 2017-18)

— *Underwriting Sustainable Homeownership:  The Federal Housing Administration and The Low Down
Payment Loan*, GEORGIA LAW REVIEW (forthcoming 2017)

— *Who Should Be Providing Mortgage Credit to American Households*?,  TULANE LAW REVIEW (2014-
2015) (response)

— *An Overview of the Fannie and Freddie Conservatorship Litigation*, NYU JOURNAL OF LAW AND
BUSINESS (2014) (symposium submission)

— *REMIC Tax Enforcement as Financial-Market Regulator*, UNIVERSITY OF PENNSYLVANIA JOURNAL
OF BUSINESS LAW (2014) (with Brad Borden)

— *Consumer Protection in the Shadow of Shadow Banking*, BROOKLYN JOURNAL OF CORPORATE,
FINANCIAL & COMMERCIAL LAW (2012) (symposium issue)

— *Reforming the Residential Mortgage-Backed Securities Market*, HAMLINE LAW REVIEW (2012)
(symposium submission)

— *Message in a Mortgage:  What Dodd Frank's "Qualified Mortgage" Tells Us About Ourselves*, BOSTON UNIVERSITY REVIEW OF BANKING & FINANCIAL LAW (2012) (symposium submission) (reprinted in FSOKX.com NEWSLETTER (Apr. 16, 2013)

— *Fannie Mae and Freddie Mac and the Future of Federal Housing Finance Policy:  A Study of Regulatory Privilege*, ALABAMA LAW REVIEW (2010)

— *First Principles for an Effective Federal Housing Policy*, BROOKLYN JOURNAL OF INTERNATIONAL LAW (2010) (symposium submission)

— *Landlords of Last Resort:  Should the Government Subsidize the Owners of Small Multifamily Buildings?*, WESTERN NEW ENGLAND LAW REVIEW (2010) (symposium submission)

— *Rating Agencies and Reputational Risk*, MARYLAND JOURNAL OF BUSINESS AND TECHNOLOGY LAW (2009) (symposium submission)

— *The Role of the Fannie Mae/Freddie Mac Duopoly in the American Housing Market*, JOURNAL OF FINANCIAL REGULATION AND COMPLIANCE (2009) (invited submission)

— *Ratings Failure: The Need for a Consumer Protection Agenda in Rating Agency Regulation*, BANKING AND FINANCIAL SERVICES POLICY REPORT (2009) (invited submission) (reprinted in REGULATION OF CREDIT RATING AGENCIES (Gayathri, ed.) (2010))

— *The Federal Government's Implied Guarantee of Fannie Mae and Freddie Mac's Obligations:  Uncle Sam Will Pick Up the Tab*, GEORGIA LAW REVIEW (2008)

— *Subprime Standardization:  How Rating Agencies Allow Predatory Lending To Flourish in The Secondary Mortgage Market*, FLORIDA STATE UNIVERSITY LAW REVIEW (2006) (selected as best article of 2005 by the American College of Consumer Financial Services Lawyers)

— *Modeling a Response to Predatory Lending: The New Jersey Home Ownership Security Act of 2002*, RUTGERS LAW JOURNAL (2004) (co-author: B. Azmy)

— *Jefferson and Madison as Icons in Judicial History:  A Study of Religion Clause Jurisprudence*, UNIVERSITY OF MARYLAND LAW REVIEW (2002)

— *Housing Abandonment and New York City's Response*, NEW YORK UNIVERSITY REVIEW OF LAW & SOCIAL CHANGE (1996-1997)

— *Neighborhood Entrepreneurs Program in New York City*, JOURNAL OF AFFORDABLE HOUSING & COMMUNITY DEVELOPMENT LAW (1996)

## BOOK CHAPTERS

— *Foundations of Federal Housing Policy in* COMMUNITY, HOME, AND IDENTITY (Michael Diamond, & Terry Turnipseed, editors) (2012)

