# PURCHASE AND SALE AGREEMENT

By and Between

223 East 5th Street LLC, 229 East 5th Street LLC, 231 East 5th Street LLC, 233 East 5th Street LLC, 235 East 5th Street LLC, 228 East 6th Street LLC, 66 East 7th Street LLC, 27 St. Mark's Place LLC, 334 East 9th Street LLC, 253 East 10th Street LLC, 325 East 12th Street LLC, 327 East 12th Street LLC, 329 East 12th Street LLC, 510 East 12th Street LLC, and 514 East 12th Street LLC

as Sellers

and

EVF1 LLC as Purchaser

Dated as of: February __, 2021

The Property:

(i) 223 East 5th Street, New York, New York, (ii) 229 East 5th Street, New York, New York, (iii) 231 East 5th Street, New York, New York, (iv) 233 East 5th Street, New York, New York, (v) 235 East 5th Street, New York, New York, (vi) 228 East 6th Street, New York, New York, (vii) 66 East 7th Street, New York, New York, (viii) 27 St Marks Place, New York, New York, (ix) 334 East 9th Street, New York, New York, (x) 253 East 10th Street, New York, New York, (xi) 325 East 12th Street, New York, New York, (xii) 327 East 12th Street, New York, New York, (xiii) 329 East 12th Street, New York, New York, (xiv) 510 East 12th Street, New York, New York, (xv) 514 East 12th Street, New York, New York

# TABLE OF CONTENTS

**PAGE**

ARTICLE 1 DEFINITIONS...................................................................................................3

ARTICLE 2 GENERAL TERMS.........................................................................................3

    **SECTION 2.1.**    **The Transaction**...................................................................3

    **SECTION 2.2.**    **Purchase Price.**...................................................................4

ARTICLE 3 PERMITTED EXCEPTIONS; TITLE INSURANCE.........................................4

    **SECTION 3.1.**    **Sale Subject to.**...................................................................4

    **SECTION 3.2.**    **Title Report.**.......................................................................5

    **SECTION 3.3.**    **Permitted Exceptions.**.......................................................6

ARTICLE 4 APPORTIONMENTS AND PAYMENTS ........................................................8

    **SECTION 4.1.**    **Apportionments Relating to the Property.**.....................8

    **SECTION 4.2.**    **Taxes and Assessments.**...................................................9

    **SECTION 4.3.**    **Transfer of Utilities.**.......................................................10

    **SECTION 4.4.**    **Rents Received After Closing.**.......................................10

    **SECTION 4.5.**    **Collection of Rents.**.........................................................10

    **SECTION 4.6.**    **Transfer Taxes.**................................................................10

    **SECTION 4.7.**    **Tax Returns.**....................................................................11

    **SECTION 4.8.**    **Violations.**.......................................................................11

    **SECTION 4.9.**    **Title Charges.**..................................................................11

    **SECTION 4.10.**    **Transaction Expenses.**....................................................11

    **SECTION 4.11.**    **Assignment of Existing Mortgages.**................................11

    **SECTION 4.12.**    **Survival.**..........................................................................12

ARTICLE 5 COVENANTS REGARDING THE PROPERTY...................................................12

    **SECTION 5.1.**    **Maintenance and Operation of the Property**..................12

**SECTION 5.2.    Leasing of the Property.**.....................................................................12

**SECTION 5.3.    Insurance.**.....................................................................................12

**SECTION 5.4.    Additional Responsibilities.**...................................................12

ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF PURCHASER .........................13

**SECTION 6.1.    Generally.** ....................................................................................13

**SECTION 6.2.    Closing Conditions; Survival of Representations and
Warranties.** .......................................................................14

ARTICLE 7 REPRESENTATIONS AND WARRANTIES OF SELLER .................................14

**SECTION 7.1.    Generally.** ....................................................................................14

**SECTION 7.2.    Property Representations.** ...........................................................16

**SECTION 7.3.    Closing Conditions; Survival of Representations and
Warranties**. .......................................................................17

**SECTION 7.4.    Knowledge of Seller**...................................................................18

ARTICLE 8 CLOSING DATE...........................................................................................18

**SECTION 8.1.    Closing Date.** ..............................................................................18

ARTICLE 9 CLOSING DOCUMENTS .............................................................................18

**SECTION 9.1.    Closing.**.......................................................................................18

**SECTION 9.2.    Further Assurances.**.....................................................................19

ARTICLE 10 NOTICES....................................................................................................19

**SECTION 10.1.   Notices.** ......................................................................................19

ARTICLE 11 BROKER .....................................................................................................20

ARTICLE 12 DEFAULTS; REMEDIES .............................................................................20

**SECTION 12.1.   Purchaser's Default**. ...................................................................20

**SECTION 12.2.   Seller's Default.** .........................................................................21

ARTICLE 13 CASUALTY; CONDEMNATION...................................................................21

**SECTION 13.1.   Casualty.** ....................................................................................21

**SECTION 13.2.    Condemnation**. ..................................................................21

ARTICLE 14 AS-IS; WHERE-IS; DISCLAIMER; WAIVER OF CLAIMS..............................22

**SECTION 14.1.    Disclaimers; As-Is, Where-Is Condition**.........................................22

**SECTION 14.2.    Acceptance of Closing Documents; Waivers**. ...............................24

**SECTION 14.3.    Survival**. ..................................................................24

ARTICLE 15 Intentionally Omitted ..................................................................

ARTICLE 16 Intentionally Omitted ..............................................**Error! Bookmark not defined.**

ARTICLE 17 BANKRUPTCY PROVISIONS ..................................................................24

**SECTION 17.1.    Competing Transaction**. ..................................................................24

**SECTION 17.2.    Intentionally Omitted**..................................................................25

**SECTION 17.3.    Bankruptcy Court Filings**. ..................................................................25

**SECTION 17.4.    Notice of Sale**. ..................................**Error! Bookmark not defined.**

**SECTION 17.5.    Closing In The Event Of The Filing Of The Notice Of Appeal**

**From The Sale Order**..................................................................25

ARTICLE 18 INTENTIONALLY OMITTED ..................................................................26

ARTICLE 19 MISCELLANEOUS ..................................................................26

**SECTION 19.1.    Entire Agreement**. ..................................................................26

**SECTION 19.2.    Modification**. ..................................................................26

**SECTION 19.3.    Binding Agreement**. ..................................................................26

**SECTION 19.4.    Assignment**..................................................................26

**SECTION 19.5.    Illegality**. ..................................................................26

**SECTION 19.6.    Choice of Law**. ..................................................................26

**SECTION 19.7.    Construction**. ..................................................................27

**SECTION 19.8.    Binding Effect; Assignment; Successors and Assigns**. ...............27

**SECTION 19.9.    Ambiguities**. ..................................................................27

**SECTION 19.10.  Expenses**. ........................................................................................27

**SECTION 19.11.  Counterparts**. ..................................................................................28

**SECTION 19.12.  Waiver of Trial by Jury**...................................................................28

**SECTION 19.13.  Third Party Beneficiaries**..............................................................28

**SECTION 19.14.  Jurisdiction**. ....................................................................................28

**SECTION 19.15.  No Recording**. .................................................................................28

**SECTION 19.16.  Not an Offer**. ...................................................................................29

**SECTION 19.17.  Intentionally Omitted**.....................................................................29

**SECTION 19.18.  No Waiver**. . ....................................................................................29

**SECTION 19.19.  Severability**. ....................................................................................29

**SECTION 19.20.  No Survival**. ....................................................................................29

**SECTION 19.21.  Tax-Free Exchange**. .......................................................................29

## PURCHASE AND SALE AGREEMENT

     **THIS PURCHASE AND SALE AGREEMENT** (the "**Agreement**") is entered into by and between East Village Properties LLC ("**East Village**"), 223 East 5th Street LLC ("**223 East**"), 229 East 5th Street LLC ("**229 East**"), 231 East 5th Street LLC ("**231 East**"), 233 East 5th Street LLC ("**233 East**"), 235 East 5th Street LLC ("**235 East**"), 228 East 6th Street LLC, ("**228 East**"). 66 East 7th Street LLC ("**66 East**"), 27 St. Mark's Place LLC ("**27 St. Marks**"), 334 East 9th Street LLC ("**327 East**"), 253 East 10th Street LLC ("**253 East**"), 325 East 12th Street LLC ("**325 East**"), 327 East 12th Street LLC ("**327 East**"), 329 East 12th Street LLC (*"***329 West***"*), 510 East 12th Street LLC ("**510 East**"), and 514 East 12th Street LLC ("**514 East**") and together with each of the aforementioned debtors, collectively referred to herein as the "**Seller**" or "**Debtors**"), and EVF1 LLC, a New York limited liability company ("**Purchaser**" or "**EVF1**") as of the __ day of _____, 2021 (the "**Effective Date**").

     **WHEREAS**, on March 28, 2017 (the "**Petition Date**"), the Debtors commenced sixteen (16) voluntary petitions (the "**Petitions**") for relief under Chapter 11 of Title 11 of the United States Code (the "**Bankruptcy Code**") before the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") under Case Nos. 1:17-22453-rdd; 1:17-22454-rdd; 1:17-22455-rdd; 1:17-22456-rdd; 1:17-22457-rdd; 1:17-22458-rdd; 1:17-22459-rdd; 1:17-22460-rdd; 1:17-22461-rdd; 1:17-22462-rdd; 1:17-22463-rdd; 1:17-22464-rdd; 1:17-22465-rdd; 1:17-22467-rdd; 1:17-22468-rdd; and 1:17-22469-rdd (the "**Cases**"), all of which Cases were jointly administered by Order of the Bankruptcy Court on April 6, 2017 under lead case 1:17-22453;

     **WHEREAS**, EVF1, a secured creditor and mortgagee of the Debtors, entered into that certain Interim Cash Collateral Stipulation with the Debtors, which was thereafter approved by the Bankruptcy Court on an interim basis on April 27, 2017 [ECF No. 45] (the "**Interim Cash Collateral Order**");

     **WHEREAS**, on May 22, 2017, the Bankruptcy Court entered the Final Cash Collateral Stipulation and Order [ECF No. 85] (the "**Final Cash Collateral Order**"), which provides, *inter alia*, the Debtors with the use of Cash Collateral[1] necessary to maintain their respective Properties during the pendency of the Debtors' Chapter 11 Cases, and that as of Petition Date, the amount of EVF1's claims against the estates of the Debtors on account of the pre-petition loans (before applicable legal fees and costs) was a sum not less than $145,428,538.38;

     **WHEREAS**, EVF1 filed its proofs of claims in the Debtors' respective Chapter 11 Cases, reflecting that as of the Petition Date, the total amount due and owing from the Debtors to EVF1 was a sum not less than $145,428,538.38 (the "**Claim**");

     **WHEREAS,** on May 30, 2017, the Debtors filed their Joint Plan of Reorganization of East Village Properties LLC and Affiliated Debtors [ECF No. 93] and accompanying Disclosure Statement for Joint Plan of Reorganization of East Village Properties LLC and its Affiliated Debtors [ECF No. 94];

---

[1] As that term is defined in the Final Cash Collateral Order (as defined herein).

**WHEREAS**, on June 23, 2017, the Debtors filed their First Amended Joint Plan of Reorganization of East Village Properties LLC and Affiliated Debtors [ECF No. 125] and accompanying First Amended Disclosure Statement for Joint Plan of Reorganization of East Village Properties LLC and its Affiliated Debtors [ECF No. 126];

**WHEREAS**, on July 5, 2017, the Debtors filed their Second Amended Joint Plan of Reorganization of East Village Properties LLC and Affiliated Debtors [ECF No. 134] and accompanying Second Amended Disclosure Statement for Joint Plan of Reorganization of East Village Properties LLC and its Affiliated Debtors [ECF No. 135];

**WHEREAS**, on October 10, 2017, the Debtors filed their Third Amended Joint Plan of Reorganization of East Village Properties LLC and Affiliated Debtors [ECF No. 248];

**WHEREAS**, on December 14, 2020, the Debtors filed their Joint Plan of Liquidation of East Village Properties LLC and Affiliated Debtors [ECF No. 735] and accompanying Third Amended Disclosure Statement for Joint Plan of Liquidation of East Village Properties LLC and its Affiliated Debtors [ECF No. 734];

**WHEREAS**, on December 15, 2020, the Debtors filed their Amended Joint Plan of Liquidation of East Village Properties LLC and Affiliated Debtors [ECF No. 739]);

**WHEREAS**, on January 6, 2021, the Debtors filed their Third Amended Disclosure Statement for Joint Plan of Liquidation of East Village Properties LLC and its Affiliated Debtors, as modified [ECF No. 751];

**WHEREAS**, on January 8, 2021, the Debtors filed their Second Amended Joint Plan of Liquidation of East Village Properties LLC and Affiliated Debtors [ECF No. 754] and accompanying Third Amended Disclosure Statement for Joint Plan of Liquidation of East Village Properties LLC and its Affiliated Debtors, as further modified [ECF No. 753];

**WHEREAS**, on January 11, 2021, the Debtors filed their Second Amended Joint Plan of Liquidation of East Village Properties LLC and Affiliated Debtors [ECF No. 756] (the "**Liquidating Plan**") and accompanying Third Amended Disclosure Statement for Joint Plan of Liquidation of East Village Properties LLC and its Affiliated Debtors [ECF No. 755] (the "**Disclosure Statement**");

**WHEREAS,** on January 12, 2021, the Bankruptcy Court entered an Order approving the Disclosure Statement [ECF Nos. 758/759[2]] and granting related relief;

**WHEREAS**, the Liquidating Plan and Disclosure Statement provide, *inter alia*, for funding by EVF1 in the amount of $3,125,000.00 (subject to the terms of the Interim Cash Collateral Order and Final Cash Collateral Order) from the Effective Date Payments and the Post

---

[2] The ECF docket reflects entry of 2 orders approving the Disclosure Statement. Document no. 758 is the controlling document as it includes all exhibits referenced in the order.