— *Fannie Mae and Freddie Mac:  Creatures of Regulatory Privilege in* FINANCIAL INSTITUTIONS AND MARKETS: CURRENT ISSUES IN FINANCIAL MARKETS (Robert R. Bliss and George G. Kaufman, eds.) (2010)

— *Rating Agencies:  Facilitators of Predatory Lending in the Subprime Market in* LESSONS FROM THE FINANCIAL CRISIS: INSIGHTS AND ANALYSIS FROM TODAY'S LEADING MINDS (Robert W. Kolb, ed.) (2010)

— *Fannie Mae and Freddie Mac:  Privatizing Profit and Socializing Loss in* LESSONS FROM THE FINANCIAL CRISIS: INSIGHTS AND ANALYSIS FROM TODAY'S LEADING MINDS (Robert W. Kolb, ed.) (2010)

— *How We Got Where We Are:  The Lessons of History*, chapter in NO MORE 'HOUSING OF LAST RESORT' – THE IMPORTANCE OF AFFORDABILITY AND RESIDENT PARTICIPATION IN IN REM HOUSING (Task Force on City-Owned Property, April 1996)

**POLICY BRIEFS**

— *Reinventing Homeownership:  A Compendium of Concepts to Consider* (with Denise Gabel) (Filene Research Institute) (2012)

— *Which Future for Fannie and Freddie?*, CATO INSTITUTE POLICY ANALYSIS (2011)

— *Fannie Mae and Freddie Mac:  Implications for Credit Unions* (a report prepared for the Filene Research Institute) (2011)


**AMICUS BRIEFS**

— Legal Services Center of Harvard Law School and other law professors in *Montgomery County, Pennsylvania Recorder of Deeds v. Merscorp Inc*., (U.S. Ct. App. 3d Cir. No. 14-4315)


**SHORTER PUBLICATIONS**

— Gorsuch, CFPB And Future Of The Administrative State, LAW360 (Feb 10, 2017)

— *Sloppy, Sloppy, Sloppy:  The State of The Mortgage Market*, CEB REAL PROPERTY LAW REPORTER, (May 2016)

— *Ensuring That Homeownership Is Sustainable*, WESTLAW J. BANK & LENDER LIABILITY (May 31, 2016)

— *The Federal Housing Administration (FHA) and Private Mortgage Insurance (PMI): A Bibliography*, (Working Paper, 2016),

— *Panel Four: The Future of Fannie and Freddie*, N.Y.U. J.L. & BUS. (2014) (with Michael Levine, Mark Calabria, Lawrence J. White, Mark Willis)

— *3 Housing Riddles for De Blasio*, LAW360.COM (Nov. 19, 2013)

— *Dirty REMICs, Revisited*, PROBATE & PROPERTY (Nov./Dec. 2013) (with Brad Borden)

— *The Emperor's New Loans: A Cautionary Tale from the Subprime Era*, PRACTICUM (Apr. 12, 2013), , *reprinted in* AALS SECTION ON REAL ESTATE TRANSACTIONS NEWSLETTER (Fall 2013)

— *Dirt Lawyers And REMIC Failures*, PROBATE AND PROPERTY (May/June 2013) (with Brad Borden)

— *Show Me The Note!*, THOMSON REUTERS NEWS & INSIGHT (2013) (with KeAupuni Akina & Brad Borden)

— *Goliath Versus Goliath in High-Stakes MBS Litigation,* WESTLAW JOURNAL SECURITIES LITIGATION & REGULATION (Sept. 4, 2013) (with Brad Borden)

— *Once a Failed REMIC, Never a* REMIC, 30 CAYMAN FINANCIAL REVIEW (2013) (with Brad Borden)

— *Cleaning Up the Financial Crisis of 2008:  Prosecutorial Discretion or Prosecutorial Abdication?,* BNA CRIMINAL LAW REPORTER (Mar. 20, 2013) (with Brad Borden), *reprinted in* BNA BANKING REPORTER (Mar. 26, 2013) and BLS LAWNOTES (Spring 2013)