Effective Date Payments which will: (i) pay, as provided for in accordance with the terms and conditions set forth in the Liquidating Plan, the Manager Administrative Claim, the Allowed Claims in Classes 1, 3, and 6 and to pay the pro rata distribution over time to Allowed Claims in Classes 4 and 5 in accordance with their relative priorities provided for in the Bankruptcy Code. EVF1 shall also be responsible to fund amounts due to pay Administrative Claims, Priority Tax Claims, Fee Claims and United States Trustee Fees and fund the payment of Disputed Claim Reserve of up to $125,000 (once the claims become Allowed Claims) (collectively, the "**Plan Fund**");

**WHEREAS**, subject to Bankruptcy Court approval, Seller is authorized to sell the Properties; and

**WHEREAS**, subject to the approval of the Bankruptcy Court, Seller desires to sell, transfer and assign to Purchaser, and Purchaser desires to purchase, acquire and assume from Seller pursuant to, *inter alia*, Sections 105, 363 365, 1146 of the Bankruptcy Code, all of Seller's right, title and interest in and to the Properties, as more specifically provided herein.

**NOW, THEREFORE**, subject to the terms and conditions of this Agreement, for and in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration, including the mutual covenants and agreements set forth herein, the receipt and legal sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE 1
## DEFINITIONS

For purposes of this Agreement, all capitalized terms and certain other terms used herein shall have the respective meanings specified in Schedule I attached hereto and made a part hereof.

## ARTICLE 2
## GENERAL TERMS

**SECTION 2.1.**        **The Transaction**.

2.1.1.  Subject to the terms and conditions of this Agreement and the entry of (i) the Sale Order[3] and/or  (ii) the Confirmation Order in connection with the Cases, pursuant to Sections 105, 363(b),363(f), 363(m), and 1146 of the Bankruptcy Code, Seller agrees to sell, transfer, convey and assign to Purchaser (or its nominee or designee), and Purchaser agrees to purchase and accept from Seller on the Closing Date (as defined herein), free and clear of all Liens, claims and all Interests (as defined in the Sale Order), subject only to Section 4.12 herein and Permitted Exceptions (as hereinafter defined), and any other interest to the extent acceptable to Purchaser, the fee ownership in and to (i) that certain real property as more particularly described on Schedule II attached hereto and made a part hereof together with the buildings and improvements thereon located at and commonly known as (i) 223 East 5th Street, New York, New

---

[3] The Liquidating Plan provides that the Confirmation Order and the Sale Order may be combined into one (1) order of the Bankruptcy Court. *See* Plan, Section 1.25.  All references herein to the Sale Order shall mean the Sale Order and/or the Confirmation Order.

York, (ii) 229 East 5th Street, New York, New York, (iii) 231 East 5th Street, New York, New York, (iv) 233 East 5th Street, New York, New York, (v) 235 East 5th Street, New York, New York, (vi) 228 East 6th Street, New York, New York, (vii) 66 East 7th Street, New York, New York, (viii) 27 St Marks Place, New York, New York, (ix) 334 East 9th Street, New York, New York, (x) 253 East 10th Street, New York, New York, (xi) 325 East 12th Street, New York, New York, (xii) 327 East 12th Street, New York, New York, (xiii) 329 East 12th Street, New York, New York, (xiv) 510 East 12th Street, New York, New York, (xv) 514 East 12th Street, New York, New York (collectively, the **"Real Estate"**), and (ii) the furniture, furnishings, fixtures, equipment and other items of personal property exclusively owned by Seller located in or upon, and used in connection with, the Real Estate (collectively, the **"Personalty"**).  The Real Estate and the Personalty are to be conveyed together with (x) the Leases (as hereinafter defined), together with, all rents and other sums due thereunder, whether acquiring prior to, on or after the Closing (collectively, the **"Rents"**) and any and all guaranties and security deposits relating to the Leases (collectively, the **"Security Deposits"**), (y) all easements, rights of way, air and development rights, reservations, privileges, appurtenances, and other estates and rights of Seller, if any, pertaining to its interest in the Real Estate, and (z) all right, title and interest of Seller, if any, in and to all alleys adjoining its interest in the Real Estate and in and to the land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining its interest in the Real Estate to the center line thereof (the Real Estate and the Personalty, together with all of the foregoing, are hereinafter sometimes collectively referred to herein as the **"Property"** or the **"Properties"**).

SECTION 2.2.       Purchase Price.

2.2.1.  Subject to the terms and conditions herein contained, including, without limitation, Section 17.1 of this Agreement, the **"Purchase Price"** for the Property and the various assignments incidental thereto referred to herein is ONE HUNDRED FIFTY MILLION DOLLARS AND NO CENTS **($150,000,000.00)**. The Purchase Price shall be payable by credit bidding the full amount of EVF1's Secured Claim as of the date of the Closing pursuant to 11 U.S.C. §363(k), which includes, but is not limited to interest, accruals and protective advances as agreed upon by and between the Purchaser and Seller and authorized by the Bankruptcy Court in connection with the Interim Cash Collateral Order and the Final Cash Collateral Order and Purchaser establishing the Plan Fund in accordance with the Plan.

2.2.2.  The Parties agree that the Personalty has *de minimis* value.  Accordingly, no portion of the Purchase Price is attributable to the Personalty.

## ARTICLE 3
## PERMITTED EXCEPTIONS; TITLE INSURANCE

SECTION 3.1.       **Sale Subject to**.   Subject to the terms and conditions of this Agreement, entry of the Sale Order and/or Confirmation Order, Seller shall convey, and Purchaser shall accept fee simple title to the Real Estate, insurable by Kensington Vanguard National Land Services (the "Title Company")at regular premiums, without exceptions or reservations of any type or kind, except (a) ALTA standard printed exceptions other than those that can be removed by the Sale Order, or by an affidavit of Seller to be provided pursuant to Section 3.2.3 hereof,

(b) the Permitted Exceptions, and (c) the obligations expressly assumed by Purchaser under this Agreement,.

3.1.1. Pursuant to the Sale Order, all liens, claims and encumbrances (the "**Liens**") shall attach to the net proceeds of the sale (the "**Net Proceeds**") to the same extent they encumber the Property. To the extent Seller is required to satisfy any of the Liens from the Net Proceeds pursuant to the Sale Order, Seller shall make such payments in accordance with the Sale Order or by further order of the Bankruptcy Court. Nothing herein is a waiver of the rights of Seller or any other third party to contest the validity, amount or priority of any Liens and the right of any claimant or lienholder to have their respective Liens satisfied from Net Proceeds.

SECTION 3.2.    **Title Report**. Purchaser acknowledges that it has received and reviewed the Title Report; and Purchaser has agreed to take title to the Property free and clear of all Liens, subject only to Section 4.12 and the Permitted Exceptions.

3.2.1. If any update to the Title Report or any update to a Survey (as hereinafter defined) reflects any title exceptions that are not Permitted Exceptions and, therefore, which Purchaser is not required to accept (the **"Non-Permitted Exceptions"**), Seller shall use its best efforts, at or prior to Closing, solely through the entry of the Sale Order and as provided in Section 3.1.1 above, to attempt to remove the following: (i) any and all of the Non-Permitted Exceptions that Seller placed of record or consented to be placed of record following the date of the Title Report, and (ii) any and all other Non-Permitted Exceptions that may be removed by the entry of the Sale Order. Seller shall have no obligation with respect to the clearance of title as required hereunder other than the delivery of the Sale Order, which shall include the protection of § 363(m) of the Bankruptcy Code and the Sale Order shall be subject to the reasonable consent of the Purchaser.

3.2.2. Notwithstanding the foregoing or anything herein to the contrary, if the removal of any mechanics' or materialmen's liens filed against the Property is the responsibility of any Tenant of the Property pursuant to the terms of its Lease, Seller shall promptly deliver a notice to such Tenant with respect thereto and shall use its best efforts (without the expenditure by Seller of any funds and without the commencement or prosecution by Seller of an action or proceeding against such Tenant with respect thereto) to cause such Tenant to promptly remove such mechanics' or materialmen's lien. Seller shall have no liability, nor shall Purchaser be entitled to any abatement or reduction of the Purchase Price or delay or adjournment of the Closing, if such Tenant fails to remove such mechanics' or materialmen's lien. Seller shall promptly deliver to Purchaser a copy of any such notice delivered by Seller to any Tenant of the Property.

3.2.3.  In the event that there exist any Non-Permitted Exception which is not removed through the entry of the Sale Order, Purchaser may elect within ten (10) Business Days after the entry of the Sale Order, and may also elect within ten (10) Business Days after the delivery to Seller's counsel of any update to the Title Report showing any Non-Permitted Exception which is not removed through the entry of the Sale Order, as the case may be, to either (i) not consummate the transactions contemplated hereby, in which event this Agreement shall be terminated and of no further force and effect, and neither of the parties hereto shall have any rights or obligations to the other hereunder or (ii) consummate the transactions contemplated hereby subject to such additional exceptions and proceed to Closing without an abatement of the Purchase Price. Purchaser's failure to timely deliver a notice electing to not consummate the transactions contemplated hereby shall be deemed Purchaser's election to consummate the transaction in accordance with the terms and conditions of this Agreement.  Notwithstanding the foregoing, if Purchaser elects to terminate this Agreement as set forth above, Seller shall have the right to void such termination by providing written notice to Purchaser that Seller elects, in its sole discretion, to cure the Non-Permitted Exception by either removing the same at or prior to Closing or providing Purchaser with a credit against the Purchase Price equal to the amount of the cost to cure the Non-Permitted Exception.  In the event Seller elects to cure the Non-Permitted Exceptions and the Title Company removes such Non-Permitted Exception(s) from the Title Report, Purchaser shall be obligated to complete the transaction contemplated by this Agreement.

3.2.4.  If required by the Title Company, Seller agrees to execute, acknowledge and deliver a standard and customary owner's title affidavit or related documentation at Closing as modified for a debtor in chapter 11 and such other matters as the Title Company may reasonably require in order to issue a policy of title insurance to Purchaser in the manner required under this Agreement; provided however that Seller shall not be obligated to pay any amounts to or claims of third parties in order to do so (other than as required by the Sale Order or pursuant to Sections 3.1.1 (as and to the extent provided for therein) and 3.2.1 above).