— *Beneficial Ownership and the REMIC Classification Rules*, CORPORATE TAX AND BUSINESS PLANNING REVIEW (Nov. 7,  2012) (with Brad Borden)

— *Wall Street Rules Applied to REMIC Classification*, THOMSON REUTERS NEWS & INSIGHT (September 13, 2012) (with Brad Borden), *reprinted in* SECURITIES LITIGATION & REGULATION WESTLAW JOURNAL (Oct. 30, 2012)

— *Fannie Mae and Freddie Mac:  A Bibliography,* (Working Paper, 2012),

— *Three Principles for Federal Housing Policy*, PROBATE & PROPERTY (Mar./Apr. 2012)

— *Learning from Financial History:  An Academic Never Forgets*, WESTLAW JOURNAL EXPERT COMMENTARY SERIES CONSUMER PROTECTION UPDATE:  BANKING, FINANCE & DATA PRIVACY 8 (2011) ((*reprinted in* BANK & LENDER LIABILITY 4 (Sept. 12, 2011) *and in* AALS SECTION ON REAL ESTATE TRANSACTIONS NEWSLETTER (2011))

— *The Legal Regulation of Predatory and Subprime Lending*, ELSEVIER ENCYCLOPEDIA OF HOUSING AND HOME (2011)

— *How the Residential Mortgage-Backed Securities Market Impacts Dirt Lawyers and Their Clients*, 35 N.Y. REAL PROPERTY LAW JOURNAL 35 (Fall 2007)

## BOOK REVIEWS

— ENVIRONMENT AND PLANNING A (2013) (*reviewing* EDWARD GLAESER, TRIUMPH OF THE CITY:  HOW OUR GREATEST INVENTION MAKES US RICHER, SMARTER, GREENER, HEALTHIER, AND HAPPIER (2011))

— ENVIRONMENT AND PLANNING A (2011) (*reviewing* KATHLEEN ENGEL & PATRICIA MCCOY, THE SUBPRIME VIRUS (2011)) (*reprinted in* 9 AALS SECTION ON REAL ESTATE TRANSACTIONS NEWSLETTER 2 (June 2, 2011))

— 42 ENVIRONMENT AND PLANNING A 253 (2010) (*reviewing* DAN IMMERGLUCK, FORECLOSED:  HIGH-RISK LENDING, DEREGULATION, AND THE UNDERMINING OF AMERICA'S MORTGAGE MARKET (2009))

— 37 ENVIRONMENT & PLANNING A 756 (2005) (*reviewing* J. DeFilippis, UNMAKING GOLIATH:  COMMUNITY CONTROL IN THE FACE OF GLOBAL CAPITAL (2003))

## POPULAR PRESS

— *Trump's Budget Proposal Is Bad News for Housing Across the Nation*, THE HILL (March 16, 2017)

— *Why Repealing Dodd-Frank Is Unappealing if You Own a Home*, THE HILL (Feb. 13, 2017)

— *The Future of American Home Ownership Under President Trump*, THE HILL (Jan. 30, 2017)

— *Hamilton Acted in Good Faith. Will Steven Mnuchin Do The Same?*, THE HILL (Jan. 13, 2017)

— *Ben Carson's Call of Duty as America's Housing Chief*, THE HILL (Jan. 5, 2017)

— *It's Time to Expand The Credit Box for American Homebuyers*, THE HILL (Dec. 27, 2016)

— *It's Time to Take Housing Finance Reform Through The 21st Century*, THE HILL (Dec. 7, 2016)

— *An Uneasy Justification for Prosecutorial Abdication in the Subprime Industry*, HUFFINGTON POST (Nov. 7, 2012) (with Brad Borden)

— *Eminently Reasonable*, NATIONAL LAW JOURNAL (Sept. 24, 2012)

— *Abolish Fannie and Freddie,* AOL NEWS (Feb. 2011)