**SECTION 3.3.    Permitted Exceptions**.

"**Permitted Exceptions**" means:

3.3.1.  intentionally omitted;

3.3.2.  covenants, easements, restrictions and agreements of record, provided same does not render title uninsurable;

3.3.3.  any state of facts that an accurate survey of the Property would show (including encroachments, projections, retaining walls and stoops), and any further state of facts that an accurate survey since the date of such survey would show, provided that such state of facts do not render title uninsurable and such state of facts does not adversely affect the present use and operation of the Property (each a "**Survey**");

3.3.4. Liens for unpaid taxes, water charges, sewer rents, vault charges, assessments, charges, rents and any other governmental charges, which are not yet due and payable and are apportioned in accordance with the provisions of Article 4 hereof;

3.3.5.  all rights and easements of record, for electricity, gas, telephone, water, cable television and any other utilities to maintain and operate lines, cables, poles and distribution boxes in, over and upon the Real Estate, as long as such improvement shall stand and that if any damage or destruction to the Property, that the Real Estate as it is currently constructed will be permitted to be reconstructed;

3.3.6.  possible minor projections and/or encroachments of less than one (1) foot of retaining walls, foundations, stoops, areas, steps, sills, trim, cornices, standpipes, fire escapes, coal chutes, casings, ledges, water tables, lintels, porticos, keystones, windows, hedges, copings, cellar doors, sidewalk elevators, fences, fire escapes and the like, or similar projections or objects upon, under or above any adjoining buildings and/or streets or avenues or those belonging to adjoining premises which encroach upon the Real Estate, or within any set back areas, provided that the Title Company shall insure that such projections or encroachments may remain undisturbed so long as the buildings and improvements shall stand and minor variations between the lines of record title and fences, retaining walls, hedges, and the like, provided they do not render title uninsurable;

3.3.7. variations between the tax diagram or the tax map and the record description, to the extent they do not render title uninsurable;

3.3.8. (a) any and all violations of building, fire, sanitary, environmental, housing and similar laws, municipal ordinances, orders or requirements (collectively, "**Violations**") affecting the Property from or by any federal, state, county or municipal department, agency, authority or bureau having or asserting jurisdiction (each, a "**Governmental Authority**") that are noted or issued as of the Effective Date or at the date of Closing; provided, however, that Seller shall be responsible for the payment of all monetary fines and penalties associated with any Violations noted or issued against the Property (together with any interest accrued thereon) through Closing;

3.3.9. building, zoning, subdivision and other governmental laws, codes and regulations, and landmark, historic and wetlands designations, which are not and would not be violated by the existing structures or present use thereof and which do not render title unmarketable or uninsurable;

3.3.10.  any matter created or caused by Purchaser;

3.3.11.  intentionally omitted;

3.3.12.  rights of the public and adjoining owners in highways, streets, roads and lanes crossing the Property provided that the Title Company shall insure (at no additional cost to Purchaser) that no third parties have any claims for adverse possession or easements by prescription by virtue of the use of such highways, streets, roads and lanes crossing the Property;

3.3.13.  standard exclusions from coverage contained in the printed jacket of the form of title policy employed by the Title Company, other than those that can be removed by the title affidavit that Seller is required to provide pursuant to the terms of this Agreement;

3.3.14.  any lien, encumbrance or other item from which the Property will be released pursuant to the Sale Order;

3.3.15.  the Leases or such of them as shall be in effect on the Closing Date, and the rights of the tenants, as tenant only, thereunder, provided that no tenant has any right to purchase the Property or right of first refusal;

3.3.16.  any matter that is the responsibility of the tenants pursuant to the terms of their Leases, and

3.3.17.  any matters which the Title Company may raise, provided that the Title Company shall agree to omit or insure without additional premium to Purchaser against collection of the same out of the Property.

## ARTICLE 4
## APPORTIONMENTS AND PAYMENTS

**SECTION 4.1.**      **Apportionments Relating to the Property**.  The following shall be apportioned between Seller and Purchaser at the Closing with respect to the Property, as of 11:59 PM of the day immediately preceding the Closing Date (the "**Apportionment Date**"), and the net aggregate amount thereof either shall be paid by Purchaser to Seller or credited to Purchaser towards the Purchase Price, as the case may be, at the Closing (provided, however, that, other than as provided in Section 3.1.1, nothing in this Agreement shall obligate the Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party, and notwithstanding the contrary, this Section 4 shall not have an impact on the Plan Fund;

4.1.1.  real property taxes, and any assessments (or installments thereof), including with respect to Business Improvement Districts, on the basis of the fiscal year for which payable; if the Apportionment Date shall be prior to the date on which the real property tax rate is fixed, the apportionment of real property taxes shall be made on the basis of the tax rate for the preceding year applied to the latest assessed valuation;

4.1.2.  to the extent not metered, water rates and charges, sewer taxes and rents and electricity and other utility charges;

4.1.3.  fuel oil and liquid propane gas, if any, at the cost per gallon most recently charged to Seller, based on the supplier's measurements thereof taken within ten (10) days of the Closing Date;

4.1.4.  rents and other revenues derived from the Leases (the "**Rents**"), shall be adjusted and prorated on an as, if and when collected basis pursuant to the terms herein.  Rents collected by Purchaser or Seller after the Closing from any Tenant or other party, allocable to periods prior to the Closing shall belong solely to Purchaser and Seller waives any rights to such Rents received after Closing;

4.1.5. insurance proceeds received by Seller, if any, and payable to Purchaser pursuant to Article 13 hereof to the extent not applied to repair or restore the Property in accordance with the provisions of this Agreement;

4.1.6. security deposits currently being held by or on behalf of Seller pursuant to the Leases shall be delivered to Purchaser at Closing;

4.1.7. annual municipal permit and inspection fees and other fees for licenses and permits assigned to Purchaser, if any; and

4.1.8. any and all amounts due under any Property Contracts, including any termination fees, shall be payable by Seller at or prior to Closing.

**SECTION 4.2.        Taxes and Assessments**.

4.2.1. If, on the Closing Date, all or any portion of the Real Estate shall be or shall have been affected by assessments (including Business Improvement District assessments) that are, or which may become, payable in annual installments, of which the first installment is then a charge or lien or has been paid or if any of the improvements to be paid for thereby are in place or commenced, then, for purposes of this Agreement only, the installment(s) which shall have been paid or the installment which shall be then due and payable shall be apportioned between Seller and Purchaser and all of the unpaid installments of any such assessments, including those which are to become due and payable after the date hereof, shall continue to be Liens upon the Real Estate, it being understood and agreed that Seller and Purchaser shall be responsible for a pro rata share of such assessment, with Purchaser being responsible for the period from and after the Apportionment Date and Seller being responsible for the period prior to the Apportionment Date, regardless of when such installments are due and payable (provided, however, that, other than as provided in Article 3 nothing in this Agreement shall obligate Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).  Notwithstanding any other provision of this Agreement, Seller shall have no responsibility for any taxes or assessments that become due or payable as a result of the loss of any exemption following the transfer of the Property.

4.2.2. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges, sewer taxes and rents or any other utility made after the Closing Date is applicable to a period before the Closing Date, such refund shall be payable to Seller or returned by Purchaser to Seller, net of the actual costs incurred by Purchaser in obtaining same.  Notwithstanding anything to the contrary any further refunds or abatements related to 421-a of the New York Real Property Tax Law shall be the property of the Purchaser.

4.2.3. To the extent that any refund of real property taxes, assessments (including Business Improvement District assessments), water rates and charges or sewer taxes and rents made after the Closing Date is applicable to a period after the Closing Date, such refund shall be payable to Purchaser or returned by Seller to Purchaser, subject to the actual costs incurred by Seller, including reasonable attorneys' fees in obtaining same (provided, however, that, other

than as provided in Section 3.1.1, nothing in this Agreement shall obligate Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

SECTION 4.3.    **Transfer of Utilities**.  Purchaser, at its sole cost and expense, shall cause the transfer of all utility services for the Real Estate to Purchaser's name as of the Closing Date and Seller shall cooperate with Purchaser in connection therewith provided same is at no cost to Seller. If utility services shall not have been transferred to Purchaser's name for the Real Estate effective as of the Closing Date, then, at the Closing, any such charges with respect to services not so transferred shall be prorated, based upon the per diem charges obtained by using the most recent period for which readings of such utility services shall then be available. Purchaser, at its sole cost and expense, shall promptly thereafter cause such utility services to be transferred to Purchaser's name, and Seller shall cooperate with Purchaser in connection therewith.  Purchaser shall make all required deposits on account with utility companies or on account with municipalities and shall reasonably cooperate with Seller in having any deposits currently held by such companies and municipalities, returned to Seller, or Purchaser can credit to Seller at Closing. However, Seller shall be solely responsible for obtaining the return of its own utility company deposits, if any (provided, however, that nothing in this Agreement shall obligate Seller to pay any amounts due and owing or otherwise relating to prepetition obligations to any third party).

SECTION 4.4.    **Rents Received After Closing.**  Subject to Section 4.5 hereof, if Purchaser shall receive Rents under any Lease after the Closing Date, such Rent shall belong to Purchaser. To the extent that Seller receives Rents after the Closing Date, the same shall be held in trust by Seller for Purchaser, and shall be promptly paid to Purchaser.

SECTION 4.5.    **Collection of Rents.**  After the Closing Date, Purchaser shall bill Tenants for Rents as required by their respective Leases.  Seller shall have no right subsequent to the Closing to bring a legal proceeding against any Tenant.  Nothing in this Section 4.5 or any other provision of this Agreement shall be construed as an agreement on the part of Purchaser to refrain from its right to terminate any Lease pursuant to its terms. Notwithstanding the foregoing, Purchaser shall receive a credit for any and all Rents which have been prepaid by tenants for periods subsequent to the Closing Date. In the event Seller enters into any lease after execution of this Agreement, Seller shall advise Purchaser of any prepaid Rents received and Purchaser shall receive a credit on the Closing Date for the amount of prepaid Rent for the period subsequent to the Closing Date.

SECTION 4.6.    **Transfer Taxes**.  Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.  Notwithstanding anything to the contrary, it is the intention of Seller and the Purchaser that the Property should be sold pursuant to, and in accordance with the Liquidating Plan providing for the sale of the Property pursuant to this Agreement and Bankruptcy Court approved sale procedures and that such sale shall be conducted pursuant to § 1146 of the Bankruptcy Code, which will serve to exempt the parties hereto from any requirement to pay any real property transfer taxes, transfer gains taxes, and other similar taxes and fees, if any, imposed on Seller by the state, county or municipality in which the Real Estate is located which are imposed in connection with the sale, assignment, transfer and conveyance of the Real Estate to Purchaser

as contemplated by the provisions of this Agreement (collectively, the "**Transfer Taxes**") that may arise in connection with the transfer of the Property through the transaction contemplated herein. In addition, pursuant to Section 1146(a) of the Bankruptcy Code, the deeds conveying the Properties to Purchaser or its nominee or designee upon the Effective Date of the Plan and any deeds further conveying any of the Properties by Purchaser or its nominee or designee within two years following Purchaser or its nominee or designee taking title to the Properties pursuant to this Plan shall be an instrument of transfer in connection with or in furtherance of the Plan and shall not be subject to tax under any law imposing a stamp tax, real estate Transfer Taxes, mortgage recording tax or similar tax. Notwithstanding anything to the foregoing, if the Bankruptcy Court fails to enter an order exempting Transfer Taxes, Seller shall have the option to pay the Transfer Taxes or cancel the sale. In the event Seller elects to terminate the Agreement as a result of if the Bankruptcy Court failing to enter an order exempting Transfer Taxes, Purchaser shall have the option to vitiate Seller's termination, pay the Transfer Taxes and proceed with the Sale.

SECTION 4.7.    **Tax Returns**.  At the Closing, Purchaser and Seller shall deliver to the Title Company a New York State Transfer Tax Return (TP-584), City of New York Real Property Transfer Tax Return (NYC-RPT) and Equalization form (RP-5217NYC) (collectively, the "**RE Tax Returns**") and deliver same to the Title Company for delivery to the appropriate authority.

SECTION 4.8.    **Violations.**  Seller and Purchaser acknowledge that Purchaser is purchasing the Property subject to all Violations that may be of record with respect to the Real Estate as of the Closing Date.  Seller hereby authorizes Purchaser to conduct a customary and ordinary search at the request of the Title Company for the purposes of determining whether any Violations have been noted or issued with respect to the Real Estate.  Seller and Purchaser shall each promptly notify the other party and provide the other party with a copy of all notes or notices of Violations which Seller or Purchaser shall receive after the date hereof through the date of Closing.

SECTION 4.9.    **Title Charges**.  Purchaser shall pay the cost of Purchaser's title insurance premiums and any title search costs, the cost of a survey for the Property or any update thereto and all recording and filing fees, including, but not limited to, those in connection with the Deed.  Notwithstanding anything in this Section and Agreement to the contrary, Seller shall be responsible for any charges associated with the recording of documents necessary to remove Non-Permitted Exceptions from the Title Report, it being agreed that Seller shall not be required to deliver any documents for recordation to clear title if the Title Company is prepared to insure over the same based upon the delivery of the Sale Order.

SECTION 4.10.    **Transaction Expenses**.  Except as expressly provided herein, each party shall bear its own costs and expenses, including attorney, accountant and other consultant fees, in connection with the execution and negotiation of this Agreement and the consummation of the transactions contemplated hereby.

SECTION 4.11.    **Assignment of Existing Mortgages.**  Upon the request of the Purchaser, Seller shall cause the current mortgagee to assign the existing mortgage(s) to

Purchaser's lender at Closing without cost to Seller and the sale of the Property shall be delivered subject to the existing Mortgages.

**SECTION 4.12.**    **Survival**.  The provisions of this Article 4 shall survive the Closing.

## ARTICLE 5
## COVENANTS REGARDING THE PROPERTY

**SECTION 5.1.**    **Maintenance and Operation of the Property**.  Between the date hereof and the Closing Date, Seller shall not be obligated to maintain, repair, operate and manage the Property.  Notwithstanding the foregoing to the contrary, Seller shall be permitted to perform such work as Seller elects, in its sole and absolute discretion, provided that such work that not adversely affect the value or structure of the Property.