— *Coming Out of Conservatorship: Developing an Exit Strategy for Fannie and Freddie,* LOMBARD STREET (July 2009)

— *Hail Paulson*, LEGAL TIMES (Sept. 29, 2008)

— *After Fannie and Freddie*, NATIONAL LAW JOURNAL (Sept. 15, 2008)

— *Fannie Mae & Freddie Mac:  Socialization of Loss*, NATIONAL LAW JOURNAL (July 17, 2008)

— *Time To Avert a Bailout*, NATIONAL LAW JOURNAL (Jan. 29, 2007)

— *No Safety Net for Fannie and Freddie*, CHRISTIAN SCIENCE MONITOR (Jul. 13, 2006)

— *Supreme Power to Seize Land Goes Too Far*, N.Y. DAILY NEWS (Mar. 6, 2006)

— *Predatory Lending: Let the States Legislate*, NATIONAL LAW JOURNAL (Mar. 7, 2005)

— *Hold the Line against Diluting Anti-Predatory Lending Law*, NEW JERSEY LAW JOURNAL (Jan. 26, 2004) (co-author: B. Azmy)

— *Unusual Impetus for a Consumer Law: Amendments to Antipredatory Lending Statute Underscore Investors' Clout*, NEW JERSEY LAW JOURNAL (Aug. 23, 2004)

— *Lenders Threaten To Gut Protections*, PHILADELPHIA INQUIRER (Dec. 18, 2003) (co-author: B. Azmy)

## SELECTED PRESENTATIONS

— *Sustainable Housing  Markets*, Sustainability Conference of American Legal Educators, Arizona State University (May 12, 2017)

— *Sustainable Housing Markets*, Association of Law, Property, and Society 8th Annual Meeting at the University of Michigan (May 19th, 2017)

— *Paying for the American Dream:  How to Reform the Market for Mortgages*, NYU Furman Center for Real Estate and Urban Policy (November 17, 2016)

— *Equitable Subrogation in Mortgage Refinancing and Land Purchase Transactions, Real Property*, Trust and Estate Law Section of the American Bar Association "Professors' Corner" teleconference presentation (December 7, 2015) (invited speaker)

— Moderator, *Planning and Protesting Public Spaces*, Brooklyn Book Festival (Sept. 21, 2014)

— *Just Do It?  Whether to Incorporate Social Justice Theory in Every Clinical Experience and If So, How*, AALS Clinical Conference (Apr. 29, 2014)

— *The Future of Fannie Mae & Freddie Mac*, Urban Land Institute (Nov. 21, 2013) (panelist)

— *Enforcing Negotiable Mortgage Notes*, Justices of the New York State Supreme Court (Kings County) Foreclosure Committee (October 7, 2013)

— *How Low Is Too Low? The Federal Housing Administration and The Low Down Payment Loan*, Canadian Law and Economics Association Annual Meeting (Sept. 28, 2013)

— *Transitioning Fannie and Freddie*, NYU School of Law, The Future of Fannie and Freddie Conference (Sept. 20, 2013)

— *FHA and Housing Affordability*, Federal Reserve Bank of Cleveland 2013 Policy Summit on Housing, Human Capital, and Inequality (Sept. 19, 2013)

— *FHA and Housing Affordability*, 2013 AALS Workshop on Poverty, Immigration and Property (June, 2013)

— Invited Speaker, *REMIC Failure*, Real Property, Trust and Estate Law Section of the American Bar Association "Professors' Corner" teleconference presentation (February, 2013)

— *Teaching Real Estate **Transactions***, AALS Real Estate Transactions Annual Meeting (January, 2013)

— *The Federal Housing Administration as Social Engineer*, International Atlantic Economic Society Conference (October 5, 2012)

— *Trends in Mortgage Law*, Real Property, Trust and Estate Law Section of the American Bar Association "Professors' Corner" teleconference presentation (July 11, 2012) (invited speaker)