**SECTION 5.2.**    **Leasing of the Property.**

Seller shall, between Effective Date and the Closing, be permitted to execute any Leases required by law or otherwise in its good business judgment.  Seller shall not, between Effective Date and the Closing, without Purchaser's prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed, grant any concession or rent abatement for any period following the Closing.  If any space is vacant on the Closing Date, Purchaser shall accept the Property subject to such vacancy.  Seller shall not apply any security deposit on account of any rental due or to become due under any of the Leases, other than in accordance with the Leases, between now and the date of Closing; absent an express provision in any such Lease to the contrary, Seller shall not return any such security deposit to the Tenant thereunder with respect to any expiring or terminated Lease unless the Tenant thereunder shall have actually vacated the premises demised under such Lease.

5.2.1.  Seller does not guarantee, represent or warrant to Purchaser that any of the Leases will be in effect on the Closing Date or whether or not Tenants under any or all of the Leases shall be in full compliance with the terms of such Leases.  Further, Purchaser acknowledges that whether or not any or all of the Leases are in effect or the Tenants thereunder are in compliance with their respective terms shall not be a condition to Closing.

**SECTION 5.3.**    **Insurance.**    Seller shall maintain in full force and effect the insurance policies, if any, currently in effect with respect to the Property (or replacements continuing similar coverage and deliver to Purchaser, upon request, reasonable evidence of such insurance, including certificates of such insurance)

**SECTION 5.4.**    **Additional Responsibilities.**

5.4.1.  Seller shall cause any and all Property Contracts to be terminated at no expense to Purchaser prior to Closing.

5.4.2.  Seller shall not remove from the Property any Personalty unless such item is replaced with a similar item of comparable utility and value.

5.4.3.  Seller shall not knowingly take any action with respect to the Properties that Seller knows would result in a failure to comply in all material respects with all laws, ordinances, rules and regulations of any governmental authorities applicable to the Property or any portion thereof.

5.4.4.  Seller shall not enter into any brokerage, leasing agency or similar agreements affecting the Property, other than  in the ordinary course of business to rent vacant apartments, without the prior written consent of Purchaser, which consent shall not be unreasonably withheld conditioned or delayed.

5.4.5.  Seller shall not grant any lien or cause any instrument to be recorded that would further encumber the Property in any manner, other than memoranda of lease and/or subordination, non-disturbance and attornment agreements with respect to Leases entered into in accordance with the terms hereof or Liens or encumbrances to be discharged as of the Closing Date.

## ARTICLE 6
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

**SECTION 6.1.**        **Generally**.  Purchaser represents and warrants to Seller the following are true and correct on the date hereof and as of the date of the Closing:

6.1.1.  (a)   Purchaser is a duly formed and validly existing limited liability company under the Laws of the State of New York, (b) Purchaser has the full right, authority and corporate power to enter into this Agreement, to consummate the transactions contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party, (c) each of the Persons executing this Agreement on behalf of Purchaser is authorized to do so, and (d) this Agreement constitutes a valid and legally binding obligation of Purchaser enforceable against Purchaser in accordance with its terms;

6.1.2.  there are no legal or administrative proceedings pending or, to the best of Purchaser's actual knowledge, without investigation, threatened against or affecting Purchaser that would adversely affect Purchaser's legal authority or financial ability to perform its obligations under this Agreement and the Closing Documents to which it is a party;

6.1.3.  the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance by Purchaser of its obligations hereunder and under the Closing Documents to which it is a party, do not and will not (a) violate or conflict with any judgment, decree or order of any court or any Law or permit applicable to it, or (b) breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which it is a party or by which Purchaser is bound;

6.1.4.  the execution and delivery of this Agreement by Purchaser does not, and the performance of its obligations hereunder and under the Closing Documents to which it is a party will not, require the consent or approval of any public authority or any other Person or any lender from which Purchaser may seek to obtain financing, as may be applicable provided however

that Purchaser acknowledges that its obligations under this Agreement are not contingent upon any such financing;

6.1.5.  Purchaser's Federal Tax Identification Number is 47-4833 053.

**SECTION 6.2.        Closing Conditions; Survival of Representations and Warranties.** The following are conditions precedent to the obligation of Seller to close title under this Agreement, any or all of which may at Seller's option be waived in writing:

6.2.1.  Intentionally Omitted.

6.2.2.  Purchaser shall have (or, with respect to obligations of Purchaser to be performed on the Closing Date, Purchaser shall be ready, willing and able to perform same on the Scheduled Closing Date) (a) delivered, or caused to be delivered, all of the Closing Documents to which it is a party and all other documents, instruments and other items required to be delivered by Purchaser at or prior to Closing (including, without limitation, pursuant to Section 9.1.2), (b) tendered the Purchase Price in accordance with the terms of this Agreement,  (c) performed in all material respects all other material obligations on Purchaser's part to be performed hereunder on or prior to the Closing Date, and (d) established the Plan Fund.

6.2.3.  All other conditions precedent expressly set forth herein to Seller's obligation to consummate the transaction contemplated hereby have been satisfied (or waived in writing by Seller).

6.2.4.  The Bankruptcy Court shall have entered the Sale Order.

6.2.5.  The representations, warranties and certifications of Purchaser set forth in this Agreement shall not survive the Closing.

## ARTICLE 7
## REPRESENTATIONS AND WARRANTIES OF SELLER

**SECTION 7.1.        Generally**.  Seller represents, warrants and covenants to and with Purchaser that the following are true and correct on the date hereof and as of the date of the Closing:

7.1.1.  (a) Seller is the owner of all of the Property of  the estate of the Debtors, (b) subject to the entry of the Bidding Procedures Order entered by the Bankruptcy Court, Seller has the full right, authority and power to enter into this Agreement, and, subject to the entry of the Sale Order, to consummate the transaction contemplated herein and to perform its obligations hereunder and under those Closing Documents to which it is a party all of which have been duly authorized by all necessary actions on the part of Seller, (c) each of the Persons executing this Agreement on behalf of Seller is authorized to do so, and (d) subject to the entry of the Sale Order, this Agreement constitutes a valid and legally binding obligation of Seller enforceable against it in accordance with its terms;

7.1.2.  the execution and delivery of this Agreement, the consummation of the transactions contemplated hereby, and the performance by Seller of its obligations hereunder and

under the Closing Documents to which it is a party (other than being subject to Bankruptcy Court approval) do not and will not conflict with or violate any Law, rule, judgment, regulation, order, writ, injunction or decree of any court or governmental or quasi-governmental entity having jurisdiction over Seller or any of the parties comprising Seller, including the United States of America, the State of New York or any political subdivision of either of the foregoing, or any decision or ruling of any arbitrator to which Seller or any of the parties comprising Seller is a party or by which Seller or any of the parties comprising Seller is bound or affected, or breach any provisions of, or constitute a default under, any contract, agreement, instrument or obligation to which Seller or any of the parties comprising Seller is a party or by which any of them is bound; and

7.1.3.  Seller is not a "foreign person" within the meaning of Section 1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (as such "foreign person" is defined in the Internal Revenue Code).

7.1.4.  Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby is prohibited by, or requires Seller to obtain any consent, authorization, approval or registration under any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller, except as required by the Bankruptcy Court.

7.1.5.  The Debtors' Federal Tax Identification Numbers are as follows:

East Village Properties LLC (47-4811437)

223 East 5th Street LLC (47-5108999)

229 East 5th Street LLC (47-5148348)

231 East 5th Street LLC (47-5284013)

233 East 5th Street LLC (47-5158999)

235 East 5th Street LLC (47-5211702)

228 East 6th Street LLC (47-5122965)

66 East 7th Street LLC (47-5091812)

27 St. Mark's Place LLC (47-5081789)

334 East 9th Street LLC (47-5337903)

253 East 10th Street LLC (47-5274317)

325 East 12th Street LLC (47-5300625)

327 East 12th Street LLC (47-5307195)

329 East 12th Street LLC (47-5320475)

510 East 12th Street LLC (47-5341469)

514 East 12th Street LLC (47-5357232)

**SECTION 7.2.        Property Representations**.        Seller represents and warrants to Purchaser that, as of the date hereof, with respect to the Property:

7.2.1. Seller has heretofore delivered to, or made available for review by, Purchaser a true and complete set of all written Leases, including any amendments, if applicable, and Purchaser acknowledges receipt and/or review of same.  Except as set forth in this Section or elsewhere in this Agreement, Seller makes no representation or warranty with respect to the Leases, it being understood and agreed that Purchaser has received and/or reviewed the same and the Tenant files and is fully familiar with the terms thereof and all other matters concerning the Leases.

7.2.2.  Intentionally Omitted.

7.2.3.  Intentionally Omitted.

7.2.4.  Intentionally Omitted.

7.2.5.  Intentionally Omitted

7.2.6.  Intentionally Omitted.

7.2.7.  Intentionally Omitted.

7.2.8.  Seller will keep all insurance policies in effect up to and including the Closing Date.

7.2.9.  There is no agreement in effect whereby Seller has agreed to sell or has granted any Person an option or right of first refusal to purchase all or any part of the Property.

7.2.10.  Neither Seller nor any Person who owns a direct or indirect interest in Seller (a "**Seller Party**") is a person or entity with whom United States persons or entities (collectively, a "U.S. Person") are restricted or prohibited from doing business under regulations of The U.S. Treasury Department's Office of Foreign Assets Control ("**OFAC**") (including those named on OFAC's specially designated and blocked persons list) or under any statute, executive order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism) or other governmental action and no Seller Party has engaged or will not engage in any dealings or transactions or be otherwise associated with such persons or entities.  No Seller Party is now nor shall be at any time prior to or at the Closing a Person with whom a U.S. Person, including a United States Financial Institution as defined in 31 U.S.C. 5312, as periodically amended (a "Financial Institution"), is prohibited from transacting business of the type contemplated by this Contract, whether such prohibition arises under United States law, regulation, executive orders and lists

published by the OFAC (including those executive orders and lists published by OFAC with respect to Specially Designated Nationals and Blocked Persons) or otherwise.

7.2.11. No Seller Party: (i) is under investigation by any governmental authority for, or has been charged with, or convicted of, money laundering, drug trafficking, terrorist related activities, any crimes which in the United States would be predicate crimes to money laundering, or any violation of any Anti-Money Laundering Laws (as hereinafter defined); (ii) has been assessed civil or criminal penalties under any Anti-Money Laundering Laws; or (iii) has had any of its funds seized or forfeited in any action under any Anti-Money Laundering Laws.  For purposes of this clause (l), the term "Anti-Money Laundering Laws" shall mean laws, regulations and sanctions, state and federal, criminal and civil, that: (w) limit the use of and/or seek the forfeiture of proceeds from illegal transactions; (x) limit commercial transactions with designated countries or individuals believed to be terrorists, narcotics dealers or otherwise engaged in activities contrary to the interests of the United States; (y) require identification and documentation of the parties with whom a Financial Institution conducts business; or (z) are designed to disrupt the flow of funds to terrorist organizations.  Such laws, regulations and sanctions shall be deemed to include the USA PATRIOT Act of 2001, Pub. L. No. 107-56 (the "Patriot Act"), the Bank Secrecy Act, 31 U.S.C. Section 5311 et. seq., the Trading with the Enemy Act, 50 U.S.C. App. Section 1 et. seq., the International Emergency Economic Powers Act, 50 U.S.C. Section 1701 et. seq., and the sanction regulations promulgated pursuant thereto by the OFAC, as well as laws relating to prevention and detection of money laundering in 18 U.S.C. Sections 1956 and 1957

7.2.12. There are no employees of the Seller at the Property engaged in the operation and maintenance of the Property.

It shall be a condition to Closing that the representations and warranties of Seller contained in Sections 7.2 shall be true and correct in all material respects on the date hereof, and such representations and warranties shall survive the Closing.

**SECTION 7.3.     Closing Conditions; Survival of Representations and Warranties**.
The following are conditions precedent to the obligation of Purchaser to close title under this Agreement, any or all of which may at Purchaser's option be waived in writing:

7.3.1. Except to the extent otherwise unnecessary as a result of the Sale Order, each of the representations and warranties of Seller set forth in this Agreement shall be deemed to have been repeated by Seller, at and as of the Closing Date, with the same force and effect as if first made on and as of such date.

7.3.2. Seller shall have delivered all of the documents and other items required pursuant to Section 9.1.1 of this Agreement and shall have performed all other material covenants, undertakings and obligations herein agreed to be performed by it, and complied with all material conditions required by this Agreement to be performed or complied with by Seller at or prior to the Closing.

7.3.3. At the time of the Closing, title to the Property shall be as provided in this Agreement and the Title Company shall be willing to issue fee title insurance policies in favor of Purchaser subject only to the Permitted Exceptions.

7.3.4.  The representations, warranties and certifications of Seller set forth in this Agreement shall survive the Closing.

7.3.5.  The Bankruptcy Court shall have entered the final, non-appealable Sale Order.

**SECTION 7.4.       Knowledge of Seller**.  Whenever a representation or warranty is made in this Agreement on the basis of the knowledge of Seller, such representation and warranty is made solely on the basis of the actual, as distinguished from implied, imputed or constructive, knowledge on the date that such representation and warranty is made, without inquiry or investigation or duty, of the Seller, without attribution to such persons of facts or matters otherwise within the personal knowledge of any other officers, directors or employees of Seller, or third parties.