— *Message in a Mortgage:  What Dodd Frank's "Qualified Mortgage" Tells Us About Ourselves*, Association of Law, Property and Society Annual Meeting (March 3, 2012)

— *Consumer Protection in The Shadow of Shadow Banking*, The Consumer Financial Protection Bureau After One Year symposium, Brooklyn Law School (March 2, 2012) (invited speaker)

— *Consumer Protection in The Shadow of Shadow Banking*, Shadow Banking symposium, Boston University Law School (February 24, 2012) (invited speaker)

— Panelist, *Post Zoning: Alternative Forms of Public Land Use Controls*, Trager Public Policy Symposium, Brooklyn Law School (February 10, 2012)

— *The FHA's Two Missions:  Market Maker and Lender of Last Resort,* AALS Sections on Real Estate Transactions and Property Annual Meeting (January 5, 2012) (invited speaker)

— *Community Benefits Agreements:  The New York Experience*, The New York City Community Economic Development Network (December 15, 2011) (invited speaker)

— *Foundations for Federal Housing Finance Policy*, Ongoing Implementation of the Dodd-Frank Act: Consumer Protection and Other Goals from a Rulemaking and Litigation Perspective symposium, University of Pennsylvania Law School (November 18, 2011) (keynote)

— *The Emperor's New Loans: Why Consumer Protection Is Intrinsic to the Federal Regulation of Consumer Credit*, Ongoing Implementation of the Dodd-Frank Act: Consumer Protection and Other Goals from a Rulemaking and Litigation Perspective symposium, University of Pennsylvania Law School (November 18, 2011)  (invited speaker)

— *Reforming the Residential Mortgage-Backed Securities Market,* Secondary Mortgage Market Reform symposium, Hamline Law School (September 30, 2011) (invited speaker)

— *The Future of Fannie, Freddie and the Federal Housing Market*, American Credit Union Mortgage Association Annual Conference (September 26, 2011) (invited speaker)

— *Federal Housing Policy*, Southeastern Association of Law Schools Annual Conference (July 28, 2011) (invited speaker)

— Panelist, *The Stuyvesant Town Default and the Future of Multifamily Housing Finance*, NYU School of Law (Apr. 9, 2011) (invited speaker)

— *Fannie Mae and Freddie Mac: Implications for Credit Unions*, Filene Research Institute Webinar (Feb. 10, 2011) (invited speaker)

— *The Future of Federal Housing Finance*, Credit Union Executive Society Michigan Council Economic Summit (Jan. 2011) (invited speaker)

— *The Role of Community Benefits Agreements in Community Development*, Neighborhood Preservation Coalition of New York State Conference (Oct. 2010) (invited speaker)

— Moderator, *The Impact of Foreclosure on Tenants*, Fordham School of Law program (Oct. 2010)

— Panelist, *Future Directions of Clinical Scholarship*, New York Law School Clinical Theory Workshop 25th Anniversary Conference (Oct. 2010) (invited speaker)

— *The Future of Fannie and Freddie*, Filene Research Institute Conference (Oct. 2010) (invited speaker)

— Panelist, *Land Use and Local Voices,* Municipal Arts Society Conference (July 21, 2010) (invited speaker)

— *First Principles for an Effective Federal Housing Policy*, Association for Law, Property and Society (Mar. 2010) (invited speaker)

— *Community Benefits Agreements*, inaugural meeting of the Comptroller of the City of New York Task Force on Public Benefits (Mar. 2010) (invited speaker)

— *Which Way Forward for Fannie Mae and Freddie Mac?*, Cato Institute (Oct. 2009) (invited speaker)

— *Fannie Mae and Freddie Mac and the Future of Federal Housing Finance Policy:  A Study of Regulatory Privilege*, Canadian Law and Economics Association (Oct. 2009)

— *First Principles for an Effective Federal Housing Policy*, Brooklyn Law School (Sept. 2009) (invited speaker)