## ARTICLE 8
## CLOSING DATE

**SECTION 8.1.       Closing Date**.  The consummation of the transaction contemplated by this Agreement (the **"Closing"**) shall take place on the "Closing Date" which shall be within the first business day following the fourteenth (14th) Business Day from the date the Bankruptcy Court shall have entered the final, non-appealable Sale Order and/or Confirmation Order (the **"Scheduled Closing Date"**), which "Closing Date" may be extended for a period of no more than 90 days at the absolute discretion of Purchaser. The Scheduled Closing Date or any such other date to which the Closing may be adjourned by Purchaser pursuant to the terms of this Agreement, is referred to herein as the **"Closing Date"**.  The Closing shall be held at the offices of the Purchaser, located at 360 Lexington Avenue, Suite 1200, New York, New York 10017, otherwise at the offices of Purchaser's lender or such lender's counsel, if any, provided such offices are located in New York City, New York.  Notwithstanding the foregoing, either Seller or Purchaser may elect to conduct the Closing pursuant to an escrow arrangement through Title Company or as may otherwise be agreed upon by Seller and Purchaser.

## ARTICLE 9
## CLOSING DOCUMENTS

**SECTION 9.1.       Closing**.

9.1.1.  At the Closing, contemporaneously with Purchaser's delivery to Seller of all of the Closing Documents required to be delivered by Purchaser hereunder, Seller shall deliver or cause to be delivered to Purchaser, duly executed by Seller in recordable form, where applicable, those Closing Documents to be delivered by Seller as set forth on <u>Schedule IV</u> attached hereto and made a part hereof.

9.1.2.  At the Closing, contemporaneously with Seller's delivery to Purchaser of all of the Closing Documents required to be delivered by Seller hereunder, Purchaser shall deliver or cause to be delivered to Seller those Closing Documents to be delivered by Purchaser, duly executed by Purchaser in recordable form, where applicable, as set forth on <u>Schedule V</u> attached hereto and made a part hereof (the documents described in this Section 9.1.1 and in Section 9.1.2

and all other documents required to be delivered hereunder are referred to collectively as the **"Closing Documents"**).

   **SECTION 9.2.**  **Further Assurances**.  Seller and Purchaser each agree, at any time and from time to time at or after the Closing, to execute, acknowledge where appropriate, and deliver or cause to be executed, acknowledged and delivered such further instruments and documents and to take such other action as the other of them or the Title Company may reasonably request to carry out the intents and purposes of this Agreement. The provisions of this Section 9.2 shall survive the Closing.

**ARTICLE 10**
**NOTICES**

   **SECTION 10.1.**  **Notices.** All notices, demands, consents, approvals, requests or other communications which any of the parties to this Agreement may desire or be required to give hereunder (collectively, "**Notices**") shall be in writing and shall be given by personal delivery, or reputable overnight courier service (charges prepaid), or email addressed as hereinafter provided, provided, however, that any Notice given by email shall also be given within one Business Day by personal delivery or reputable overnight courier service (charges prepaid).  Except as otherwise specified herein, the time period in which a response to any notice or other communication must be made, if any, shall commence to run on the earliest to occur of (a) if by overnight express delivery or personal delivery, the date of receipt, or attempted delivery, if such communication is refused; (b) if given by email, the date on which such email is transmitted and confirmation of delivery thereof is received (provided same is followed within one Business Day with hard copy sent by personal delivery or reputable overnight delivery service (charges prepaid)); and (c) if sent by overnight courier service, one (1) Business Day after having been deposited for next day overnight delivery with any reputable overnight courier service (charges prepaid), if such mailing is refused.  Until further notice, notices and other communications under this Agreement shall be addressed to the parties listed below as follows:

If to Seller, to:

         ROBINSON BROG LEINWAND
         GREENE GENOVESE & GLUCK P.C.
         Attn: A. Mitchell Greene, Esq.,
         875 Third Avenue
         New York, New York 10022
         Email: amg@robinsonbrog.com

with a copy to:    dgoldwasser@fiacp.com

If to Purchaser, to:  EVF1 LLC
       c/o Madison Realty Capital
       520 Madison Avenue, Suite 3501
       New York, New York 10022
       Attention: Brian Shatz, Esq.
       Email: bshatz@madisonrealtycapital.com and
       Email: dspeiser@madisonrealtycapital.com

with a copy to:   Kriss & Feuerstein LLP
       360 Lexington Avenue, Suite 1200
       New York, New York 10017
       Attention: Jerold C. Feuerstein, Esq.
       Email: jfeuerstein@kandfllp.com
       Email: ehoberman@kandfllp.com

Any party may designate another addressee, and/or change its address, for Notices hereunder by a Notice given pursuant to this Article 10.

## ARTICLE 11
## BROKER

Seller and Purchaser each represents and warrants to the other that it has not dealt with any broker, agent or any other Person in connection with the transaction contemplated by this Agreement.  Purchaser hereby indemnifies Seller and holds Seller harmless from and against any and all claims for commission, fee or other compensation by any other Person who shall claim to have represented or dealt with Purchaser in connection with this Agreement and for any and all costs incurred by Seller in connection with such claims, including reasonable attorneys' fees and disbursements.  The Sale Order shall provide that Purchaser shall have no liability for any and all claims for commission, fee or other compensation by any Person who shall claim to have represented Seller in connection with this Agreement. The provisions of this Article 11 shall survive the Closing or the sooner termination of this Agreement.

## ARTICLE 12
## DEFAULTS; REMEDIES

**SECTION 12.1.** **Purchaser's Default**.  If Purchaser shall (a) fail or refuse to close as and when required by the terms of this Agreement, or (b) otherwise be in default hereunder, which default shall continue for ten (10) days after notice to Purchaser specifying such default, the parties hereto agree that the damages that Seller would sustain as a result thereof would be substantial, but would be difficult to ascertain. Accordingly, the parties hereto agree that in the event of such default, failure or refusal by Purchaser, to close, Seller's sole remedy shall be to terminate this Agreement. In such event, Purchaser and Seller shall have no further rights or obligations under this Agreement, except those expressly provided herein to survive the termination of this Agreement.  Nothing contained in this Section shall limit or diminish Purchaser's obligations or liabilities under Article 6 or Section 19.10 hereof.

**SECTION 12.2.     Seller's Default**.  If Seller shall (a) fail or refuse to close as required by the terms of this Agreement or (b) otherwise be in default hereunder, which default shall continue for ten (10) days after written notice to Seller thereof, then Purchaser's sole remedy shall be to either (i) terminate this Agreement or (ii) seek specific performance hereunder.  Purchaser expressly agrees however, that Purchaser shall not have the right to seek or recover any actual, consequential or punitive damages or any similar additional sums or amounts against Seller for any breach occurring prior to Closing.  Nothing herein shall limit or diminish Seller's obligations or liabilities under Article 7 or Section 19.10 hereof.

## ARTICLE 13
## CASUALTY; CONDEMNATION

**SECTION 13.1.     Casualty**.  Seller agrees to give Purchaser immediate notice of any fire or other casualty occurring at the Property of which Seller obtains knowledge, between the date hereof and the date of the Closing, or of any actual or threatened condemnation of all or any part of the Property of which Seller obtains knowledge.  If prior to the Closing there shall occur damage to the Property caused by fire or other casualty which would cost an amount equal to a Material Part (as defined below) or more to repair, as reasonably determined by an engineer selected by Seller which is reasonably satisfactory to Purchaser, Purchaser may elect to terminate this Agreement by written notice given to Seller within ten (10) Business Days after Seller has given Purchaser the notice referred to in this Section hereof, or at the Closing, whichever is earlier, in which event this Agreement shall thereupon be null and void and neither party hereto shall thereupon have any further obligation to the other, except for the provisions hereof intended to survive the termination of this Agreement.  If Purchaser does not elect to terminate this Agreement, then the Closing shall take place as herein provided, without abatement of the Purchase Price, and Seller shall assign to Purchaser at the Closing, by written instrument, all of Seller's interest in and to any insurance proceeds or condemnation awards which may be payable to Seller on account of any such fire, casualty or condemnation, and shall deliver to Purchaser any such proceeds or awards actually theretofore paid, less any amounts (the "**Reimbursable Amounts**") (i) actually and reasonably expended or incurred by Seller in adjusting any insurance claim or negotiating and/or obtaining any condemnation award (including, without limitation, reasonable attorneys' fees and expenses) and/or (ii) theretofore actually and reasonably incurred or expended by or for the account of Seller for the cost of any compliance with laws, protective restoration or emergency repairs made by or on behalf of Seller.  The proceeds of rent interruption insurance, if any, shall on the Closing Date be appropriately apportioned between Purchaser and Seller.  For purposes of this Section 13.1, **"Material Part"** shall mean a casualty that causes damage that amounts to more than ten (10%) percent of the Purchase Price.

**SECTION 13.2.     Condemnation**.  If, prior to the Closing, all or a Material Part (as hereinafter defined) of the Property is taken by eminent domain, Purchaser may, by notice to Seller given within ten (10) Business Days after notice from Seller to Purchaser of the taking, elect to cancel this Agreement.  In the event that Purchaser shall so timely elect, neither of the parties hereto shall have any rights or obligations to the other hereunder except those expressly stated to survive the termination of this Agreement.  Unless this Agreement is so canceled, or if less than a Material Part of the Property is taken by eminent domain, this Agreement shall remain in full force and effect in which event Seller shall, on the Closing Date, and upon receipt of the balance of the

Purchase Price, pay to Purchaser any sums of money collected by Seller as an award for any taking by eminent domain, after deducting any reasonable amount which Seller may have agreed or been obligated to pay in obtaining such award, including reasonable attorneys' fees and disbursements. Seller shall not negotiate, compromise, or settle any such award without Purchaser's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed.  In addition, Seller shall assign, transfer and set over to Purchaser all of Seller's right, title and interest in and to any portion of any condemnation award not yet received by Seller.   For purposes of this Section 13.2, **"Material Part"** shall mean a taking of more than ten (10%) percent of the Purchase Price. The provisions of this Article 13 are intended to constitute an "express provision to the contrary" within the meaning of Section 5-1311 of the New York General Obligations Law. This provision shall survive the Closing.

## ARTICLE 14
## AS-IS; WHERE-IS;
## DISCLAIMER; WAIVER OF CLAIMS

**SECTION 14.1.**        **Disclaimers; As-Is, Where-Is Condition.**

14.1.1.  Purchaser acknowledges and represents that it (a) is a sophisticated purchaser, with experience in owning and operating real property in the nature of the Property, (b) realizes the nature of this transaction, understands and is freely taking risks including the risks that Purchaser may be outbid at an Auction, if any, involved in connection with this transaction, (c) has undertaken such independent investigations and evaluations of the Property as it has determined to be necessary or desirable in connection with the transaction contemplated herein, including the matters set forth in Section 14.1.2 below, and (d) acknowledges that the foregoing is reflected in the Purchase Price and the terms upon which Purchaser is willing to purchase and Seller is willing to sell.

14.1.2.  Except as otherwise expressly set forth in this Agreement, the Property is being sold by Seller and Purchaser agrees to accept the Property AS IS AND WHERE IS, in its condition on the date hereof (subject to reasonable wear and tear and natural deterioration between the date hereof and the Closing Date).  Purchaser acknowledges, represents and warrants that (i) Purchaser has had ample opportunity to make an independent investigation and examination of the Property (and all matters of every nature related thereto), and to become fully familiar with the physical condition, state of title, compliance with Law and environmental conditions of the Property, (ii) Purchaser inspected, examined, investigated and sampled the Property to its satisfaction and is familiar with the physical conditions, state of title, compliance with Law and environmental conditions of the Property and uses thereof and will rely on that inspection, examination, investigation and sampling, (iii) Purchaser has inspected, examined and investigated to its satisfaction all laws, ordinances, and governmental rules and regulations relating thereto and is purchasing the Property subject to any Violations thereof, (iv) Purchaser has inspected and examined to its satisfaction all licenses and permits relating to the facility, including but not limited to environmental and operational permits, and it agrees to be bound by the terms of those licenses and permits and/or will ensure that it obtains new or additional licenses and permits to fully comply with all applicable governmental rules and regulations, (v) Purchaser has independently investigated, analyzed and appraised the value and the profitability of the Property, (vi) Purchaser

has independently investigated the tenant files made available for review by Purchaser and all other due diligence documents delivered to Purchaser by Seller, (vii) Purchaser has independently investigated and evaluated all matters of a financial nature relating to the Property, and (viii) Purchaser has been in possession of the Property and has been managing same, and (ix) Seller has not made and shall not make any verbal or written representations, warranties or statements of any nature or kind whatsoever to Purchaser, whether express or implied, except as expressly set forth in this Agreement, with respect to the above, and, in particular, except as expressly set forth herein, no representations or warranties have been made or shall be made with respect to (a) the physical condition or operation of the Property, including the existence of any environmental hazards or conditions thereon (including the presence of asbestos containing materials or the release or threatened release of Hazardous Materials), (b) the revenues or expenses of the Property, (c) the zoning and other laws applicable to the Property or the compliance of the Property therewith, (d) the status of any approvals required for the development of the Property, (e) the nature and extent of any matter affecting title to the Property or to any Personalty, (f) the quantity, quality, or condition of the Personalty, or (g) any other matter or thing affecting or relating to the Property, or any portion thereof, the interests therein to be conveyed to Purchaser pursuant to the terms of the transactions contemplated hereby or the status thereof. Purchaser has had the opportunity to inspect the Property and will rely on that inspection and its other investigations and evaluations of the Property.