— *Fannie Mae and Freddie Mac and the Future of Federal Housing Finance Policy: A Study of Regulatory Privilege*, International Banking, Economics and Finance Association Summer Conference (July 2009)

— Panelist, *The Legitimacy of Using Tax Breaks To Promote Professional Sports Facilities*, Third Annual Land Use and Real Estate Development Forum, New York Law School (Apr. 2009)

— *The Proper Role of Fannie and Freddie in the Housing Market*, Pace Law School (Mar. 2009)

— *Restructuring the U.S. Banking System* Panel, NYSBA Business Law Section Annual Meeting (Jan. 2009) (invited speaker)

— *The Residential Mortgage Foreclosure Crisis – Policy Solutions* Panel, ABCNY Housing & Urban Development Committee (Jan. 2009) (invited speaker)

— *Analysis of the Subprime Mess*, NYSBA Banking Law Committee (Nov. 2008) (invited speaker)

— Commentator, *Reviving the Mortgage Securitization Market*, University of Connecticut School of Law (Nov. 2008)

— *The Social Utility of the Small Rental Property Owner: Should Landlords be Subsidized?*, Western New England College School of Law (invited speaker) (Oct. 2008)

— *The Role of the Rating Agencies in the Subprime Meltdown*, University of Maryland School of Law (invited speaker) (Oct. 2008)

— *The Federal Government's Implied Guarantee of Fannie Mae and Freddie Mac's Obligations: Uncle Sam Will Pick Up the Tab*, St. Johns Financial Services Institute Symposium (Sept. 2008)

— *Foreclosures*, New York State Judicial Institute Summer Seminars (June and July 2008)

— *Fannie Mae and Freddie Mac's Public Mission: Are The Benefits Worth The Risk?*, Junior Workshop on Banking and Consumer Financial Services Law (May 2008)

— *How the Residential Mortgage Backed Securities Market Impacts Dirt Lawyers and Their Clients*, New York State Bar Association, Real Property Law Section, Annual Meeting (Jan. 2007) (invited speaker)

— *Subprime Standardization: How Rating Agencies Allow Predatory Lending To Flourish in the Secondary Mortgage Market*, Conglomerate Junior Scholars Workshop (Sept. 2005) (online workshop)

— *Strangled by an Invisible Hand: How Rating Agencies Are Killing Predatory Lending Laws*, AALS Clinical Conference (May 2005)

## SELECTED COMMENTS TO REGULATORS

— *Federal Housing Finance Agency Proposed Collection for National Survey of Mortgage Originations* (November 10, 2016) (No. 2016-N-06)

— *Federal Housing Finance Agency Update on Implementation of the Single Security and the Common Securitization Platform* (August 29, 2016)

— *Federal Financial Institutions Examination Council's Uniform Interagency Consumer Compliance Rating System* (July 5, 2016) (Docket # FFIEC-2016-0001)

— *CFPB Collection Activities* (April 14, 2016) (Docket Number CFPB-2016-0011)

— *FHFA Duty to Serve* (March 17, 2016) (Comments/RIN 2590-AA27)

— *Home Mortgage Disclosure Act Proposed Rule* (October 29, 2014) (Docket No. CFPB–2014–0019/RIN 3170–AA10)

— *Federal Housing Finance Agency's Small Multifamily Subgoal* (Oct. 27, 2014) (RIN 2590-AA65) (with J. Lederman)

— *Federal Housing Finance Agency's Proposed Single Security Structure* (October 13, 2014) (Federal Housing Finance Agency)

— *The GSE Guarantee Fee as a Policy Tool* (September 8, 2014) (Federal Housing Finance Agency request for input)

— *The Future of the Private Label Securities Market* (Aug. 8, 2014) (Department of the Treasury, Public Input on Development of Responsible Private Label Securities (PLS) Market)

— *Armed, Unarmed or Harmed by Knowledge? A Comment on the FHA's Housing Counseling Pilot Program* (July 14, 2014) (Federal Housing Administration, Docket No. FR-5786-N-01))