14.1.3. Except as expressly set forth in this Agreement, Purchaser acknowledges that Seller has not made, and Seller is not liable for or bound in any manner by, any express or implied warranties, guarantees, promises, statements, inducements, representations or information pertaining to the Property or any part thereof, the physical condition, size, zoning, income, expenses or operation thereof, the uses which can be made of the same or of any other manner or thing with respect thereto. Without limiting the foregoing, Purchaser acknowledges and agrees that Seller is not liable for or bound by, and Purchaser has not relied upon, any verbal or written statements, representations, or any other information respecting the Property furnished by Seller or any broker, employee, agent, consultant or other person representing or purportedly representing Seller.

14.1.4. Intentionally omitted.

14.1.5. Purchaser waives any and all rights to bring an action or a claim against Seller arising out of or related to (i) the past, present, or future environmental condition associated with the Property, (ii) past, present, or future environmental remediation of the Property, (iii) implied statements, representations and/or warranties made by Seller or Seller's agents concerning the environmental conditions of the Property and (iv) violation of any Environmental Law or liability imposed pursuant to any Environmental Law.

14.1.6. Purchaser waives any and all rights to bring an action or claim against Seller for contribution or indemnification related to the cost or expenses that Purchaser may incur to investigate or remediate the Property and/or to defend against any governmental, citizen, or private actions or proceedings arising out of or related to the past, present, or future environmental conditions of the Property.

14.1.7. Except as set forth in this Agreement, Seller hereby specifically disclaims any warranty, guaranty, oral or written, express or implied or arising by operation of law or otherwise, with respect to the matters referred to in this Section 14.1 and any warranty of condition, habitability, merchantability or fitness for a particular purpose, in respect to the Property. Purchaser declares and acknowledges that this express disclaimer shall be considered a material and integral part of this sale and is reflected in the consideration payable by Purchaser hereunder and, as an inducement for Seller to proceed with this transaction, Purchaser further declares and acknowledges that this disclaimer has been brought to the attention of Purchaser and explained in detail and that Purchaser has voluntarily and knowingly consented thereto.

**SECTION 14.2.    Acceptance of Closing Documents; Waivers**.  Except for those matters expressly set forth in this Agreement to survive the Closing and except for the agreements of Seller and Purchaser set forth in the Closing Documents or otherwise entered into at the Closing, Purchaser's acceptance of the Deed(s) and the other Closing Documents shall be and be deemed to be an acknowledgment by Purchaser that Seller has fully performed, discharged and complied with all of Seller's obligations, covenants and agreements hereunder to be performed prior to Closing and that Seller shall have no further liability with respect thereto.

**SECTION 14.3.    Survival**. The provisions of this Article 14 shall survive the Closing.

## ARTICLE 15
## ASSUMED LEASES AND CONTRACTS

**SECTION 15.1.**    Upon the Closing Date,  Seller shall assign to Purchaser, and from and after the Closing Date, Purchaser does hereby agree to assume, any and all rights and liabilities in connection with the Leases, the Rents (including any arrears) and Security Deposits, as further set forth in the Assignment and Assumption and Assumption of Lease and Security Deposits attached hereto as Exhibit C and made a part hereof.

**SECTION 15.2.**    Upon the Closing Date, Seller shall assign to Purchaser, and from and after the Closing Date, Purchaser does hereby agree to assume, any and all liabilities in connection with the  Contracts as set forth on Exhibit F, attached hereto and made a part hereof.

## ARTICLE 16
## Intentionally Omitted

## ARTICLE 17
## BANKRUPTCY PROVISIONS

**SECTION 17.1.    Competing Transaction**.  Purchaser acknowledges and understands this Agreement is part of an extensive process undertaken by the Debtor and Purchaser in the Debtors' Chapter 11 Cases to identify and negotiate a transaction with a bidder who is prepared to pay the highest and best purchase price for the Properties. As such, this Agreement is subject to approval by the Bankruptcy Court.  The Sale Order shall be in a form reasonably acceptable to Purchaser and Seller and shall contain, without limitation, the following provisions:

(i) a finding that the proposed sale of the Properties was proper and sufficient under the Bankruptcy Code and the Bankruptcy Rules, and that all parties in interest entitled to notice of the Sale received such notice;

(ii) except as set forth in Article 4, the sale of the Properties will be free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, with such Liens, attaching to the sale proceeds;

(iii) the sale and transfer of the Properties to the Purchaser is approved pursuant to Sections 363(b), (f) and (m) of the Bankruptcy Code;

(iv) Purchaser is not a mere continuation of Seller, there is no continuity of enterprise between Seller and Purchaser, Purchaser is not a successor to Seller and the transactions contemplated by this Agreement do not amount to, or otherwise constitute a consolidation, merger or *de facto* merger of Purchaser and Seller;

(v) Purchaser has acted in good faith within the context of and is entitled to the protections of Section 363(m) of the Bankruptcy Code;

(vi) the transactions contemplated hereunder are not avoidable pursuant to Section 363(n) of the Bankruptcy Code;

(vii) all Persons are enjoined from in any way pursuing Purchaser or the Properties by suit or otherwise to recover on any Liens which they may have against Debtor or the Properties as of the Closing Date; and

(viii) the Sale Order shall contain a waiver of the 14 day stay pursuant to, and shall be effective immediately notwithstanding the provisions of, Bankruptcy Rules 6004(h) and 6006(d).

**SECTION 17.2.    Intentionally Omitted**.

**SECTION 17.3.    Bankruptcy Court Filings**. As promptly as practicable following the execution of this Agreement, Seller shall, at its sole costs and expense, file with and seek the approval of the Bankruptcy Court for the transactions contemplated hereby. Purchaser agrees that it will promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order including furnishing affidavits or other Documents or information for filing with the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Purchaser under this Agreement and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event the entry of the Sale Order shall be appealed, each party shall use its respective commercially reasonable efforts to defend against such appeal.

**SECTION 17.4.    Intentionally Omitted**.

**SECTION 17.5.    Closing In The Event Of The Filing Of The Notice Of Appeal From The Sale Order.** In the event the Bankruptcy Court enters the Sale Order and a notice of appeal is filed by any person or entity and no stay of the Sale Order is granted by the Bankruptcy

Court or any other court with competent jurisdiction, Purchaser shall not be obligated to close the transaction approved by the Sale Order until any applicable appeal is exhausted.

## ARTICLE 18
## Intentionally Omitted

## ARTICLE 19
## MISCELLANEOUS

**SECTION 19.1.    Entire Agreement**.  The Plan, this Agreement, the Exhibits and Schedules annexed hereto, and any contemporaneously executed agreements, are the entire agreement between Seller and Purchaser concerning the sale of the Property and all understandings and agreements heretofore had or made between the parties hereto are merged in this Agreement which, together with aforementioned agreements and other items, alone fully and completely expresses the agreement of the parties hereto.

**SECTION 19.2.    Modification**.  Except as otherwise provided herein, this Agreement may not be changed, modified, supplemented or terminated, except by an instrument executed by the parties hereto which are or will be affected by the terms of such change, modification, supplement or termination. Either party hereto may waive any of the terms and conditions of this Agreement made for its benefit, provided such waiver is in writing and signed by the party waiving such term or condition.

**SECTION 19.3.    Binding Agreement**.  Subject to the provisions of this Agreement, the terms, covenants, agreements, conditions, representations and warranties contained in this Agreement shall inure to the benefit of and be binding upon the respective parties hereto. This Agreement shall not inure to the benefit of or be enforceable by any other Person.

**SECTION 19.4.    Assignment**.  Purchaser shall have the right to assign all rights of Purchaser hereunder to one or more (i) affiliate or affiliates of the Purchaser or (ii) third-party or third parties designated by Purchaser, for the purpose of acquiring title.  Such right of assignment shall be exercised on notice to Seller on or prior to the Closing Date. Nothing herein shall prevent Purchaser from assigning its right to acquire title to each parcel that makes up the Property to multiple entities.  Purchaser shall provide reasonable allocations of the Purchase Price for each of the parcels that make up the Property to Seller on or prior to the Closing.

**SECTION 19.5.    Illegality**.  If any term or provision of this Agreement or the application thereof to any Person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to Persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby and each term and provision of this Agreement shall be valid and enforced to the fullest extent permitted by Law.

**SECTION 19.6.    Choice of Law**.  EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL

LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

**SECTION 19.7.**    **Construction**.  The headings and captions of the various Articles and **Sections** of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and shall not be deemed in any manner to modify, explain, expand or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references to Articles, Sections, paragraphs or clauses herein shall be to the specified Article, Section, paragraph or clause of this Agreement, and all references to Exhibits and Schedules shall be to the specified Exhibits and Schedules attached hereto. All Exhibits and Schedules attached hereto are made a part hereof. All terms defined herein shall have the same meaning in the Exhibits and Schedules, except as otherwise provided therein. All references in this Agreement to "**this Agreement**" shall be deemed to include the Exhibits and Schedules attached hereto. The terms "**hereby**", "**hereof**", "**hereto**", "**hereunder**" and any similar terms as used in this Agreement, refer to this Agreement in its entirety and not only to the particular portion of this Agreement where the term is used. Whenever in this Agreement provision is made for the payment of attorneys' fees, such provision shall be deemed to mean reasonable attorneys' fees and paralegals' fees. The term "**including**" when used herein shall mean "**including, without limitation**." Wherever in this Agreement the singular number is used, the same shall include the plural, and the masculine gender shall include the feminine and neuter genders, and vice versa, as the context shall require.

**SECTION 19.8.**    **Binding Effect; Assignment; Successors and Assigns.**    This Agreement shall apply to, be binding in all respects upon and inure to the benefit of the parties and their respective successors, administrators and permitted assigns.  A successor to Seller shall include Seller as a liquidated debtor. Except to the extent provided for in Section 19.4 of this Agreement, no assignment of this Agreement or of any rights or obligations hereunder may be made by any party (by operation of Law or otherwise) without the prior written consent of Purchaser and Seller and any attempted assignment without the required consents shall be void. No permitted assignment of any rights hereunder and/or assumption of obligations hereunder shall relieve the parties hereto of any of their obligations.  Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy or claim under or with respect to this Agreement or any provision of this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their respective successors, administrators and permitted assigns.

**SECTION 19.9.**    **Ambiguities**.  Each party acknowledges that it and its counsel have reviewed this Agreement, and the parties hereby agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

**SECTION 19.10.**    **Expenses**.  If any legal action or other proceeding is brought for the enforcement of this Agreement or because of an alleged dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party or parties shall be entitled to recover its fees and costs, including reasonable attorneys' fees, court costs and other costs incurred in such action or proceeding, in addition to

any other relief to which it or they may be entitled.  The provisions of this Section shall survive the Closing or earlier termination of this Agreement.

**SECTION 19.11.    Counterparts**.  This Agreement may be executed in counterparts, each of which together shall be deemed to be an original and all of which shall constitute one and the same Agreement.  Any counterpart may be executed by PDF signature and such PDF signature shall be deemed an original.

**SECTION 19.12.    Waiver of Trial by Jury**.  THE RESPECTIVE PARTIES HERETO SHALL AND THEY HEREBY DO WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER OF THE PARTIES HERETO AGAINST THE OTHER ON ANY MATTERS WHATSOEVER ARISING OUT OF OR IN ANY WAY CONNECTED WITH THIS AGREEMENT, OR FOR THE ENFORCEMENT OF ANY REMEDY UNDER ANY STATUTE, EMERGENCY OR OTHERWISE.    THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 19.13.    Third Party Beneficiaries**.  Except as expressly set forth herein, no Person other than the parties hereto, shall have any rights or claims under this Agreement.

**SECTION 19.14.    Jurisdiction**.

19.14.1.  FOR THE PURPOSES OF ANY SUIT, ACTION OR PROCEEDING INVOLVING THIS AGREEMENT, PURCHASER AND SELLER EACH HEREBY EXPRESSLY SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT AND PURCHASER AND SELLER EACH AGREE THAT SUCH COURT SHALL HAVE EXCLUSIVE JURISDICTION OVER ANY SUCH SUIT, ACTION OR PROCEEDING COMMENCED BY EITHER PARTY.