— *Shared Appreciation Proposed Rule*, (Jan. 29, 2014) (New York State Department of Financial Services)

— *TILA Ability-to-Repay Rulemaking* (July 9, 2012) (Consumer Financial Protection Bureau, Docket No. CFPB-2012-0022 / RIN 3170-AA17)

— *Use of Eminent Domain to Restructure Performing Loans* (September 7, 2012) (Federal Housing Finance Agency, Docket No. 2012–N–11)

— *Federal Housing Finance Agency's Strategic Plan: Fiscal Years 2013-2017* (June 18, 2012) (Federal Housing Finance Agency)

— *Enterprise Duty to Serve Underserved Markets* (July 22, 2010) (Federal Housing Finance Agency)

— *Reform of the Housing Finance System* (July 21, 2010) (Department of Housing and Urban Development)

## SELECTED EXPERT WITNESS ENGAGEMENTS

— For the United States (SDNY) in <u>U.S. v. Cherico</u>, a mortgage fraud case (2011)

— For the United States (SDNY) in <u>U.S. v. Lacey</u>, a mortgage fraud case (2010)

— For the United States (SDNY) in <u>U.S. v. Cooper</u>, a mortgage fraud case (2009)

## TESTIMONY

— New York City Council Committee on Consumer Affairs and Committee on Civil Rights Hearing on *Predatory Lending In New York City* (Apr. 2007)

## BLOG

— Editor and Author, REFinblog.com. *Tracking developments in the law and practices of the real estate finance industry.*  Over 500,000 page views. Expert Institute's Best Legal Blog Nominee 2015, 2016.

## SELECTED MEDIA APPEARANCES

- YAHOO! HOMES
- WNYC
- WISEBREAD
- WASHINGTON POST
- WASHINGTON EXAMINER
- WALL STREET JOURNAL
- WALLETHUB.COM
- WACO TRIBUNE-HERALD
- VOICE OF AMERICA
- VILLAGE VOICE
- US NEWS & WORLD REPORT
- USA TODAY
- UNIVISION
- THESTREET.COM
- THE REAL DEAL
- THEDEAL.COM
- THE BRIDGE
- TELEMUNDO
- TECH NEWS WORLD
- ST. LOUIS POST-DISPATCH
- RISK MANAGEMENT MAGAZINE
- REUTERS
- REALTORMAG
- REALTOR.COM
- PROVIDENCE JOURNAL
- POLITICO
- PHOENIX BUSINESS JOURNAL
- PITTSBURGH TRIBUNE-REVIEW
- ORLANDO SENTINEL
- OCCUPY.COM
- NPR MARKETPLACE
- NPR ALL THINGS CONSIDERED
- NIGHTLY BUSINESS REPORT (PBS/CNBC)
- NEW YORK WORLD
- NEW YORK TIMES
- NEW YORK SUN
- NEW YORK NEWSDAY
- NEW YORK LAW JOURNAL
- NEW YORK DAILY NEWS
- NEWSMAX
- NEWSDOCVOICES
- NBC NEWS affiliates
- NATIONAL LAW JOURNAL
- NATIONAL JURIST
- MSN.COM
- MONEY
- METRO
- MAINSTREET.COM
- MAGNIFYMONEY.COM
- LOANS.ORG
- LAWYER & STATESMAN
- LAW360
- KPCW (Salt Lake City Public Radio)
- iWATCH NEWS
- INVESTOPEDIA.COM
- INVESTMENT PROFESSIONAL
- INTERNATIONAL BUSINESS TIMES
- INSTITUTIONAL INVESTOR
- INSIDE THE GSES
- INSIDE MORTGAGE FINANCE
- INSIDE MBS & ABS
- INC.COM
- HUFFINGTON POST
- HSH.COM
- HERALD-NEWS (JOLIET, IL)
- GOVERNING
- GOODCALL.COM
- GLOBEST.COM
- GEORGIA PUBLIC RADIO
- FOX NEWS
- FOX BUSINESS
- FORBES.COM
- FISCAL TIMES
- FINANCIAL ADVISOR
- E-COMMERCE TIMES
- DISTRESSED ASSETS INVESTOR
- DEPOSITACCOUNTS.COM
- DESERET NEWS
- DALLAS MORNING NEWS
- C-SPAN
- CRMBUYER
- CREDIT UNION TIMES
- CREDITCARDS.COM
- CREDITCARDGUIDE.com
- CREDIT.COM
- CRAIN'S NEW YORK BUSINESS
- CONSUMERS DIGEST
- CONSUMER REPORTS
- CONSUMER EAGLE
- CONSTRUCTION DIVE
- COINDESK.COM
- CHRON.COM (HOUSTON CHRONICLE online)
- CHRISTIAN SCIENCE MONITOR
- CHICAGO READER
- CFPB JOURNAL
- CBSNEWS.COM
- CAROLINA JOURNAL
- CARDHUB.COM
- CANADA FREE PRESS
- BUSINESS NEWS NETWORK (Canadian television)
- BUSINESS NEWS DAILY
- BUILDIUM
- BROOKLYN PAPER
- BROOKLYN DOWNTOWN STAR
- BROOKLYN DAILY EAGLE
- BROOKLYN COURIER
- BNA BANKING REPORT
- BLOOMBERG RADIO
- BLOOMBERG INDUSTRY
- BLOOMBERG NEWS
- BLOOMBERG BUSINESSWEEK
- BIGGERPOCKETS.COM
- BEST REAL ESTATE INVESTING ADVICE EVER (podcast)
- BCAT (Brooklyn public television)
- BANKRATE.COM
- BALTIMORE SUN
- BADCREDIT.ORG
- ATLANTA JOURNAL-CONSTITUTION
- ASHEVILLE CITIZEN-TIMES
- AP
- AMERICAN BANKER
- ABCNEWS.COM
- AARP MAGAZINE