19.14.2. PURCHASER AND SELLER EACH HEREBY IRREVOCABLY WAIVE ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT BROUGHT IN ANY FEDERAL OR STATE COURT SITTING IN THE COUNTY OF NEW YORK IN THE STATE OF NEW YORK AND HEREBY FURTHER IRREVOCABLY WAIVE ANY CLAIM THAT ANY SUCH SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

19.14.3. THE PROVISIONS OF THIS SECTION SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT.

**SECTION 19.15.    No Recording**.  Purchaser covenants and agrees that it has no right and in no event will Purchaser record or cause to be recorded this Agreement or any memorandum hereof or affidavit, assignment or other document relating to this Agreement prior to the Closing and, if Purchaser breaches the provisions of this Section, Seller shall have the option of terminating this Agreement.  Notwithstanding anything in the Section to the contrary, Purchaser shall be able

to file and record a *lis pendens* if such is necessary to preserve its rights under this Agreement, including but not limited to in connection with an action for specific performance.

**SECTION 19.16.    Not an Offer**.  Notwithstanding anything herein to the contrary, it is to be strictly understood and agreed that (a) the submission by Seller to Purchaser of any drafts of this Agreement or any correspondence with respect thereto shall (i) be deemed submission solely for Purchaser's consideration and not for acceptance and execution, (ii) have no binding force or effect, (iii) not constitute an option for the purchase of the Property or a lease or conveyance of the Property by Seller to Purchaser and (iv) not confer upon Purchaser or any other party any title or estate in the Property, (b) the terms and conditions of this Agreement shall not be binding upon either party hereto in any way unless and until it is unconditionally executed and delivered by both parties in their respective sole and absolute discretion and all conditions precedent to the effectiveness thereof shall have been fulfilled or waived, and (c) if this Agreement is not so executed and delivered for any reason whatsoever (including, without limitation, either party's willful or other refusal to do so or bad faith), neither party shall be liable to the other with respect to this Agreement on account of any written or parole representations, negotiations, any legal or equitable theory (including, without limitation, part performance, promissory estoppel, or undue enrichment) or otherwise.

**SECTION 19.17.    Intentionally Omitted.**

**SECTION 19.18.    No Waiver**.  The failure of either party hereto to seek redress for any breach, or to insist upon the strict performance, of any covenant or condition of the Agreement by the other shall not be, or be deemed to be, a waiver of the breach or failure to perform (unless the time specified herein for the exercise of such right, or satisfaction of such condition, has expired), nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms hereof from constituting a default hereunder.

**SECTION 19.19.    Severability**.  If any term, condition or provision of this Agreement or the application thereof to any circumstance or party hereto, is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement and the applicability of such term, condition or provision to other persons or circumstances shall not be affected thereby. Each term, condition or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law.

**SECTION 19.20.    No Survival**.  The delivery and acceptance of the Deed(s) at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on Seller's part to be performed, and, except as expressly set forth in this Agreement, the representations, warranties, covenants or other obligations of Seller set forth in this Agreement shall not survive the Closing, and no action based thereon shall be commenced after the Closing.

**SECTION 19.21.    Tax-Free Exchange**.  Either party may, at its sole cost and expense, consummate the transaction as part of a like-kind exchange (the "**Exchange**") pursuant to Section 1031 of the Code, provided that: (i) the Exchange is effected through a qualified intermediary (as defined in Treas. Reg. Section 1.1031(k)-1(g)(4)(iii)) and the other party is not be required to: (A) acquire or hold title to any real property other than the Premises; or (B) incur any costs to third

parties (other than such party's obligation under this Agreement for the benefit of the qualified intermediary) for purposes of consummating, or otherwise in connection with, the Exchange. Each party shall reasonably cooperate with the other, at the other party's cost and expense, to effectuate the Exchange, including the execution of a trust or escrow agreement or any other document or instrument customarily entered into with a qualified intermediary to effectuate the Exchange, provided that the Exchange and the related documentation shall not be contrary to or inconsistent with the terms of this Agreement.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK.
SIGNATURES FOLLOW ON THE NEXT PAGE.**

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

SELLERS

**27 ST MARKS PLACE LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

**514 EAST 12TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

**223 EAST 5TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

**229 EAST 5TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

**231 EAST 5TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

**233 EAST 5TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:   Authorized Signatory

**235 EAST 5TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:   Authorized Signatory

**66 EAST 7TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:   Authorized Signatory

**253 EAST 10TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:   Authorized Signatory

**510 EAST 12TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:   Authorized Signatory

**228 EAST 6TH STREET LLC**,
a New York limited liability company

By: _____

Name:  David Goldwasser
Title:    Authorized Signatory

**325 EAST 12TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

**327 EAST 12TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

**329 EAST 12TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

**334 EAST 9TH STREET LLC**,
a New York limited liability company

By: _____
Name:  David Goldwasser
Title:    Authorized Signatory

PURCHASER

EVF1 LLC

By: _____
      Name:
      Title:

## SCHEDULE I TO PURCHASE AND SALE AGREEMENT

## DEFINITIONS

For all purposes of this Agreement, the following terms shall have the respective meanings specified below:

"**Affiliate**" means a Person that: (a) directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with a specified Person; (b) is a director or officer of a specified Person or of an Affiliate of such specified Person within the meaning of clause (a) above; (c) is a partner, member, beneficiary of a trust or other owner of any stock or other evidence of beneficial ownership in a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above; or (d) is related as an ancestor, descendant, sibling, or is the current spouse of a specified Person or an Affiliate of such specified Person within the meaning of clause (a) above.

"**Agreement**" means this Agreement, the Exhibits and Schedules and all amendments, modifications and extensions hereto and thereto.

"**Alternative Transaction**" shall have the meaning set forth in Section 17.2.1.

"**Apportionment Date**" shall have the meaning set forth in Section 4.1.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York.

"**Business Day**" means each day, except Saturdays, Sundays and all days observed by the federal government as legal holidays.

"**Closing**" shall have the meaning set forth in Section 8.1.

"**Closing Date**" shall have the meaning set forth in Section 8.1.

"**Closing Documents**" shall have the meaning set forth in Section 9.1.2.

"**Condemnation**" means any condemnation, taking or any damages to the interest in the Real Estate by reason of a change of grade of any street, road or avenue.

"**Confirmation Order**" means an order of the Bankruptcy Court confirming a plan of liquidation for the Seller.

"**Deed**" means the deed to the Real Estate to be delivered by Seller to Purchaser pursuant to Schedule IV.

"**Exchange**" shall have the meaning set forth in Section 18.21.

"**Governmental Authority**" shall have the meaning set forth in Section 3.3.8.

"**Hazardous Material**" shall mean all materials and substances now or hereafter subject to any Environmental Laws, including (i) all substances which are designated pursuant to Section 311(b)(2)(A) of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1251, et seq., (ii) any element, compound, mixture, solution, or substance which is designated pursuant to Section 102 of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., (iii) any hazardous waste having the characteristics which are identified under or listed pursuant to Section 3001 of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901, et seq., (iv) any toxic pollutant listed under Section 307(a) of FWPCA, (v) any hazardous air pollutant which is listed under Section 112 of the Clean Air Act, 42 U.S.C. § 7401, et seq., (vi) any imminently hazardous chemical substance or mixture with respect to which action has been taken pursuant to Section 7 of the Toxic Substances Control Act, 15 U.S.C. § 2601, et seq., (vii) "hazardous materials" within the meaning of the Hazardous Materials Transportation Act, 49 U.S.C. § 5101, et seq., (viii) any element or compound contained in the list of hazardous substances adopted by the United States Environmental Protection Agency ("EPA") or by the New York Department of Environmental Conservation ("DEC"), (ix) petroleum or petroleum by-products, (x) ACM, (xi) any radioactive material or substance, (xii) all toxic wastes, hazardous wastes and hazardous substances as defined by, used in, controlled by, or subject to all implementing regulations adopted and publications promulgated pursuant to the foregoing statutes, and (xiii) any other hazardous or toxic substance or pollutant identified in or regulated under any other applicable federal, state or local Environmental Laws.

"**Law**" means any law, rule, code, regulation, ordinance, moratorium, injunctive proceeding, restriction or similar matter imposed by any federal, state, municipal or local government or any public or quasi-public board, authority, commission, agency or department thereof having jurisdiction over the Property, or any portion thereof and/or Purchaser or Seller.

"**Leases**" shall mean the leases, licenses or other agreements, written or oral, regarding the right to use or occupy all or any portion of the Property, to which Seller is a party or by which Seller is bound of all or any portion of the Property.

"**Liens**" shall have the meaning set forth in Section 3.1.1.

"**Material Part**" shall have the meaning set forth in Section 13.2.

"**Net Proceeds**" shall have the meaning set forth in Section 3.1.1.

"**Non-Permitted Exceptions**" shall have the meaning set forth in Section 3.2.1.

"**Notices**" shall have the meaning set forth in Section 10.1.

"**Permitted Exceptions**" shall have the meaning set forth in Section 3.3.

"**Order**" shall mean, collectively, the Confirmation Order and the Sale Order.

"**Person**" means an individual, corporation, partnership, limited liability company, limited liability partnership, joint venture, association, joint stock company, trust, un-incorporated organization or the federal government or any state or local government or any agency or political subdivision thereof.

"**Personalty**" shall have the meaning set forth in Section 2.1.1.

"**Property**" shall have the meaning set forth in Section 2.1.1.

"**Properties**" shall have the meaning set forth in Section 2.1.1.

"**Property Contracts**" shall mean all management, service, telecommunications, information service, equipment, supply and maintenance contracts, construction contracts in connection with the Properties that exist on the Effective Date to which Seller is bound or a party to.

"**Purchase Price**" shall have the meaning set forth in Section 2.2.1.

"**Purchaser**" shall mean EVF1 LLC.

"**Purchaser-Related Parties**" means, individually and collectively, and to the extent applicable, (i) Purchaser, (ii) Affiliates of Purchaser, and (iii) the shareholders, officers, directors, employees, members and constituent partners of Purchaser and/or of any direct or indirect partner or member of or corporate joint-venturer with Purchaser, and/or of any Affiliate of Purchaser.

"**Real Estate**" shall have the meaning set forth in Section 2.1.1.

"**RE Tax Returns**" shall have the meaning set forth in Section 4.8.

"**Rents**" shall have the meaning set forth in Section 4.1.4.

"**Sale Order**" means an Order entered by the Bankruptcy Court pursuant to sections 105 and 363 of the Bankruptcy Code authorizing and approving, inter alia, the sale of the Property to Purchaser on the terms and conditions set forth herein, free and clear of all Liens and encumbrances other than Permitted Exceptions and as provided for in Section 4.12, and containing a finding that Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code, which Order, including exhibits and any amendments, modifications or supplements, shall be in form and substance acceptable to Purchaser.

"**Scheduled Closing Date**" shall have the meaning set forth in Section 8.1.

"**Seller**" shall have the meaning set forth in the Recitals.

"**Seller-Related Parties**" means individually and collectively, Seller and its officers, directors, members, employees, agents, representatives and contractors and Affiliates of Seller.

"**Tenant**" shall mean the then tenant under the Leases.

"**Title Company**" shall have the meaning set forth in Section 3.1.

"**Title Report**" means the Certificate of Title issued by the Title Company.

"**Transfer Taxes**" shall have the meaning set forth in Section 4.7.

"**<u>Unavoidable Delay</u>**" shall mean any delays due to strikes, acts of God, governmental restrictions, enemy action, civil commotion, fire, unavoidable casualty or other causes similarly beyond the control of Seller; provided, however, that any lack of funds shall not be deemed a cause beyond the control of Seller.

"**<u>Violations</u>**" shall have the meaning set forth in Section 3.3.8.

# SCHEDULE II

# PROPERTY DESCRIPTION

## SCHEDULE III

## SELLER'S WIRING INSTRUCTIONS



THE PRIVATE BANK

# FOR ESCROW/IOLA ONLY

**Account Information:**

| | |
|---|---|
| **Bank Name and Address:** | Wells Fargo Bank, N.A. |
| | 150 East 42nd Street, 35th Fl. |
| | New York, NY  10017 |
| **Account Name:** | **Robinson Brog Leinwand Greene Genovese & Gluck P.C.** |
| | **NY IOLA Attorney Escrow Account** |
| | |
| **Account Address:** | **875 Third Avenue, Fl. 9** |
| | **New York, NY 10022** |
| | |
| **Checking Account Number:** | **2000045708734** |

**To Send Wire Transfers into Your Account:**

Provide the sender with your account information above (Bank Name, Account Name) as well as the following:

**Checking Account Number:**          **2000045708734**
**Routing#:**                                    **121000248**
**For International Wires, the Wells Fargo* Swift Code:     WFBIUS6S**

**Your Relationship Contacts:**

Alyssa M. Goldstein, Private Banking Assoc.
Tel: (212) 214-6801, Alyssa.M.Goldstein@wellsfargo.com

Keith Frazier, Private Banking Assoc.
Tel: (212) 214-6802, Keith.Frazier@wellsfargo.com

## SCHEDULE IV

## CLOSING DOCUMENTS TO BE DELIVERED BY SELLER

1.      Statutory form of bargain and sale deed without covenants (the **"Deed"**) substantially in the form attached hereto as <u>Exhibit A</u> containing the covenant required by Section 13 of the Lien Law, and properly executed and acknowledged so as to convey the title required to be conveyed by Seller under this Agreement.