## COMMUNITY SERVICE

— *Fellow*, American College of Real Estate Lawyers (ACREL)

— *Public Member, New York City Rent Guidelines Board* (2017- )

— *Treasurer,* BLS Legal Services Corporation (2011- )

— *Chair Emeritus (previously Secretary, Treasurer, Chair-Elect and Chair),* Real Estate Transactions Section of American Association of Law Schools (2015)

— *Member*, Brooklyn Bridge Park Development Corporation Community Advisory Committee (CAC) (2011-2014)

   o   Chair, CAC Bylaws Committee

   o   Member, CAC Executive Committee

— *Member*, Brooklyn Community Board Six (2001-2012), serving at various times as

   o   Co-Chair of Economic Development Committee

   o   Member of Executive Committee

   o   Board appointee to Empire State Development Corporation Atlantic Yards Community Advisory Committee

   o   Board appointee to Brooklyn Bridge Park Development Corporation Community Advisory Committee

   o   Treasurer and Board's representative to Southwest Brooklyn Empowerment Zone

— *Member,* Comptroller of the City of New York Task Force on Public Benefits (2010)

— Packer Collegiate Institute

   o   *Trustee* (2001-2010)

   o   *Former Chair*, Board Audit Committee and Student Life Committee

   o   *Former Member*, Affordability Task Force

## OTHER

— *Contributor,* THE HILL

— *External Reviewer,* University of Chicago Press, Columbia University Press, STANFORD LAW REVIEW, POLITICAL SCIENCE QUARTERLY, HOUSING POLICY DEBATE, GEOFORUM, BUSINESS ETHICS QUARTERLY, ECONOMIC NOTES, STANFORD JOURNAL OF COMPLEX LITIGATION, Peer Reviewed Scholarship Marketplace, Rubriq

— *Lecturer,* Kaplan PMBR Bar Review (2010)

— *Consultant,* Guidepoint Global, Gerson Lehrman Group, Dematteo Monness LLC, Ridgetop Research