2.      Bank or certified check(s), payable to the direct order of the appropriate tax collecting agencies or officials, in the amount of all documentary stamp and transfer and transfer gains taxes, and other taxes, fees and charges, payable by reason of or in connection with the conveyance and transfer of the Property by Seller to Purchaser. In lieu of delivering such bank or certified checks, Seller may elect, by written notice to Purchaser given at least two (2) Business Days prior to Closing, to have Purchaser pay any of such taxes and charges and give Purchaser a credit on the Closing Date against the Purchase Price in the amount thereof.

3.      Copies of any required real property transfer tax returns properly executed and acknowledged by Seller and Purchaser, as applicable.

4.      All documents, as shall be reasonably necessary to evidence that Seller has proper authority to sell the Property and deliver the documents required to be delivered by Seller pursuant to this Agreement.

5.      All keys to entrance doors to, and equipment and utility rooms located in, the Property and in Seller's possession.

6.      A certificate of a duly authorized representative of Seller, sworn to under penalties of perjury, setting forth Seller's U.S. tax identification number and stating that Seller is a **"United States person"** within the meaning of Sections 1445(f)(3) and 7701(a)(30) of the Code.

7.      To the extent such are in the possession or control of Seller or its managing agent, original copies of all guarantees and warranties then in effect in respect of the Property.

8.      To the extent such are in the possession or control of Seller or its managing agent, original licenses and permits to be transferred hereunder, except to the extent the same are required to be and located at or are affixed of the Property.

9.      Certificate of an authorized representative of Seller with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Seller, if applicable.

10.     A Bill of Sale, without warranty, recourse or representation, conveying the Personalty to Purchaser substantially in the form attached hereto as <u>Exhibit B.</u>

11.     All existing surveys and building plans for the Property and the improvements thereon to the extent in Seller's possession.

12.     An Assignment and Assumption of Lease and Security Deposit, substantially in the form of <u>Exhibit C</u> attached hereto and made a part hereof, properly executed and acknowledged by Seller and Purchaser.

13.     All original Leases and tenant documents, to the extent in the possession of Seller. In the event such original lease files are not in the possession of Seller, a certified copy of all Leases.

14.     A certified Rent Roll in the form attached as Exhibit D, stating the rent amount paid as of such date, and all security deposits being held, and any arrears schedule.

15.     A certificate dated as of Closing, certifying that all of the representations and warranties made by Seller herein are true and correct in all material respects or, to the extent the facts and circumstances arising after the date hereof underlying such representations and warranties may have changed as of the Closing, Seller shall certify as to such changed facts and circumstances.

16.     Any Title Affidavit or similar document required by the Title Company required in order to deliver title to the Properties to Purchaser in the manner required by this Agreement.

## SCHEDULE V

## PURCHASER'S CLOSING DOCUMENTS

1.     Copies of any required real property transfer tax returns properly executed and acknowledged by Purchaser and Seller.

2.     All documents as shall be reasonably necessary to evidence that Purchaser has proper authority to purchase the Property and deliver the documents required to be delivered by Purchaser pursuant to this Agreement.

3.     Certificate of an authorized representative of Purchaser with respect to the authority of the person(s) executing this Agreement and the other Closing Documents on behalf of Purchaser.

4.     Certificate in form and substance reasonably acceptable to Seller, signed and acknowledged by an authorized representative of Purchaser, restating and attesting, except as otherwise permitted pursuant to the terms of this Agreement, to be true and correct as of the Closing Date each of the represents and warranties of Purchaser set forth in this Agreement.

5.     An Assignment and Assumption of Lease and Security Deposit, substantially in the form of Exhibit C attached hereto and made a part hereof, properly executed and acknowledged by Seller and Purchaser.

6.     A certificate dated as of Closing, certifying that all of the representations and warranties made by Purchaser herein are true and correct in all material respects or, to the extent the facts and circumstances arising after the date hereof underlying such representations and warranties may have changed as of the Closing, Purchaser shall certify as to such changed facts and circumstances.

## **EXHIBIT A**

## **DEED**

[See Attached]

## **Form of Bargain and Sale Deed**

WITHOUT COVENANT AGAINST GRANTOR'S ACTS

_____, a Delaware limited liability company

TO

_____,
a [_____]

ADDRESS:
BLOCK:
LOT:
COUNTY:

RETURN BY MAIL TO:

BARGAIN AND SALE DEED WITHOUT COVENANT AGAINST GRANTOR'S ACTS THIS INDENTURE, made as of this _____ day of _____, 2021

BETWEEN _____, a _____ limited liability company having an address _____ ("Seller")   party   of   the   first   part,   and   [_____],   a [_____], with offices at [_____], party of the second part,

WITNESSETH, that the party of the first part, in consideration of ten dollars and other valuable consideration paid by the party of the second part, does hereby grant and release unto the party of the second part, the heirs or successors and assigns of the party of the second party forever,

ALL that certain plot, piece or parcel of land, with the buildings and improvements thereon erected, situate, lying and being in the County of _____, City and State of New York, more commonly known as _____ and more particularly described on Exhibit A attached hereto and hereby made part hereof.

TOGETHER with all right, title and interest, if any, of the party of the first part in and to any streets and roads abutting the above described premises to the center lines thereof; TOGETHER with the appurtenances and all the estate and rights of the party of the first part in and to said premises;

TO HAVE AND TO HOLD the premises herein granted unto the party of the second part, the heirs or successors and assigns of the party of the second part forever.

AND the party of the first part, in compliance with Section 13 of the Lien Law, covenants that the party of the first part will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund to be applied first for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvement before using any part of the total of the same for any other purpose.  The word "party" shall be construed as if it read "parties" whenever the sense of this indenture so requires.

IN WITNESS WHEREOF, the party of the first part has duly executed this deed the day and year first above written.

_____,

By:    _____
      Name:
      Title:

STATE OF NEW YORK
COUNTY OF NEW YORK

On the _____ day of _____ in the year 2021 before me, the undersigned, a Notary Public in and for said State, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Signature and Office of individual taking
acknowledgement

**Exhibit A**

**Legal Description**

**EXHIBIT B**

**FORM OF BILL OF SALE**

[See attached]

KNOW ALL MEN BY THESE PRESENTS,

That, subject to the terms and conditions hereinafter set forth, forth between _____, a Delaware limited liability company having an address _____ ("Seller") for and in consideration of the sum of Ten Dollars ($10.00), lawful money of the United States, to it in hand paid at or before delivery of these presents by _____, a Delaware limited liability company having an address _____ ("Purchaser"), the receipt of which is hereby acknowledged, has bargained and sold, and by these presents does grant and convey unto Purchaser its successors and assigns all right, title and interest of Seller in and to all of the fixtures, equipment and other items of personal property (collectively, the "Personal Property") attached to, contained in, appurtenant to or utilized in connection with the ownership or operation of, the premises and the improvements thereon located at _____ NY ("Premises"), including, without limitation, the items listed on Schedule A attached hereto).

Seller grants, conveys and assigns the Personal Property unto Purchaser without recourse and without representation or warranty of any kind, express or implied (except to the extent set forth in the Purchase and Sale Agreement, dated as of _____ __, 2021, by and between Seller and Purchaser, and subject to the limitations contained therein).

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns forever.

SELLER HAS MADE NO WARRANTY THAT THE PERSONAL PROPERTY COVERED BY THIS BILL OF SALE IS MERCHANTABLE OR FIT FOR ANY PARTICULAR PURPOSE AND THE SAME IS SOLD IN AN "AS IS" "WHERE IS" CONDITION. BY ACCEPTANCE HEREOF, PURCHASER AFFIRMS THAT, EXCEPT AS SET FORTH IN THE AGREEMENT, IT HAS NOT RELIED ON ANY WARRANTY OF SELLER WITH RESPECT TO THE PERSONAL PROPERTY AND THAT, EXCEPT AS SET FORTH IN THE AGREEMENT, THERE ARE NO REPRESENTATIONS OR WARRANTEES, EXPRESSED, IMPLIED OR STATUTORY.

This Bill of Sale shall be governed by and construed in accordance with the laws of the State of New York.

This Bill of Sale shall be binding upon, enforceable by and shall inure to the benefit of the parties hereto and their respective successors and assigns.

[Signature page follows immediately]

IN WITNESS WHEREOF, Seller has caused this instrument to be duly executed this day of _____, 2021.

ASSIGNOR:

_____

By: _____
Name:

**EXHIBIT C**

**ASSIGNMENT AND ASSUMPTION OF LEASE AND SECURITY DEPOSIT**

[See attached]

## ASSIGNMENT OF AND ASSUMPTION OF
## LEASE AND SECURITY DEPOSIT

**THIS AGREEMENT**, made and entered into this ___ day of _____, 2021 between _____, ("**Assignor**") and _____, a New York ("**Assignee**").

## W I T N E S S E T H:

**WHEREAS**, pursuant to that certain Purchase and Sale Agreement, dated _____ __, 2021, between Assignor and Assignee (the "**PSA**"), Assignor has agreed to convey to Assignee, and Assignee has agreed to accept from Assignor, all of Assignor's right, title and interest in and to the real property, and the buildings and other improvements located thereon, owned by Assignor and commonly known by the address of _____.(the "**Premises**"); and

**WHEREAS**, Assignor desires to assign to Assignee all of Assignor's right, title and interest in and to the leases, tenancies, concessions, licenses and occupancies set forth on the rent roll attached hereto as Schedule A and made a part hereof (collectively, the "**Leases**"), on the terms and conditions hereinafter set forth; and Assignee desires to accept the assignment by Assignor of all of Assignor's right, title and interest in and to the Leases, on the terms and conditions hereinafter set forth, Assignee being willing to perform all duties and responsibilities of the lessor under the Lease as hereinafter set forth.  Assignor desires to assign to Assignee all of the outstanding rents owns ("**Arrears**"), and Assignee desires to assume all of the Arrears (the Arrears shall be set forth on the rent roll annexed hereto as Schedule A).

**NOW, THEREFORE**, in consideration of the mutual acts, obligations and covenants of the parties, one to the other, and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged by the parties, one to the other, it is mutually understood and agreed as follows:

**Assignment.**  Assignor hereby assigns, sets over and transfers the Leases to Assignee, its successors and assigns, together with all of Assignor's right, title, interest, duties and responsibilities under the Leases including, without limitation any arrears or other outstanding payments due thereunder.  Assignor shall indemnify Assignee against any liability and expense arising out of any breach by the lessor under the Leases occurring prior to the date hereof.

**Acceptance of Assignment.**  Assignee hereby accepts the within assignment by Assignor of the Leases and all of Assignor's right, title, interest, duties and responsibilities thereunder arising from and after the date hereof, and Assignee hereby covenants to assume and perform all duties and responsibilities of the lessor under the Leases to the extent arising from and after the date hereof.  Assignee shall indemnify Assignor against any liability and expense arising out of any breach by the lessor under the Leases occurring from and after the date hereof.

**Assignee's Acknowledgement of Receipt of Security Deposits and Indemnification Relating Thereto.**  Assignee hereby acknowledges that Assignee has received security deposits under the Leases in the aggregate amount of _____

{01089885.DOCX;2 }

_____/100s ($_____) Dollars (collectively, the "Security Deposits").  Assignee shall indemnify and save and hold Assignor harmless from and against any and all costs, losses, liabilities and expenses, including reasonable attorneys' fees, court costs and costs of collection, arising out of any breach by Assignee under the Leases respecting the lessor's duty to refund the Security Deposits or any part thereof, to lessees or any lessee under the Leases.

**Survival.**  This Agreement and all indemnifications hereunder shall survive closing of that certain purchase and sale transaction contemplated by the PSA.

**Binding Effect.**  This Agreement shall be binding upon the parties hereto, their successors and assigns.

**Modification.**  This Agreement may not be modified, revoked or amended other than in writing.

**Governing Law.**  This Agreement shall be governed by and in accordance with the laws of the State of New York.

        **IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement as of the date first above written.

                    **ASSIGNOR:**


                    _____.

                    By:_____
                        Name:
                        Title:


                    **ASSIGNEE:**


                    By:_____
                        Name:
                        Title:

## SCHEDULE A

**EXHIBIT D**

**RENT ROLL**

{01089885.DOCX;2 }

**EXHIBIT E**

**Intentionally Omitted**

**EXHIBIT F**

**Assumed Contracts**

None